## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PUBLIC SCHOOL TEACHERS' PENSION
AND RETIREMENT FUND OF CHICAGO,
on behalf of itself and all others similarly
situated,

      Plaintiff,

        - against -

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.; MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; BARCLAYS PLC;
BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS, S.A.; BNP
PARIBAS SECURITIES CORP.;
CITIGROUP, INC.; CITIBANK, N.A.;
CITIGROUP GLOBAL MARKETS INC.;
CITIGROUP GLOBAL MARKETS
LIMITED; CREDIT SUISSE AG; CREDIT
SUISSE GROUP AG; CREDIT SUISSE
SECURITIES (USA) LLC; CREDIT
SUISSE INTERNATIONAL; DEUTSCHE
BANK AG; DEUTSCHE BANK
SECURITIES INC.; THE GOLDMAN
SACHS GROUP, INC.; GOLDMAN,
SACHS & CO.; GOLDMAN SACHS BANK
USA; GOLDMAN SACHS FINANCIAL
MARKETS, LP; GOLDMAN SACHS
INTERNATIONAL; ICAP CAPITAL
MARKETS LLC; J.P. MORGAN CHASE &
CO.; J.P. MORGAN CHASE BANK, N.A.;
J.P. MORGAN SECURITIES LLC; J.P.
MORGAN SECURITIES PLC; THE ROYAL
BANK OF SCOTLAND GROUP PLC;
ROYAL BANK OF SCOTLAND PLC; RBS
SECURITIES INC.; TRADEWEB
MARKETS LLC; UBS AG; AND UBS
SECURITIES LLC,

      Defendants.

No. 15 Civ. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE .................................................................................9

PARTIES ...................................................................................................................10

    A.    Plaintiff ......................................................................................................10

    B.    Defendants ................................................................................................10

THE MARKET FOR INTEREST RATE SWAPS ..................................................18

    A.    Interest Rate Swaps Generally ................................................................18

    B.    The Over-the-Counter "Retail" Side of the Market Contrasts Sharply with the Exchange-Like "Wholesale" Side of the Market ..............................20

FACTUAL ALLEGATIONS REGARDING DEFENDANTS' CONSPIRACY ......24

I.    DEFENDANTS' CONSPIRACY TO BLOCK SWAP EXECUTION FACILITIES AND EXCHANGE-LIKE TRADING PLATFORMS FROM ENTERING THE MARKET ......................................................................24

    A.    The Defendants Boycotted Any Entrant Swap Execution Facilities that Offered All-To-All Trading ......................................................................27

        1.    The Dealer Defendants boycotted Javelin ...............................28

        2.    The Dealer Defendants boycotted TrueEX ...............................29

        3.    The Dealer Defendants boycotted TeraExchange ....................31

        4.    The Dealer Defendants' boycotts chilled market progress ......33

    B.    The Dealer Defendants Police Market Bifurcation Through "Name Give-Up" ...........................................................................................................35

        1.    "Name give-up" is an effective deterrent to buy-side participation on exchanges, or the creation of platforms allowing that to take place ......................................................................................35

        2.    There is no non-conspiratorial justification for the continued prevalence of "name give-up" ..................................................38

        3.    "Name give-up" continues only because of Defendants' (highly effective) conspiracy ............................................................40

C.      The Dealer Defendants Threaten to Cut Off Clearing Services for Buy-Side Firms Who Try to Make Markets on Swap Execution Facilities .................44

II.     THE DEALER DEFENDANTS' SUCCESS IN THWARTING RECENT MARKET ENTRANTS IS DUE TO THEIR TIGHT CONTROL OF THE INTEREST RATE SWAPS MARKET ........................................................................46

A.      The Dealer Defendants Collectively Ensured that Tradeweb Would Not Offer Exchange-Like Features ..............................................................51

B.      Defendants Agreed with ICAP to Not Open Up Exchange-Like Platforms to the Buy-Side — And Pressured Other Interdealer Brokers to Do the Same..............................................................................................................55

C.      The Dealer Defendants Collectively Gained Control of a Key Clearinghouse (LCH.Clearnet) to Ensure It Did Not Collapse the Bifurcation of the Market.......................................................................58

D.      The Dealer Defendants Collectively Boycotted Swapstream, a Clearinghouse That Threatened to Improve the Market .......................................63

III.    ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE EFFICIENT AND TRANSPARENT FOR THE BUY-SIDE..........................................................................................................................65

A.      The Dealer Defendants' Substantial Market Power....................................65

B.      Defendants' Conspiracy Has Negatively Impacted the Market............................66

C.      Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes...........................................73

D.      Investigations and Litigation Concerning the Credit Default Swaps Market Show That the Dealer Defendants Collude to Block Exchange Trading..............75

EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ...................................79

CLASS ACTION ALLEGATIONS .....................................................................................82

CAUSES OF ACTION ..........................................................................................................85

FIRST CAUSE OF ACTION (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act) ........................................................................................................85

SECOND CAUSE OF ACTION (Unjust Enrichment) ...........................................................86

PRAYER FOR RELIEF .........................................................................................................86

JURY DEMAND ........................................................................................................................88

Plaintiff Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all persons and entities who, during the period of January 1, 2008, through the present, entered into interest rate swaps transactions with Defendants in the United States, brings this antitrust class action for treble damages and injunctive relief and alleges as follows:

<u>**OVERVIEW OF THE ACTION**</u>

1.        Interest rate swaps ("IRS") are an important financial tool used by an array of investors in the United States and worldwide.  IRS allow investors, including the Plaintiff and other pension funds, university endowment funds, corporations, insurance companies, and municipalities (*i.e.*, members of the proposed class here), to manage risk and protect themselves from rising interest rates.  IRS comprise one of the largest financial markets with billions of dollars in swaps being traded each day.

2.        This case concerns a conspiracy among the major banks who act as "dealers" or "market makers" in the IRS market (the "Dealer Defendants"[1]).  For years, IRS have been standardized and ripe for exchange trading.  Yet buy-side investors continue to be unable to trade IRS on exchanges.  Instead, they remain stuck trading IRS in an inefficient and antiquated market dominated by the Dealer Defendants.

3.        As alleged herein, this state of affairs is the result of the Dealer Defendants' conspiring to prevent buy-side investors (also called "end users") from enjoying the critical benefits of exchange trading, including transparent and competitive pricing and faster execution. The Dealer Defendants did this for one simple reason:  to preserve an extraordinary profit center. By blocking the entry of exchanges into the IRS market, the Dealer Defendants force the buy-

---

[1]   As defined more fully below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, RBS, and UBS.

side to trade with them in an opaque and inefficient over-the-counter ("OTC") market in which the Dealer Defendants hold all the cards.[2]  By conspiring to keep the buy-side off IRS exchanges, the Dealer Defendants have been able to extract billions of dollars in monopoly rents, year after year, from the class members in this case.

4.      The most common type of IRS is an agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time.  In the most common (or "plain vanilla") swap, one party pays a fixed rate to a receiving counterparty who, in return, pays a floating rate based on a benchmark.  Typically, a party is described as either "paying" or "receiving" the fixed rate in exchange for the floating rate.  This arrangement permits an investor to mitigate the risk of changes in interest rates or to speculate on the future movement of interest rates.

5.      The Dealer Defendants have historically acted as market makers (or "dealers") in the OTC market, meaning one of them was typically on one side of every IRS trade.  In the OTC market, IRS investors must request a quote from one or more of the Dealer Defendants.  While investors could obtain quotes from more than one dealer, they could only negotiate a final actionable price — which has to be accepted on the spot — with one dealer at a time.  This outdated form of trading does not allow for competitive price shopping by customers, and it denies the buy-side immediate execution and access to real-time price information.

6.      In such a market, the deck is stacked against the end user (class members here).  As a result of the lack of price transparency and limited direct price competition, the Dealer

---

[2]  *See, e.g.*, Michael J. Moore, *JPMorgan Says Credit, Swaps Among Trading Revenue Leaders*, BLOOMBERG (Feb. 28, 2012), http://www.bloomberg.com/news/articles/2012-02-28/jpmorgan-says-credit-swaps-lead-trading-revenue-sources-in-rare-breakdown (noting that JP Morgan had revenues of $350 million from IRS trading in a "typical quarter" in 2012).

Defendants were able to buy IRS lower and sell IRS higher than they would have been able to in a competitive market where prices are streamed to end-users in real-time on an electronic platform. Through their collusive control of the IRS market, the Dealer Defendants, in effect, extracted monopoly rents from the buy-side in the form of inflated bid/ask "spreads."

7.  Absent collusion, the lack of transparency and limited price competition that pervades the IRS market would have disappeared long ago. Because of the benefits of transparency, competitive pricing, and immediacy, markets for financial products historically move to exchange-trading platforms soon after the products become sufficiently standardized and liquid. Because of its maturity, size, and high-level of standardization, the IRS market has long been primed for exchange trading.

8.  In fact, the Dealer Defendants themselves trade IRS with each other on electronic, exchange-like platforms. But they have made sure that *only the dealers* are allowed to trade IRS on these platforms. Thus, even as they enjoyed the benefits of exchange trading among themselves, the Dealer Defendants were able to deny those benefits to their customers.

9.  Pursuant to their conspiracy, the Dealer Defendants met and agreed to work together to maintain the bifurcated market for trading IRS. They agreed to squash every potential market entrant that threatened to bring competition and transparency to the IRS market. Since at least 2007, as detailed herein, the Dealer Defendants have jointly threatened, boycotted, coerced, and otherwise eliminated any entity or practice that had the potential to bring exchange trading to buy-side investors in the IRS market.

10.  More recently, the Dealer Defendants boycotted potential market entrants known as Swap Execution Facilities, or "SEFs," which are exchange-like trading platforms. In the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or the

"Dodd-Frank Act"), Congress sought to bring more competition to derivatives markets, including the IRS market.  Dodd-Frank mandates, for example, that standard IRS move to exchanges or SEFs with central clearing.  But the Dealer Defendants have, through coordinated action, made sure that no new entrants emerge to bring any of the benefits of exchange trading to the market.

11.     Working together, the Dealer Defendants coerced the SEFs that entered the market to allow only a Request for Quote ("RFQ") trading method.  This stopped the buy-side from experiencing the true benefits of exchange trading because RFQ, which requires the end user to "request a quote" from a dealer, is the functional equivalent of transacting OTC.  As the General Counsel of Defendant Tradeweb Markets LLC ("Tradeweb"),[3] Douglas Friedman, candidly conceded at a recent industry conference,[4] even after SEFs entered the market, the "mode of execution has largely stayed the same" for investors seeking to trade in IRS.

12.     Similarly, Larry Tabb, the Founder and CEO of the TABB Group, a market research firm, recently described the market for IRS at the same conference as "basically the same two-tiered market of before [Dodd Frank] with a greater percentage of the market cleared."  Michael Koegler, Managing Director at Javelin Capital Markets, LLC ("Javelin"), a SEF operator, has similarly observed:  "Almost all of the [dealer-to-client] business being done in the

---

[3]   As described more fully below, Tradeweb is a provider of trading services for IRS, credit default swaps, and other asset classes.

[4]   The conference, "SEFCON," is an annual industry event featuring panels composed of representatives from SEFs, dealers, buy-side firms, and government regulators.  All references to "SEFCON" herein are to "SEFCON VI," which was held on October 26, 2015 at the Waldorf Astoria hotel in New York City.  Plaintiff's counsel attended the conference, and all quotes attributed to SEFCON speakers and participants are direct quotes that were made during speeches or panel discussions.

market is happening via RFQ which is essentially ***business as usual***."[5]  And Will Rhode, Director of Fixed-Income Research at Tabb Group LLC noted in 2014 that "[t]he walls are not coming down."[6]

13.     The Dealer Defendants' collusion is responsible for business as usual prevailing in the IRS market.  As representatives of the Dealer Defendants have acknowledged, they "want[ed] desperately to preserve the status quo" so as to protect the extraordinary profits they made on IRS.[7]  The Dealer Defendants were driven to block entry of exchanges because it was the only way they could protect their control over the lucrative IRS market.

14.     Any SEFs that tried to break the Defendants' RFQ-only rule were met with a collective boycott.  Borrowing a hockey metaphor, the Dealer Defendants would put in the "penalty box" any market participant who stepped out of line.  As just one example, when an interdealer SEF "run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform."[8]  GFI promptly reversed course.

15.     The Dealer Defendants also jointly agreed to boycott other SEFs that took steps to permit the buy-side to trade IRS on electronic platforms outside of the Dealer Defendants' control.  These SEFs include, among others, Javelin, TrueEX Group LLC ("TrueEX"), and TeraExchange — the three market entrants that dared to attempt to "loosen[] the stranglehold

---

[5]   Jesse Colin, *SEF NY Interview: Michael Koegler, Managing Director, Javelin Capital Markets*, TOTAL ASSET (Aug. 18, 2014), http://blogs.terrapinn.com/total-asset/2014/08/18/sef-ny-interview-michael-koegler-managing-director-javelin-capital-markets/ (emphasis added).

[6]   Matthew Leising, *Swaps Revolution Falling Flat as Brokers Keep Grip on New Market*, BLOOMBERG (Mar. 4, 2014), http://www.bloomberg.com/news/articles/2014-03-05/swaps-revolution-falling-flat-as-brokers-keep-grip-on-new-market.

[7]   Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

[8]   *Id.*

that the [Dealer Defendants] have on the multi-trillion dollar [IRS] market"[9]  Each of these new entrants offered the buy-side the same type of exchange-trading options the Dealer Defendants themselves enjoy.  And each, in turn, was boycotted by the Dealer Defendants.

16.     To police the threat from exchange trading, the Dealer Defendants force every SEF in the market to use a protocol called "name give-up."  This requires the disclosure of the identity of each swap counterparty to the other on every trade.  As discussed below, whatever justification there may have been for name give-up in the past, it has been removed with the advent of central clearing of IRS, which removes all counterparty risk.[10]  The sole remaining purpose of name give-up is so the Dealer Defendants can collectively ensure that no buy-side investor is trading IRS on the inter-dealer platforms.  Any SEF that steps out of line is put in the penalty box, or (in the case of some SEFs) is put out of business entirely.

17.     The Dealer Defendants implemented their conspiracy through several collusive structures.  For example, many Dealer Defendants have divisions organized for the *very purpose* of devising business strategies that are beneficial to the "dealer community" as a whole.  Personnel in these secretive divisions form strategies to keep markets frozen in an inefficient OTC-like structure.  They then collude with their counterparts at other Dealer Defendants to formulate and execute strategies that ensure that they — and only they — control the market.

18.     Often, the Dealer Defendants effected their conspiracy through "projects" given codenames — including, as relevant here, "Colin," "Fusion," "Lily," and "Valkyrie."  The

---

[9]   *Id.*

[10]   A clearinghouse is an entity that operates as an intermediary to a trade.  When two parties enter into an IRS contract, the clearinghouse stands in the middle of the contract, acting as the buyer to the seller and as the seller to the buyer.  This centralizes all counterparty risk.  Thus, if one counterparty defaults, the other counterparty still maintains the advantage of the IRS contract because its counterparty is actually the clearinghouse, a facility with a large default fund designed to handle such defaults.

Dealer Defendants also met frequently under the auspices of various consortiums, boards, committees, and "market utilities," including SEFs, to which they belong or which they formed in part to facilitate collusion.  For instance, as detailed below, Tradeweb is a forum many of the Dealer Defendants have used for years to meet and discuss their shared goal of maintaining the bifurcated IRS market.[11]  All of the Dealer Defendants (except BNP Paribas) hold equity stakes in Tradeweb, and they installed their own employees on its board of directors and various "governance" committees throughout the class period.

19.     To cement their control of the market, the Dealer Defendants have also conspired to ensure that interdealer brokers, or "IDBs," do not open their trading platforms to end users. IDBs have long operated IRS trading platforms with exchange-like features.  But they only allow dealer-to-dealer transactions.  If an IDB were to allow end-users access to the dealer-only platforms, the bifurcation of the market desired by the Dealer Defendants would have collapsed long ago.  But the Dealer Defendants made sure that any IDB that dared to consider opening its platform to the buy-side was put in the "penalty box" and blackballed.

20.     The Dealer Defendants also worked collectively to neutralize the nascent threat posed by vertical integration of IRS clearinghouses.  Clearinghouses are another part of the infrastructure in the financial marketplace and process a high volume of IRS transactions.  The Dealer Defendants recognized that, if allowed to act in their own economic self-interest, clearinghouses could potentially expand to both clear *and trade* IRS on an exchange-based trading platform.  To prevent this, the Dealer Defendants jointly neutralized the potential threat from a leading clearinghouse (LCH.Clearnet) that was threatening to develop a vertically

---

[11]  Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL STREET & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

integrated exchange.  As more fully set forth below, they did so by assuming control of LCH.Clearnet and making sure it did not develop an execution platform and by collectively boycotting other clearinghouses they perceived as a threat.

21.     The Dealer Defendants also use punitively high clearing fees and threats to cut off clearing and other services to punish buy-side firms that they perceive as trying to compete with them by making markets on SEFs.  For example, and as more fully set forth below, when two buy-side entities successfully completed the first IRS trade on TeraExchange's all-to-all platform in 2013, the clearing affiliate of BNP Paribas notified its execution office, which then threatened the two buy-side entities with loss of access to clearing and other services.

22.     As a result of Defendants' collusion, the IRS market has not progressed in the manner that financial markets typically do.  The Dealer Defendants have instead collectively kept it frozen in time for their own selfish purposes.  In fact, many believe the IRS market is *worse* today than it was in 2008.  Yet, because Defendants' conspiracy to maintain a bifurcated market is not expressly prohibited by Dodd-Frank, the Commodity Futures Trading Commission ("CFTC"), the Dodd Frank Act's primary enforcer with respect to the swaps market, is unable to address the anticompetitive harms described herein.  As CFTC Chairman Massad recently explained, the CFTC has no plans to address name give-up, and Dodd-Frank "doesn't specifically go to the wholesale versus retail distinction."[12]  Defendants' conspiracy is, however, prohibited by the Sherman Act whose applicability was expressly preserved by Congress.[13]

---

[12]  FINANCIAL TIMES, *CFTC Not Planning on Anonymity for Swaps Market* (Oct. 27, 2015), http://www.ft.com/fastft/414101/us-swaps-market.  The IRS market is sometimes described as bifurcated into "wholesale" (dealer-to-dealer) and "retail" (dealer-to-client) divisions.

[13]  *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws,

## JURISDICTION AND VENUE

23.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees,

against Defendants for the injuries to Plaintiff and the Class, alleged herein, arising from

Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and

16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and

1337(a).

25.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as

pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the

Defendants resided, transacted business, were found, or had agents in this District; a substantial

part of the events or omissions giving rise to these claims occurred in this District; and a

substantial portion of the affected interstate trade and commerce discussed herein was carried out

in this District.

26.     Defendants' activities, and those of their co-conspirators, were within the flow of,

were intended to, and had a substantial effect on interstate commerce.

27.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many

Defendants are subject to personal jurisdiction in the United States because they, as set forth

below, were formed in or have their principal places of business in the United States.  In

addition, all members of the conspiracy are subject to personal jurisdiction in the United States

because the conspiracy was directed at, carried out in substantial part in, and had the intended

---

unless otherwise specified."); *see also* H.R. Rep. No. E1347-01 (2010) (Conf. Rep.) (statement
of Rep. Conyers, Jr.), 2010 WL 2788137 ("The final bill contains a number of provisions to
ensure that the antitrust laws remain fully in effect.").

effect of, causing injury to Plaintiff and Class Members residing in, located in, or doing business throughout the United States. For example, and as set forth more fully below, the Defendants directly conspired at Tradeweb Board of Directors meetings in Miami and elsewhere.

28.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. The IRS at issue in this action — which, indeed, often included a contractual clause submitting the parties to jurisdiction in this District — were regularly traded through desks at the major sell-side banks located in New York.

<strong><u>PARTIES</u></strong>

### A.     <u>Plaintiff</u>

29.     Established by the Illinois state legislature in 1895, the Public School Teachers' Pension and Retirement Fund of Chicago (also, the "Chicago Teachers' Pension Fund" or "CTPF") is the administrator of a defined benefit public employee retirement system providing retirement, survivor, and disability benefits for certain certified teachers and employees of the Chicago Public Schools. During the class period, CTPF entered into IRS transactions directly with multiple Dealer Defendants.

### B.     <u>Defendants</u>

30.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

31.     Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte,

North Carolina.  Defendant Bank of America, N.A. ("BANA") is a federally chartered national

banking association with its principal place of business in Charlotte, North Carolina, and branch

locations in New York, New York.  BANA is a wholly owned subsidiary of BAC.  On January 1,

2009, Bank of America acquired Merrill Lynch & Co., Inc.  Defendant Merrill Lynch, Pierce,

Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws

of the State of Delaware with its principal place of business in New York, New York.  MLPFS is

a wholly owned subsidiary of BAC.  In addition, MLPFS is registered as a broker-dealer with the

U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant

("FCM") with the CFTC.

  32.  As used herein, the term "Bank of America" includes Defendants BAC, BANA,

MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch

Bank USA, that entered into IRS contracts with the Class, including as a dealer.  During the

Class Period, Bank of America directly sold IRS to and bought IRS from Class Members.

During the Class Period, Bank of America was a shareholder of Tradeweb.

  33.  Defendant Barclays PLC is a corporation organized and existing under the laws of

England and Wales, with its principal place of business in London, England.  Defendant

Barclays Bank PLC is a corporation organized and existing under the laws of England and

Wales, with its principal place of business in London, England and branch locations in New

York, New York.  Defendant Barclays Capital Inc. is a corporation organized and existing under

the laws of the State of Connecticut, with its principal place of business in New York, New

York, and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly

owned subsidiary of Barclays Bank PLC.  In addition, Barclays Capital Inc. is registered as a

broker-dealer with the SEC, and as an FCM with the CFTC.

34.     As used herein, the term "Barclays" includes Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Barclays Bank PLC maintains a New York branch.  Barclays transacts business in New York, New York.  During the Class Period, Barclays directly sold IRS to and bought IRS from Class Members.  During the Class Period, Barclays was a shareholder of Tradeweb.

35.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of the France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch.  Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA.  In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

36.     As used herein, the term "BNPP" includes Defendant BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  BNPP transacts business in New York, New York.  During the Class Period, BNPP directly sold IRS to and bought IRS from Class Members.

37.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.  Defendant Citigroup Global Markets Inc. is a corporation organized and

existing under the laws of the State of New York, with its principal place of business in New

York, New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose

ultimate parent is Citigroup.  In addition, Citigroup Global Markets Inc. is registered as a broker-

dealer with the SEC, and as an FCM with the CFTC.  Defendant Citigroup Global Markets

Limited is a corporation organized and existing under the laws of England and Wales, with its

principal place of business in London, England.

       38.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank,

Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citigroup Global Markets

Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that

entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Citi

directly sold IRS to and bought IRS from Class Members.  During the Class Period, Citi was a

shareholder of Tradeweb.

       39.     Defendant Credit Suisse Group AG is a corporation organized and existing under

the laws of Switzerland with its principal place of business in Zurich, Switzerland.  Defendant

Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its

principal place of business in Zurich, Switzerland, and it maintains a New York, New York

branch.  Defendant Credit Suisse International is a bank organized and existing under the laws of

England and Wales, with its principal place of business in London, England.  Defendant Credit

Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State

of Delaware with its principal place of business in New York, New York, and is a wholly owned

subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG.  In

addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and

as an FCM with the CFTC.

13

40.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Credit Suisse transacts business in New York, New York.  During the Class Period, Credit Suisse directly sold IRS to and bought IRS from Class Members.  During the Class Period, Credit Suisse was a shareholder of Tradeweb.

41.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany.  Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG.  In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

42.     As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Deutsche Bank directly sold IRS to and bought IRS from Class Members.  Deutsche Bank transacts business in New York, New York, and maintains a New York branch.  During the Class Period, Deutsche Bank was a shareholder of Tradeweb.

43.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of

14

business in New York, New York.  In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Goldman Sachs Bank USA is a New York state-chartered bank and a member of the Federal Reserve's system, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group.  Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group.  Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Goldman Sachs Group.

44.    As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Goldman Sachs directly sold IRS to and bought IRS from Class Members.  During the Class Period, Goldman Sachs was a shareholder of Tradeweb.

45.    Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York.  Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary

of JPMorgan Chase & Co.  In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co.

46.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc; and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, JP Morgan directly sold IRS to and bought IRS from Class Members.  During the Class Period, JP Morgan was a shareholder of Tradeweb.

47.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut. Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC.  In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

48.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  RBS PLC maintains a New York branch.  RBS transacts business in New York, New York.  During the Class Period, RBS directly sold IRS to and bought IRS from Class Members.  During the Class Period, RBS was a shareholder of Tradeweb.

16

49.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.  Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of UBS AG.  In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

50.     As used herein, the term "UBS" includes Defendant UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  UBS maintains a New York branch and transacts business in New York, New York.  During the Class Period, UBS directly sold IRS to and bought IRS from Class Members.  During the Class Period, UBS was a shareholder of Tradeweb.

51.     Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities.  In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers.  As explained below, ICAP agreed with the Dealer Defendants that it would not allow its platform to be accessed by the buy-side of the IRS market.

52.     Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  As used herein, the term "Tradeweb" includes Tradeweb

Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS, CDS, and other asset classes. Tradeweb's historical focus has been on providing electronic trading services in the dealer-to-client side of the market. Tradeweb is jointly owned by Thomson Reuters and a consortium of Wall Street Dealers (the Dealer Defendants other than BNPP).[14] The Dealer Defendants exercise control over Tradeweb. As explained below, at all times relevant to the allegations set forth herein, the Dealer Defendants took control of Tradeweb to prevent it from developing an all-to-all platform for IRS that would collapse the artificial bifurcation the Dealer Defendants have collectively imposed, and further used their joint control of it as a pretext to coordinate other acts of the conspiracy.

## THE MARKET FOR INTEREST RATE SWAPS

### A.      Interest Rate Swaps Generally

53.      An IRS is a type of derivative. It is an agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time. The notional principal amount is the specified amount on which the exchanged interest payments are based. The value of the contract to each side moves (in opposite directions) depending on changes in prevailing interest rates. While an IRS can involve any combination of rates in any currency, the most common swaps, often referred to as "plain vanilla swaps," are those in which one counterparty pays the other a fixed rate in exchange for a floating rate.[15] The floating rate is often, but not always, based on the London interbank offered rate ("LIBOR"). In the context of a plain vanilla swap, the counterparty paying a fixed rate is typically referred to as

---

[14]      Schmerken, *supra* note 11.

[15]      *See* HOWARD CORB, INTEREST RATE SWAPS AND OTHER DERIVATIVES 4 (2012).

the "buyer," while the counterparty making payments on the floating rate is known as the "seller."[16]

54.     When the market for IRS began, IRS trading was largely *ad hoc*.  Dealers intermediated trades and did not make markets in IRS.  Also IRS were not standardized, meaning that counterparties had to negotiate and then document each IRS trade.  IRS trading thus involved high transaction costs.

55.     Because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of corporations and financial institutions.[17]  End users also began to use IRS to speculate about interest-rate movements.[18]  Consequently, the IRS market has grown exponentially over the last three decades.

56.     By way of example, in 2006 the outstanding notional value of IRS was $230 trillion.  By 2014 that amount had increased to $381 trillion, representing 75% of all types of interest-rate derivatives.  In April 2013 the IRS market saw approximately $1.4 trillion of notional value turn over on a *daily* basis.  IRS are traded in many currencies, but, as shown in the below chart, trades in USD and EUR make up approximately two-thirds of the market.

---

[16]   Despite the use of such terms, in terms of describing the market participants, regardless of which side of the swap is being entered into by which party, the Dealer Defendants represent the "sell side" of the market, while non-dealers represent the "buy-side" of the market.

[17]   *See* CORB, *supra* note 15, at 2 n.2; FINANCIAL CRISIS INQUIRY COMMISSION, PRELIMINARY STAFF REPORT — OVERVIEW ON DERIVATIVES (2010), http://citeseerx.ist.psu.edu/ viewdoc/download;jsessionid=CDAEABCFE48A12FFD156C343B 27A5D1B?doi=10.1.1.175. 940&rep=rep1&type=pdf.

[18]   *See id.*



57.     By no later than 2000, IRS had become highly standardized, resulting in lower transaction costs and higher volumes.  All of the material terms of IRS — the tenor, the fixed rate, the benchmark rates used to calculate floating payments, and the timing of payments — have been standard across IRS for many years.  A driving force in this standardization was the 1987 ISDA Master Agreement, which created standard form agreements for IRS.  The ISDA Master Agreement was significantly revised and updated in 1992 and 2002.

**B.      The Over-the-Counter "Retail" Side of the Market Contrasts Sharply with the Exchange-Like "Wholesale" Side of the Market**

58.     As demand for IRS increased, dealers emerged as market makers, continually offering prices to both potential buyers and sellers of IRS.  They are now referred to as the "sell-side" of the market.  The sell-side makes markets in IRS by offering both fixed and floating-rate cash flows to end users.  Their customers, the end users in the market (Plaintiff and the Class here), are the buyers and sellers of IRS who receive prices quoted by the market-making dealers.

Over time, end users have become known as the "buy-side," and the two terms are used interchangeably herein.

59.     IRS trading typically works as follows:  A buy-side entity asks a dealer for a quote either (1) to pay the floating rate and receive a fixed rate or (2) to pay the fixed rate and receive a floating rate.  The rate at which the dealer will pay the fixed rate is known as the "bid," and the rate at which it will receive the fixed rate is known as the "offer" or the "ask."  For instance, a five-year IRS may be quoted by a dealer at a bid of 25 and an ask of 30, meaning that the dealer will either pay the fixed rate at a 25 basis-point premium above the five-year U.S. Treasury yield, or receive the fixed rate payments at a 30 basis-point premium above the five-year U.S. Treasury yield.  The floating rate in either case is typically based on LIBOR or another benchmark rate.  The fixed rate is the primary term that is subject to negotiation when entering into an IRS trade.  A buy-side entity that is seeking to pay the floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed rate.  A buy-side entity seeking to pay the fixed rate and receive the floating rate will pay the "ask" or "offer" price quoted by a dealer for the fixed rate.

60.     The Dealer Defendants profit by paying low on fixed rates (*i.e.*, the bid price) and receiving higher fixed rates (*i.e.*, ask or offer price).  This difference is known as the "bid/ask spread" or the "spread."  The wider the spread, the more money the Dealer Defendants make.[19] The mid-point of the spread is generally known as the mid-market price.

61.     Historically, the IRS market was an OTC market, meaning that an entity seeking to enter into an IRS had to call up various market-making dealers in hopes of finding a counterparty with which to trade.  A buy-side end user could only call up a limited number of

---

[19]     *See* DARRELL DUFFIE, DARK MARKETS 5 (2012).

dealers, and there was no way to know how long a price offered by a dealer would remain open and executable. This OTC process was inefficient and did not allow end users to shop around, which would have put the dealers in direct competition. As a result, in the IRS OTC market there was no price transparency and little competitive pricing.[20]

62. This is not, however, how IRS dealers traded with each other. When dealers wanted to lay off risk on other dealers, they traded on platforms that came to be known as IDBs. These platforms were very different from the inefficient OTC trading mechanism to which the Defendants Dealers relegated their end-user customers. In sharp contrast with the OTC "retail" side of the market, the "wholesale" dealer-only IDB side of the market has long been characterized by the pervasive use of exclusive dealer-only exchange-like platforms that offer immediate execution at or close to the mid-market price.

63. Dealers submit their bid and ask prices to an IDB, which then publicizes those quotes, making them viewable to and executable by other dealers. A dealer can view multiple simultaneous quotes on an IDB platform, and can immediately enter into an IRS contract at the quoted price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price.

64. On an IDB platform, the dealers' identities are concealed from one another until they agree to enter into a trade. As many IRS products have been standardized for many years, IDBs utilize exchange-like platforms known as "order books," "central limit order books," or "CLOBs," which automatically match the best bids and offers on an anonymous basis. Because IDB platforms allow dealers to view and choose from numerous bid and offer prices, in sharp

---

20  *See* DUFFIE, *supra* note 19, at 1 (In the OTC market, end users are "ignoran[t] of the prices currently available from other potential counterparties and [have] limited knowledge of trades recently negotiated elsewhere in the market.").

contrast to the OTC "retail" side of the market, dealers trade with each other at or close to mid-market prices.

65.    This competitive price transparency in the dealer-to-dealer market further benefitted the Dealer Defendants because at the same time they provided bids and asks to the buy-side, they could simultaneously see the true mid-market prices available in the interdealer market.

66.    As noted above, in an OTC market, dealers serve as the primary market makers, quoting prices at which they will buy (the "bid") or sell (the "offer" or "ask") to end users or other dealers.[21]  Trading is not centralized, and dealers typically convey their "take-it-or-leave-it" quotes and enter into swaps with end users over the telephone or via a Bloomberg chat.[22]  "Prices and allocations in OTC markets are to varying extents influenced by opaqueness and by the role of intermediating brokers and dealers."[23]

67.    While originally traded OTC, more recently IRS have come to be traded on RFQ platforms, which are just an extension of the OTC marketplace.  On an RFQ, an end user can request quotes from several dealers at once.  Typically, the quotes provided are not live (or executable), and the end user must then, as in the OTC market, contact the dealer over the telephone or via Bloomberg chat to obtain a live price and formalize the swap.

68.    In contrast, a CLOB, such as that used by IDBs, is a centralized electronic platform on which all market participants can post bids and offers anonymously.  The platform then disseminates these quotes to all market participants, thereby exposing parties to the best

---

[21]    *See* FINANCIAL CRISIS INQUIRY COMMISSION, *supra* note 17.

[22]    DUFFIE, *supra* note 19, at 1.

[23]    *Id.*

prices in the market, who can then sell or buy at the quoted prices or make counteroffers.  As discussed in detail below, the introduction of CLOB trading brings pricing transparency to the marketplace,[24] typically resulting in a narrowing of bid/ask spreads.

69.    Because of the standardization of IRS and increased liquidity, the entire market should have moved to trading on exchange-like CLOB platforms.[25]  However, as Professor Darrell Duffie, the foremost expert in OTC derivatives has noted, "[d]ealers have a vested interest in maintaining trade in OTC markets, where profitability of intermediation is enhanced by market opaqueness."[26]  Thus, Defendants conspired to relegate end users to the retail IRS market, which remains a vestige of archaic trading market structures.  Defendants limit end users to the functional equivalent of the OTC market so that the Dealer Defendants can benefit from the pricing opacity and lack of competition inherent in that market, thereby allowing them to extract wider bid/ask spreads (*i.e.*, supracompetitive profits) from the buy-side.[27]

**FACTUAL ALLEGATIONS REGARDING DEFENDANTS' CONSPIRACY**

**I.    DEFENDANTS' CONSPIRACY TO BLOCK SWAP EXECUTION FACILITIES AND EXCHANGE-LIKE TRADING PLATFORMS FROM ENTERING THE MARKET**

70.    There is no pro-competitive justification for keeping the benefits of the electronic IDB marketplace for dealers only.  The only reason this market structure has persisted is the greed and collective will of the Dealer Defendants.  Trading amongst themselves in transparent

---

[24]    *Id.* at 5.

[25]    *See id.* at 6-7 ("[S]imple interest rate swaps . . . seem like natural candidates for exchange-based trade but are normally traded over the counter.  At this point, we lack convincing theories that explain why such simple and heavily traded instruments are traded over the counter.").

[26]    *Id.* at 7.

[27]    *See id.* at 5.

efficient markets while relegating the buy-side to the antiquated OTC market allows the Dealer Defendants to extract enormous unlawful profits from the buy-side.

71.     In the absence of the conspiracy, the two separate types of trades would have merged into a single marketplace with all-to-all exchange trading.  Buy-side Class members would have received better prices and would have had the opportunity to transact directly with each other.

72.     By the mid-2000s, the IRS market was primed and ready for the introduction of exchange trading.  As discussed above, IRS were standardized and volume was growing exponentially.  There was no pro-competitive reason for the OTC trading system to continue in the IRS markets.

73.     The benefits that central clearing and exchange trading could bring to the IRS market were widely recognized by market participants, regulators, and economists.

74.     In 2010, Congress passed the Dodd-Frank Act[28] in an effort to bring increased transparency and competition to swaps and other derivatives markets.  Among other things, Dodd-Frank mandated that certain derivatives, including IRS, be traded on exchanges or SEFs.[29]

75.     Congress envisioned that SEFs would include CLOB platforms on which the buy-side could trade electronically with other buy-side members or dealers — thereby reaping the benefits of exchange trading in the form of price transparency and competitive pricing.

76.     As the CFTC observed:

It is generally accepted that when markets are open and transparent, prices are more competitive and markets are more efficient.  The legislative history of the Dodd-Frank Act indicates that Congress viewed exchange trading as a mechanism to "provide pre- and trade transparency for end users, market participants, and

---

[28]   12 U.S.C. § 5301 (2010).

[29]   7 U.S.C. § 2(h)(8) (2010); 15 U.S.C. § 78c-3(h) (2010).

regulators."  As such, exchange trading was intended as "a price transparency mechanism" that complements Title VII's separate central clearing requirement to mitigate counterparty risk.  Additionally, *legislative history reveals a Congressional expectation that, over time, exchange trading of swaps would reduce transaction costs, enhance market efficiency, and counter the ability of dealers to extract economic rents from higher bid/ask spreads at the expense of other market participants*.[30]

77.     Dodd-Frank defines a SEF as follows:

[A] trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system, through any means of interstate commerce, including any trading facility, that — (A) facilitates the execution of swaps between persons; and (B) is not a designated contract market.[31]

The Act thus contemplates the emergence of platforms where "multiple participants" — not just dealers — can view executable bids and asks provided by various other participants in the marketplace.

78.     The Dealer Defendants, however, conspired to prevent exchange platforms and SEFs from introducing greater competition and transparency to the market.  In particular, they conspired to ensure that SEFs did not offer anonymous all-to-all trading platforms to the buy-side.  Instead, they offered only RFQ platforms that are functionally equivalent to trading in the opaque OTC market.

79.     The Dealer Defendants worked together to accomplish this in the following ways. *First*, they jointly boycotted any SEFs that planned to offer all-to-all CLOB platforms to the buy-side.  By starving these SEFs of liquidity, they effectively put them out of business.  *Second*, they insisted that every SEF must impose "name give-up" — thereby destroying a buy-side member's anonymity and allowing the Dealer Defendants to police and maintain their bifurcated

---

[30]     *See* Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33,476, 33, 553-54 (June 4, 2013) (codified at 17 C.F.R. Part 27) (emphasis added).

[31]     7 U.S.C. § 1a(50) (2010).

IRS market.  *Third*, they forced those buy-side participants that attempted to make markets in

IRS or trade on an exchange platform to pay excessive clearing fees in a transparent attempt to

prevent SEFs from disintermediating the Dealer Defendants.

80.     As a result of these collective steps, Defendants have successfully prevented

meaningful change in the market.[32]  As Richard Mazzella, Chief Operating Officer for Global

Fixed Income at Citadel explained, there remains "a two-tier market today on S[EF]s — dealer-

to-dealer and dealer-to-client" and that "[i]t is not truly an all-to-all market."[33]

### A.     The Defendants Boycotted Any Entrant Swap Execution Facilities that Offered All-To-All Trading

81.     Not long ago, market participants forecasted "that 40 to 50 firms could end up

competing for swaps execution business."[34]  Today, however, only a few independent SEFs offer

anything close to anonymous all-to-all trading, and those few are on their last legs.[35]

82.     At least three IRS SEFs were launched in recent years — Javelin, TrueEx, and

TeraExchange — to introduce anonymous all-to-all trading of IRS for the buy-side.  The Dealer

Defendants boycotted each of them.  Specifically, the Dealer Defendants collectively "threatened

---

[32]   Leising, *supra* note 6 ("Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change — and little indication that it's coming.  Banks are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another.").

[33]   Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, RISK (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-anonymity.

[34]   Mike Kentz, *SEF Start-ups Face Obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[35]   *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[36]

83.     This was a grave threat given the Dealer Defendants' considerable market power. "[T]he banks' refusal to deal with [an exchange-like trading platform] is a potent weapon, because market players want to trade on exchanges where there is high volume."[37]  CFTC Chairman Timothy Massad has acknowledged that "[s]ome market participants have said they are being shut out of platforms."[38]

### 1.     *The Dealer Defendants boycotted Javelin*

84.     In 2011, Javelin began developing an anonymous all-to-all IRS exchange-like trading platform.  Javelin planned "to offer firm pricing for swaps as opposed to the indicative quotes that are offered on most other platforms."[39]  This would have been a major step forward for the buy-side.  On the strength of its offering, Javelin secured the support of a group of buy-side entities, along with a number of second-tier dealers and RBS.

85.     By 2013, Javelin was preparing to launch its platform.  The Dealer Defendants were, however, infuriated as Javelin's plans became known.  They recognized that if Javelin launched an anonymous, all-to-all trading platform for IRS, it would attract liquidity, increase price transparency, and therefore imperil their privileged status as market makers.

---

[36]     Peter Madigan, *Massad:  Sefs Fear Retaliation if They End Name Give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up.

[37]     Levinson, *supra* note 7.

[38]     Madigan, *supra* note 36.

[39]     Kentz, *supra* note 34.

86.     To prevent Javelin from offering an anonymous order book open to both dealers and the buy-side, the Dealer Defendants collectively agreed not to provide liquidity to Javelin and to pressure their buy-side customers not to trade on the platform.

87.     Upon observing the Dealer Defendants' collective refusal to provide liquidity to the platform, RBS and the second-tier dealers that had informally committed to provide liquidity withdrew their support.  As a result of the Dealer Defendants' boycott, Javelin today effectively has no revenues and facilitates no IRS trading.[40]

2.     *The Dealer Defendants boycotted TrueEX*

88.     In 2013, TrueEX similarly sought to bring to market a SEF offering a vertically integrated IRS exchange-like trading platform and clearinghouse open to both buy- and sell-side entities.  TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for CDS for an IDB called Creditex.

89.     TrueEX, which was the "first swaps exchange to be approved by the [CFTC],"[41] "offers trading features, such as anonymous trading, that regulators and traders at funds say will encourage smaller banks and other players, such as hedge funds, to enter the market as dealers[, which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[42]  According to one trader, TrueEX "took a very old way of executing and

---

[40]     *See* Mike Kentz, *Cawley Exit Signals SEF Troubles*, INT'L FIN. REV. (May 9, 2014), http://www.ifre.com/cawley-exit-signals-sef-struggles/21144521.article.

[41]     *See* Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER (Apr. 1, 2013), http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-1057473-1.html.

[42]     Levinson, *supra* note 7.

brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[43]

90.     With these attractive features and Mr. Hirani's background in electronic swaps trading, TrueEX was ready and able to become a successful all-to-all trading platform for IRS. Mr. Hirani publicly stated that the platform had signed up sixty-two buy-side participants, explaining that "[c]learly the buyside demand is there."[44]

91.     But "[m]any of the top derivatives dealers . . . have declined to use [T]rueEX," stonewalling the trading platform.[45]  That is, the Dealer Defendants collectively blocked TrueEX from becoming a successful exchange-like trading platform for IRS.

92.     Today, TrueEX, like Javelin, facilitates few trades in the IRS market.[46]  And the vast majority of trades that are conducted through TrueEX are conducted only on its *RFQ* platform, on a name-disclosed basis.[47]  Further, most of those trades are in actuality only "compression" trades — which merely consolidate multiple offsetting contracts into one position — done to reduce the overall number of trades in a firm's portfolio and to simplify its balance sheet.  No bid/ask spread is associated with the "compression" trades, so TrueEX's execution of those trades does not threaten the Dealer Defendants in the marketplace.  In sum, the Dealer Defendants have successfully prevented TrueEX from becoming a competitive threat.

---

[43]   Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INV. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

[44]   Levinson, *supra* note 7.

[45]   *Id.*

[46]   Timms, *supra* note 43.

[47]   *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, TABB FORUM (Feb. 26, 2015), http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print _preview=true&single=true.

3. *The Dealer Defendants boycotted TeraExchange*

93. TeraExchange developed an anonymous order book for several asset classes, including IRS.[48] TeraExchange went to great lengths to create a viable exchange-like trading platform, connecting to the established clearinghouse of the Chicago Mercantile Exchange ("CME") and working with CME to develop a portfolio margining system so participants could easily calculate and post collateral for their cleared IRS.[49] TeraExchange spent millions of dollars developing its platform, and launched with a robust offering that was "poised to take business from the big banks that have dominated swaps trading."[50]

94. TeraExchange signed up six buy-side firms to make markets on its platform. In addition, a number of other buy-side firms committed to trading on the platform. These buy-side entities successfully tested TeraExchange's technology in connection with their trading interfaces.

95. A number of the Dealer Defendants, including Goldman Sachs, initially voiced support for TeraExchange's CLOB as well. In reality though, the Dealer Defendants recognized that TeraExchange's CLOB would enable buy-side market makers to directly compete with them for business.

---

[48] TERAEXCHANGE, http://www.teraexchange.com/teraexchange.html (last visited Oct. 31, 2015).

[49] *See TeraExchange Connects to CME Clearing to Provide Margin Relief to Customers Trading Interest Rate Swaps, Eurodollar and Treasury Futures*, PR NEWSWIRE (June 25, 2013), http://www.prnewswire.com/news-releases/teraexchange-connects-to-cme-clearing-to-provide-margin-relief-to-customers-trading-interest-rate-swaps-eurodollar-and-treasury-futures-212928021.html.

[50] *See* Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

96.     Two buy-side entities successfully conducted the first trade on TeraExchange's CLOB in the summer of 2013; the trade was for a notional amount of $10 million, and it was cleared through the CME's clearinghouse by BNP Paribas Securities Corp., the clearing FCM-affiliate of BNPP.  Upon observing that buy-side entities were trading with one another via TeraExchange's CLOB, BNPP's clearing office notified its execution office of the transgression, which contacted the trading buy-side entities and threatened them with a loss of access to clearing and other banking services, including execution services in other asset classes and general market research, if they continued to use TeraExchange's platform.

97.     Word of BNPP's threat spread to other buy-side entities.  At around the same time, Bank of America's FCM threatened buy-side firms with inflated clearing fees and liquidity boycotts if they made markets on or traded on TeraExchange's CLOB.  Not surprisingly, the buy-side caved in to the threats, and they have not traded on TeraExchange's platform as a result. Shortly thereafter, the Dealer Defendants abandoned TeraExchange in striking parallel, refusing to trade on or provide liquidity to the platform.

98.     Absent Defendants' conspiracy, the buy-side firms could have simply found another FCM to clear for them.  But the Dealer Defendants coordinated their activities, and collectively made it clear to the buy-side that they would refuse to deal with any firm which traded on TeraExchange.

99.     In addition, the Dealer Defendants thereafter boycotted TeraExchange, starving it of the liquidity it needed to succeed after losing — to threats — buy-side liquidity.  Absent the Dealer Defendants' anticompetitive boycott, buy-side firms would have traded between and amongst themselves on TeraExchange's platform.

100.    Facing a boycott from the Dealer Defendants and knowing it had little chance of success, TeraExchange left the swaps market.  TeraExchange "announced on Feb. 27 [2015] that it was shifting its focus to bitcoin derivatives."[51]

### 4.    *The Dealer Defendants' boycotts chilled market progress*

101.    In addition to squashing these specific threats, the Dealer Defendants' collective boycotts sent a clear message to the industry that *any* SEF platform attempting to offer the buy-side access to an anonymous CLOB platform would be collectively boycotted and crushed, and any buy-side partners would be punished through a starvation of trading services and an imposition of excessive clearing fees.  As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side entity, stated during a recent SEFCON panel discussion:  "No one wants to do anything because no one wants to be the next person to piss everyone off."

102.    SEFs are afraid to even apply to make swaps "available to trade" (and buy-side firms are afraid to trade swaps on exchange-like platforms) because of the risk of collective retaliation by the Dealer Defendants.

103.    Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background."  Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs, enforce market discipline by making direct threats to SEFs.  In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

---

[51]    Levinson, *supra* note 7.

104.    Instead, the Dealer Defendants have directed liquidity to the RFQ-based SEFs complicit in their conspiracy, effectively maintaining a market functionally equivalent to the OTC market.  Specifically, the Dealer Defendants reward SEF operators, such as co-conspirators ICAP and Tradeweb, that help maintain market bifurcation.  These platforms receive the vast majority of the trading volume of the Dealer Defendants, meaning high revenues.  Consequently, as shown in the figure below, ICAP now operates the dominant SEF, with approximately 50% of SEF-based trades taking place on its platform.[52]



105.    Tradeweb too has benefited from its active role in the conspiracy, also receiving ever-increasing liquidity from the Dealer Defendants.  As discussed above, Tradeweb operates

_____

[52]   This data was obtained from FIA, *SEF Tracker*, *available at* https://fia.org/sef-tracker (last visited Nov. 19, 2015).

two SEFs:  Tradeweb, for trades between dealers and the buy-side, and Dealerweb, for trades between dealers and other dealers.

106.    The Tradeweb SEF is one of the few trading venues available to buy-side Class members.  As such, the Dealer Defendants' collective control and influence over Tradeweb, as set forth more fully below, provides a direct method of control over how Class members trade.

107.    Tradeweb's percentage of dealer-to-client trades is continually increasing, and its ever-growing prominence in the market gives it further control over how the buy-side participates in the IRS market.  As shown in the chart below, Tradeweb's share of all dealer-to-client trades has increased from 23% to 45% since January of 2014.



**B.      The Dealer Defendants Police Market Bifurcation Through "Name Give-Up"**

1.      *"Name give-up" is an effective deterrent to buy-side participation on exchanges, or the creation of platforms allowing that to take place*

108.    Name give-up refers to the practice of identifying the names of each counterparty to an IRS to the other.  This practice has been widely decried by buy-side firms and independent SEFs, as it has been wielded like a hammer by the Dealer Defendants.

109.     Name give-up serves as a policing mechanism because it allows the Dealer Defendants to determine which trading platforms are abiding by the Dealers' unwritten rules and which are not.  For instance, if a CLOB transaction closes with a dealer on one side,[53] that dealer is able to immediately see if a buy-side participant has (a) been allowed access to the CLOB, and (b) had the audacity to try to capitalize on that access by entering into a transaction over the CLOB rather than in the OTC (or, more recently, RFQ) systems.  And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in many trades, even on an all-to-all trading platform, meaning that they are able quickly to identify any buy-side entity trading on such a platform.[54]  As discussed further below, a buy-side entity's use of a CLOB would trigger an immediate collective response from the Dealer Defendants, which would punish both the service provider that allowed such access *and* the buy-side member that tried to use it, by putting them each in the "penalty box."

110.     Name give-up also serves as an effective roadblock to all-to-all trading in another way.  It does so by forcing the end user to reveal its trading positions, and thus elements of its trading strategies, to both dealers and other end users, which may be able to exploit that information against them.  Many end users go to great lengths to keep their trading strategies confidential.  As Ken Griffin, founder of Citadel Investment Group ("Citadel"), explained, name give-up allows dealers unfairly to "position their book by taking advantage of their trading

---

[53]   This would often happen because of the Defendants' outsized market share.  *See* Ivy Schmerken, *Swap Markets Debate Anonymous Trading in SEFs*, WALL STREET & TECH. (Jan. 5, 2015), http://www.wallstreetandtech.com/trading-technology/swap-markets-debate-anonymous-trading-in-sefs/d/d-id/1318257.

[54]   *See id.*

counterparties' market insights."[55]  Michael O'Brien, Director of Global Trading at Eaton Vance, has stated:  "I don't want to show the size of my trades, I don't want people to know how I'm trading.  Information is the most valuable asset we have."[56]

111.    As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel explained:  "Forcing end-users to disclose themselves if they are in a [CLOB] is a means to discourage alternative market participants from participating in what were historically interdealer [CLOBs.]"[57]  Paul Hamill, formerly employed by Defendant UBS AG and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment, stating that exchanges without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[58]  He added that numerous "[i]nvestors have complained that they are unable to break into the inter-dealer markets because they are not anonymous — with names given up after trading."[59]

112.    Whereas name give-up is seen as a roadblock to buy-side participation, on the other side of the coin, there is pent-up demand on the buy-side for all-to-all, anonymous trading. According to former CFTC Commissioner Mark Wetjen, "some asset managers have claimed

---

[55]    Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

[56]    Levinson, *supra* note 7.

[57]    Madigan, *supra* note 33 (O'Brien:  "I would like my desk to be executing any trades possible on central limit order books").

[58]    MARKETS MEDIA, *SEFs Win Qualified Praise* (Oct. 8, 2013), http://marketsmedia.com/sefs-win-qualified-praise/.

[59]    FINANCIAL TIMES, *CFTC not planning on anonymity for swaps market* (Oct. 27, 2015), http://www.ft.com/fastft/414101/us-swaps-market.

their use of [CLOBs] will increase if they are allowed to trade anonymously."[60]  Richard

Mazzella explained that "removing these barriers is important in allowing" a true order book to

come to market.[61]  Ken Griffin noted that "anonymous markets foster competition," adding that

"[i]t should not matter who provides the best price."[62]  And George Harrington, CFA, Global

Head of Fixed Income, Currency, and Commodity Execution at Bloomberg LP stated during a

panel discussion at SEFCON that there is "a good deal of demand for anonymous trading" for

cleared swaps.

113.    It is telling that a feature so affirmatively bad for the buy-side is so prevalent in

the market – prevalent not because of market demand, but rather because the Dealer Defendants

have, through their collective market power, imposed it to maintain "the status quo."[63]

> 2.    *There is no non-conspiratorial justification for the continued prevalence of "name give-up"*

114.    Historically, a swap participant needed to know the identity of its counterparty in

order to assess the risk that the counterparty would default on its obligations.

115.    Central clearing, however, eliminates that concern.  Under a central clearing

regime, as it has existed for years in the IRS market, a clearinghouse stands in the middle of

cleared swap transactions, removing the need for two counterparties to directly transact with

each other.

---

[60]    Madigan, *supra* note 36; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, RISK (Aug. 6, 2015), http://www.risk.net/risk-magazine/feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading firm as stating:  "[i]f volume moves more towards Clobs, then that's where we'll get more engaged").

[61]    Madigan, *supra* note 33.

[62]    Devasabai, *supra* note 55.

[63]    Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL STREET J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

116.     By way of example, suppose X and Y would like to enter into an IRS contract in which X pays a fixed rate and Y pays a floating rate.  Without central clearing, X and Y would make these payments directly to each other.  Thus, each party would need to account for the risk that the other will fail to fulfill its side of the bargain.

117.     By contrast, with central clearing, X would make fixed payments to the clearinghouse in exchange for floating payments from the clearinghouse.  Similarly, Y would make floating payments to the clearinghouse in exchange for fixed payments from the clearinghouse.

118.     The payments received and paid are the same under either regime — X pays fixed payments and receives floating payments, while Y pays floating payments and receives fixed payments.  The counterparty risk with respect to X and Y, however, is eliminated, because they face the clearinghouse, rather than each other.  As a result, X and Y have no economic need to know each other's identities.

119.     In other words, because IRS trades conducted on SEFs are now centrally cleared by a clearinghouse, there is no legitimate justification for maintaining name give-up on SEFs.[64]  Declan Graham of UBS admitted as much during a recent panel discussion at SEFCON, noting that name give-up on CLOBs is pointless for cleared swaps.  CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling

---

[64]     *See* J. CHRISTOPHER GIANCARLO, CFTC COMMISSIONER, PRO-REFORM RECONSIDERATION OF THE CFTC SWAPS TRADING RULES:  RETURN TO DODD-FRANK 37 (2015), http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/sefwhitepaper012915.pdf ("In markets with CCP clearing of swaps, however, the rationale for name give-up is less clear cut.  That is because the CCP and not the trading counterparty bears the credit obligations.").

justification" for the practice of name give-up in today's IRS market.[65]  Richard Mazzella, Chief

Operating Officer for Global Fixed Income at Citadel noted, "[i]f you are trading on [an order

book] where you are pre-trade anonymous then you should also be post-trade anonymous . . .

[W]hen you cut through the arguments for post-trade disclosure, it's really just a means to

discourage people from participating in the [order book]."[66]  And CFTC Commissioner Mark

Wetjen has stated publicly that it is "difficult to rationalize trading protocols that reveal the

identities of counterparties on an anonymous, central limit order book."[67]

120.     An April 2015 position paper by the Managed Funds Association correctly

concluded that this practice is "anticompetitive" because it denies buy-side firms access to

liquidity, forces them to trade exclusively with dealers, and gives dealers an informational

advantage over other market participants.[68]

3.     *"Name give-up" continues only because of Defendants' (highly effective)
conspiracy*

121.     Name give-up is a highly effective deterrent to the evolution of all-to-all

platforms, which would threaten the Dealer Defendants' supracompetitive profits by

disintermediating them, and by compressing spreads on those transactions which they entered

---

[65]     Madigan, *supra* note 36.  The CFTC's regulatory powers do not include wide-ranging
authority to police collusion in the IRS market.  Indeed, as noted, the CFTC Chairman has
recently stated that the CFTC has no plans to combat name give-up and Dodd-Frank does not
give the CFTC license to address the market bifurcation maintained by the Dealer Defendants
and their co-conspirators.  *See* FINANCIAL TIMES, *supra* note 59.

[66]     Madigan, *supra* note 33.

[67]     *See* Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial
Services Policy Summit (Nov. 14, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/
opawetjen-10.

[68]     MANAGED FUNDS ASS'N, MFA POSITION PAPER:  WHY ELIMINATING POST-TRADE
NAME DISCLOSURE WILL IMPROVE THE SWAPS MARKET 5 (2015), https://www.managedfunds.
org/wp-content/uploads/2015/04/MFA-Position-Paper-on-Post-Trade-Name-Disclosure-
Final.pdf.

into.  As a direct consequence of maintaining name give-up, "[t]o date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[69] There is, however, an "obvious solution" — anonymous trading.[70]

122.    The Dealer Defendants realized that, because centralized clearing eliminated counterparty risk, all-to-all anonymous trading should take hold, as it has in the markets for equity options and foreign exchange ("FX").  The Dealer Defendants knew full well that, left to its own devices, the IRS market would naturally move from clearing to anonymous all-to-all exchange trading.

123.    To prevent this from happening, the Dealer Defendants agreed to work together to ensure that all trading platforms maintain name give-up.  Any trading platform that refused to include name give-up as a feature was collectively boycotted.  As a former IDB employee explained, when the IDB attempted to bring buy-side entities onto its trading platform in a different asset class, the Dealer Defendants responded with collective threats "to simply move their business to another broker."  He stated that, as a result, the IDB relented, limiting its platform to dealers.  The employee added:  "We didn't have much choice but to shut it down."[71] As discussed, the fact that Javelin, TrueEX, and TeraExchange all tried to offer order books *without* name give-up is a major reason why the Dealer Defendants worked together to shut them down.  When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of

---

[69]    Timms, *supra* note 43.

[70]    *Id.*

[71]    Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, Rɪsᴋ (Sept. 14, 2015), http://www.risk.net /risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

Tradition SEF (an IDB), bluntly explained that SEFs were not willing to stand up to the dealers and go anonymous because of the risk "of the loss of liquidity."

124.    Defendants also threatened buy-side entities that showed support for anonymous all-to-all platforms.  When, for instance, one buy-side firm attempted to trade IRS on an electronic platform, it received a phone call from a Dealer Defendant demanding to know why the buy-side firm had done this instead of trading directly with the Dealer Defendant.

125.    Aside from putting SEFs and buy-side members in the "penalty box," the Dealer Defendants ensure that name give-up persists through an entity by the name of MarkitSERV. MarkitSERV is a trade processing service for IRS and other asset classes, meaning it delivers trades to clearinghouses once they have been executed by counterparties.  While it is possible to design IRS trading platforms to feature "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed — the Dealer Defendants have forced IDBs to send trades to MarkitSERV *before* they are cleared.[72]  MarkitSERV then offers the counterparties to an IRS transaction a "last look" at the trade, where they learn each other's identities and have the option to terminate the transaction.  This process is inefficient and more cumbersome than exchange trading.[73]

126.    The IDBs only use MarkitSERV, and disclose the names of the parties to an IRS transaction post-trade, because the Dealer Defendants collectively insist that they do so.  Buy-side firms have complained that this practice "is applied to please dealers and that it discourages

---

[72]    *See* Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, RISK (Aug. 5, 2015), http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[73]    *Id.* (citing a CFTC staffer as stating:  "[i]t is not uncommon for it to take more than an hour for counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire").  During a SEFCON panel discussion, Declan Graham of UBS stated that the lack of straight-through processing delays trade processing and clearing by up to six hours.

non-banks from trading, helping to preserve the traditional market structure in which dealer-to-client and interdealer markets were separate."[74]

127.    As a result of collective pressure from the Dealer Defendants, numerous SEFs have agreed to impose name give-up on their platforms.  Today, the largest interdealer SEFs — BGC, DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up, thereby effectively preventing buy-side entities from trading on them.[75]  These entities recognize the collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are careful about "not biting the hand that feeds you."[76]

128.    Because the Dealer Defendants have blocked the development of SEF order books through name give-up,[77] buy-side firms are forced to trade on dealer-to-client RFQ platforms, which typically offer worse prices.[78]  As Michael O'Brien noted:  "[i]f on [SEFs] we only end up executing in an RFQ format, then that is not really any different to where we were

---

[74]    *Id.*

[75]    *See* RISK, *Top of the Swaps* (Nov. 2014), https://www.citadelsecurities.com/_files/uploads/sites/2/2014/12/Ken-Griffin-Risk-Magazine-Top-Of-The-Swaps-November-2014.pdf (noting that dealer-run platforms feature name give-up).

[76]    Mike Kentz, *New Dawn as Non-bank Enters Interdealer Order Book*, INT'L FIN. REV. (July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-book/21154986.article.

[77]    Tradeweb's CLOB, which is technically open to the buy-side, is in reality unusable because it utilizes name give-up.  Bloomberg offers a CLOB without name give-up, but buy-side entities cannot use it due to the risk of retaliation following improper information leakage through the Dealer Defendants' control of clearing mechanisms.  Furthermore, the Dealer Defendants do not provide liquidity to Bloomberg's order book, and the threat of retaliation prevents the buy-side from providing sufficient liquidity to the platform to overcome the Dealer Defendants' collective boycott.  Moreover, Bloomberg actively dissuades other entities from providing liquidity to the platform.

[78]    *See* GIANCARLO, *supra* note 64, at 38 ("To some experienced market observers, name give-up has been abused by major sell-side dealers to restrict participation by nondealers and other liquidity takers in the D2D markets.").

pre-[SEF]."[79]  He explained:  "[i]f [SEFs] end up being simply a more complicated, more costly, more compliance-heavy method of trading the same way we always have, then I don't think we will have accomplished a lot."[80]  Not accomplishing a lot is exactly what the Dealer Defendants intended.

### C.    The Dealer Defendants Threaten to Cut Off Clearing Services for Buy-Side Firms Who Try to Make Markets on Swap Execution Facilities

129.    The Dealer Defendants also use punitively high clearing fees and threats to cut off clearing services to punish buy-side firms that the Dealer Defendants perceive as trying to compete with them by making markets on SEFs.  In the current IRS market, buy-side firms that wish to clear trades routinely rely on affiliates of banks which are registered with the CFTC as FCMs to clear their trades.  This is because, in order to clear directly through a clearinghouse, a firm must contribute a large amount of capital to the clearinghouse's default fund to ensure that the clearinghouse has the ability to withstand the default of one of its members.[81]

130.    Many buy-side firms cannot afford the steep payments required to become a direct clearing member of a clearinghouse.  They therefore clear through the Dealer Defendants' FCMs, which have the necessary capital to pay the clearinghouse fees.  This relationship is mutually beneficial — the FCMs make money on clearing fees, and the buy-side firms are able to clear trades through the FCMs.

---

[79]    Madigan, *supra* note 33.

[80]    *Id.*

[81]    For example, CME requires clearing members to hold $50,000,000 in capital *and* contribute at least $15,000,000 in cash to its guaranty fund in order to clear IRS.  *See Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership And OTC Derivatives Clearing Membership*, CME GROUP (Aug. 2015), http://www.cmegroup.com/ompany/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

131.     As described above, the Dealer Defendants used their control of clearing services to drive TeraExchange out of the IRS market.  Acting as FCMs enables the Dealer Defendants to control the IRS market because, in such capacity, they are able to view the details of their client's (*i.e.*, the buy-side's) trades and can thus determine when buy-side firms are trading IRS directly with each other.

132.     In July 2015, certain FCMs of the Dealer Defendants, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began penalizing certain transgressor buy-side firms by hiking their clearing fees "by as much as ten-fold," while obedient buy-side entities "have been protected."[82]

133.     As clearing for certain IRS is mandated by law, and serves a critical risk-mitigation function,[83] denial of clearing services effectively hamstrings the buy-side's ability to trade IRS.  The mere possibility that the Dealer Defendants' FCMs can cut off access to clearing is sufficient to deter many buy-side firms from attempting to become market makers or otherwise support reform efforts.

134.     In a competitive market, the Dealer Defendants' FCMs would compete with each other to provide clearing services to their clients.  Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others have collectively threatened to raise or

---

[82]     Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, RISK (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

[83]     *See* Timothy Massad, Chairman of the CFTC, Remarks Before the OTC Derivatives Conference (Sept. 29, 2015), http://www.mondovisione.com/media-and-resources/news/remarks-of-cftc-chairman-timothy-massad-before-the-otc-derivatives-conference-s/ ("One of the most important reforms we've undertaken was to require that more derivatives transactions be cleared through clearinghouses.  Central clearing is one of the great innovations of the financial system. It enables market participants to reduce exposures through netting, mitigate counterparty credit risk, and mutualize tail risk.").

actually raised clearing fees for certain buy-side members due to their attempts to compete with the Dealer Defendants. The FCMs of the Dealer Defendants would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants, absent collusion.

135.    The Dealer Defendants' FCMs are able to coordinate their activities in this way because, among other things, their clearing operations communicate regularly with their counterparts at the other Dealer Defendants. For example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan.[84]   Mr. Murray communicates with his counterparts at other Dealer Defendants, such as Robert Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services.

## II.    THE DEALER DEFENDANTS' SUCCESS IN THWARTING RECENT MARKET ENTRANTS IS DUE TO THEIR TIGHT CONTROL OF THE INTEREST RATE SWAPS MARKET

136.    The Dealer Defendants have been remarkably successful in preventing market entry that would bring more price transparency and competition to the buy-side, even after the passage of Dodd-Frank. As discussed above, market participants lament that the IRS market has not changed in any meaningful way and that trading remains business as usual and effectively the *status quo*.

137.    The reasons for Defendants' remarkable success in freezing the market in place and preventing market entry pre-date Dodd-Frank. In the years leading up to the passage of

---

[84] Matt Cameron, *Deutsche Snares JP Morgan's Murray for Clearing Role*, RISK (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

Dodd-Frank, Defendants worked together closely to ensure that the IRS market would remain under their collective control.

138.    Several of the Dealer Defendants, including Goldman Sachs, JP Morgan, and Credit Suisse, utilize internal divisions specifically created to devise strategies that are mutually beneficial to the dealer community as a whole.  Personnel in these divisions regularly communicate with counterparts at other Dealer Defendants to ensure that the dealers are acting in a unified fashion.  These divisions have developed the strategies, discussed herein, to preserve the dealers' collective control of the OTC market.

139.    Goldman Sachs's Principal Strategic Investments Group ("PSI"), for example, has championed the idea of a "consortium" strategy, by which it works with its "biggest competitors as part of dealer consortiums."[85]  The PSI group has been described as "a way for [Goldman Sachs] to bet on the future" and "control how the thing turns out."[86]  JP Morgan has a "similar, though smaller, group" while the other Dealer Defendants conduct similar strategic activities through their trading businesses.

140.    There is a revolving door between such groups and the non-Dealer Defendant firms that own and control important aspects of the IRS market infrastructure.  For example, Vic Simone, a Managing Director at Goldman Sachs and the former head of Goldman Sachs' PSI Group, has served as the Chairman of Tradeweb's Board of Directors.[87]  He was succeeded in

---

[85]  Liz Moyer, *Goldman Group Takes Stakes in Market Evolution*, MARKETWATCH (Jan. 23, 2012), http://www.marketwatch.com/story/goldman-group-takes-stakes-in-market-evolution-2012-01-23.

[86]  *Id.*

[87]  *See Tradeweb Appoints New CEO*, TRADEWEB (Sept. 9, 2008), http://www.tradeweb.com/News /News-Releases/Tradeweb-Appoints-New-CEO/; *Citi Takes Equity Stake in Tradeweb*, TRADEWEB (Apr. 8, 2008), http://www.tradeweb.com/News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb/.

that role by Brad Levy, who had become the head of Goldman Sachs' PSI group.  Mr. Levy is currently the CEO of MarkitSERV, which provides trade processing services related to IRS.[88]  Simon Maisey, a former JP Morgan employee whose duties involved overseeing "market structure and startegic [sic] investments for the Rates businesses, initiating, structuring and driving many types of industry partnerships," is now a Managing Director at Tradeweb.[89]

141.   The Dealer Defendants organize and maintain their conspiracy, in part, through investments as part of these dealer consortia.  The Dealer Defendants have determined that the best way to prevent competition in the IRS market is to purchase, control, and dominate the firms that provide necessary infrastructure for the market.  The Dealer Defendants' control of such infrastructure helps them keep barriers to entry in the IRS market high, and the boards of the firms they control provide a convenient forum for collusion.  As discussed below, and as one example, this is exactly what they did with Tradeweb.

142.   The Dealer Defendants often give their joint efforts to control the IRS market codenames, which are perhaps intended to provide them a veneer of legitimacy.  One recent example is "Project Colin"[90] — a Goldman Sachs-led "coalition" of Dealer Defendants, including Bank of America and JP Morgan, nominally organized to deal with impending new

---

[88]   *Linkedin Profile of Brad Levy*, https://www.linkedin.com/pub/brad-levy/51/678/306 (last visited Nov. 19, 2015).

[89]   *Linkedin Profile of Simon Maisey*, https://uk.linkedin.com/pub/simon-maisey/86/89 /b78 (last visited Nov. 19, 2015).

[90]   *See Goldman Sachs Leads Project to Tackle Collateral Crunch*, THE TRADE (Feb. 27, 2015), http://www.thetradenews.com/news/Trading___Execution/Industry_issues/Goldman _Sachs_leads_project_to_tackle_collateral_crunch.aspx.

collateral requirements for cleared IRS imposed by European regulators.  Project Colin was run by Goldman Sachs' PSI Group.[91]

143.    Under the rubric of "Project Colin," personnel from the Dealer Defendants met and discussed how to prevent aspects of the IRS market from slipping outside of their control.  In May 2015, for example, the Dealer Defendants became concerned that a company called AcadiaSoft would enter the IRS market and offer a new service to automate collateral requests and the posting of collateral at competitive prices.  While several Dealer Defendants already had investments in Acadiasoft, they needed to ensure that AcadiaSoft would continue to do their bidding.  So the Dealer Defendants and ICAP "teamed up"[92] and "joined forces" with AcadiaSoft by increasing their investments in AcadiaSoft or purchasing stakes in AcadiaSoft for the first time.[93]  This ensured that AcadiaSoft would not flaunt the wishes of the Dealer Defendants, and provided the Dealer Defendants and ICAP yet another forum in which to collude.

144.    Similarly, the Dealer Defendants coordinate their unlawful conspiracy through their control of the International Swaps and Derivatives Association ("ISDA").  ISDA is nominally an industry group, but in reality serves the interests of the Dealer Defendants.

---

[91]    *See* Joe Parsons, *Project Colin Architect to Leave Goldman Sachs*, Global Custodian (Mar. 17, 2015), http://www.globalcustodian.com/People_Moves/Project_Colin_Architect_ to_Leave_Goldman_Sachs.aspx.

[92]    *Banking industry unites for swaps margin utility*, THE TRADE (July 8, 2015), http://www.thetradenews.com/News/Operations___Technology/Clearing___settlement/Banking _industry_unites_for_swaps_margin_utility.aspx.

[93]    *Leading Global Banks, Service Providers and Market Infrastructures Create New Hub for End-to-End Margin Processing*, ACADIASOFT (July 7, 2015), http://www.acadiasoft.com /press-new-hub-2015-07-07.html.

145.     From 2008 to the present, the Dealer Defendants have controlled ISDA's board, making ISDA a safe place to discuss the IRS market and their conspiracy.  The following employees of the Dealer Defendants hold positions on the ISDA board of directors, and use ISDA to ensure that they all remain on the same page regarding their collective boycott of exchange-like platforms for IRS trading:  Keith Bailey (Barclays:  Secretary), Diane Genova (JP Morgan:  Treasurer), Biswarup Chatterjee (Citigroup:  Director), Kieran Higgins (RBS:  Director), Christopher Murphy (UBS:  Director), Will Roberts (Bank of America:  Director), and Eraj Shirvani (Credit Suisse:  Director).

146.     As discussed below, the Dealer Defendants have worked together to lay the foundation for their control of the IRS market.  These joint efforts include the following four steps.

147.     *First*, as early as 2007, the Dealer Defendants conspired to take over and turn an electronic and exchange platform being developed for IRS trading — Tradeweb — into a dealer-only IDB.

148.     *Second*, the Dealer Defendants subsequently agreed with Tradeweb that it would not compete with a competitor (ICAP) in the IRS market in exchange for ICAP agreeing not to open its anonymous CLOB IRS trading platform to the buy-side.

149.     *Third*, the Dealer Defendants conspired to prevent a clearinghouse (LCH.Clearnet) from falling into the "wrong" hands in order to ensure it could not be used as a vehicle to facilitate electronic or exchange buy-side trading.

150.     *Fourth*, the Dealer Defendants collectively boycotted another clearinghouse (Swapstream) that was otherwise poised to evolve to all-to-all trading.

A.   **The Dealer Defendants Collectively Ensured that Tradeweb Would Not Offer Exchange-Like Features**

151.   Consistent with the "consortium" strategy championed by Goldman Sachs, Tradeweb is one of the primary forums where many of the Dealer Defendants meet to coordinate their unlawful conduct.

152.   While Tradeweb holds itself out as an independent actor in the market, pursuing its own commercial interests, in reality the Dealer Defendants control Tradeweb behind the scenes through their domination of its board of directors and governance committees.  The Dealer Defendants use their membership on this board and these committees to meet in private and coordinate their conspiracy to control the IRS market.

153.   During the time period relevant here, the Tradeweb board and governance committees were inhabited by members of many of the Dealer Defendants' "market structure" groups, such as Goldman Sachs' PSI group, which were organized specifically for the purpose of protecting the "dealer community" from the growth of exchange trading.  Tradeweb facilitated this scheme by keeping the committees and their members secret.

154.   Tradeweb was initially a private dealer-backed firm "owned by a consortium" of investment banks that focused on creating an online marketplace for fixed-income products, such as U.S. Treasuries.[94]  Thomson Reuters acquired Tradeweb in 2004.[95]

155.   Tradeweb offered a dealer-to-client RFQ platform for IRS that lacked anonymous trading.  Investors could request non-executable and non-binding quotes from multiple dealers.

---

[94]   *See Thomson to Acquire TradeWeb*, TRADEWEB (Apr. 8, 2004), http://www.tradeweb .com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

[95]   *Id.*

156.     Tradeweb's success was dependent on the dealers steering trading volume to its platform and Tradeweb had expressly contracted for dealer-provided liquidity from 2004 to 2007.[96]

157.     After Tradeweb was sold to Thomson Reuters, the Dealer Defendants realized they had created a potential competitor by selling an electronic trading platform to an independent company.  Tradeweb touted itself as a "real-time trading platform" and boasted as early as 2004 that it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[97]  In other words, it was well-positioned to disintermediate the Dealer Defendants.  As buy-side demand for all-to-all trading of IRS increased, the Dealer Defendants realized their mistake and resolved to regain control of Tradeweb.

158.     In 2007, at the expiration of the liquidity contracts, Tradeweb began to worry that its founding banks would steer liquidity to alternate trading platforms, starving it of necessary trading volume and revenue.  According to one source, "Thomson [Reuters] realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[98] The Dealer Defendants capitalized on Tradeweb's vulnerability and neutralized a potential competitor by effectively taking control of the company.

159.     The result was an agreement, codenamed "Project Fusion," in which "[a]ll nine dealers [] agreed to provide liquidity into Tradeweb's markets, including interest-rate swaps."[99] In exchange, the Dealer Defendants obtained the right to determine how Tradeweb was

---

[96]    Schmerken, *supra* note 11.

[97]    *See Thomson to Acquire TradeWeb*, *supra* note 94.

[98]    Schmerken, *supra* note 11.

[99]    *Id.*

governed.  This allowed the Dealer Defendants to ensure that Tradeweb would not convert its
platform to an anonymous order book that would allow exchange trading.

160.    The Dealer Defendants (except BNPP) quickly set to work filling Tradeweb's
Board of Directors and governance committees with their current and former employees.  For
example, Lee Olesky, Tradeweb's past and current CEO, was the former Chief Operating Officer
for Fixed Income at Credit Suisse.  In 2008, Vic Simone, a Managing Director at Goldman Sachs
and the former head of Goldman Sachs' PSI Group, served as the Chairman of Tradeweb's board
of directors.[100]  He was succeeded by Brad Levy, who was also a member of Goldman Sachs'
PSI Group.  Therefore, the head of a Goldman Sachs division that was *expressly organized for
the purpose of allowing Goldman Sachs to control the infrastructure of the swaps market also
served as the Chairman of Tradeweb's board*.  Through such positions, Messrs. Simone and
Levy and other representatives of the Dealer Defendants regularly met in secret and collaborated
with *direct competitors* at Tradeweb board meetings.

161.    The Dealer Defendants dominate Tradeweb's board of directors.  Tradeweb's
board consists of two Tradeweb officers (Lee Olesky, Tradeweb's CEO, and Billy Hult,
Tradeweb's President), two Thomson Reuters employees, and one representative from each of
Tradeweb's shareholder banks (*i.e.* each of the Dealer Defendants except BNPP).  Because they
hold the majority vote on the board, the Dealer Defendants are able to collectively block any
decision by Tradeweb that is not in their interest.

162.    The Dealer Defendants also exercise control of Tradeweb via its governance
committees.  Tradeweb keeps these committees and the identities of their members hidden from

---

[100]  *See Tradeweb Appoints New CEO*, *supra* note 87; *Citi Takes Equity Stake in
Tradeweb*, *supra* note 87.

the public.  Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[101]

163.    Many of the Dealer Defendants met regularly under the cover of Tradeweb's board and governance committees.  In addition to routine conference calls, which take place as often as every week, the board meets annually in person in Miami, Florida.  Last year, the meeting occurred just before the annual Futures and Options Exposition in Chicago, Illinois, on November 4-6, 2014.  The Dealer Defendants used these meetings to discuss and coordinate their strategy and to further their conspiracy to control the IRS market.

164.    By working together, the Dealer Defendants ensure that Tradeweb acts in their collective interests.  When, for instance, the independent managers of Tradeweb attempted to act against the interests of the Dealer-Defendant owners, they were quickly disciplined and instructed to change course.  Tradeweb employees — who recognized it would be in Tradeweb's independent interest to launch an all-to-all anonymous trading platform to compete with the Dealer Defendants — were deterred from even attempting to implement procompetitive changes because they knew that the Dealer Defendants would ultimately block them.

165.    The Dealer Defendants publicly touted Tradeweb as a modern, efficient trading platform that would provide "accurate pricing information" and "greater market transparency."[102]  But these "benefits" were a sham, and were introduced only to placate the buy-

---

[101]    *See DW SEF LLC:  SEF Participation Committee Charter*, TRADEWEB, http://www. tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Particip ation%20Committee%20Charter.pdf (last visited Nov. 23, 2015); *TW SEF LLC:  Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content /About_Us/Regulation/TW%20SEF%20Participation%20Committee%20Charter.pdf (last visited Nov. 23, 2015).

[102]    *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb,* TRADEWEB (Oct. 11, 2007), http://www.tradeweb.com/MediaCenter

side's increasingly insistent demands for all-to-all trading.  Tradeweb merely put a new sheen on the OTC market structure — it facilitated *only* dealer-to-client trades on an RFQ platform, rather than a CLOB, and would not allow buy-side clients to trade directly with one another.  As a result, the Dealer Defendants were able to use Tradeweb to extract the same supracompetitive profits on dealer-to-client trades that they had historically realized in the OTC market.

166.    Tradeweb continued to play this role even after the passage of Dodd-Frank.  Even today, Tradeweb plays a role in maintaining a two-tiered market structure.  As Jon Williams, Managing Director and Head of U.S. Institutional Market Operations at Tradeweb stated during a recent panel discussion at SEFCON:  "we don't have buy-side participants" on Tradeweb's interdealer SEF, Dealerweb.

### B.   Defendants Agreed with ICAP to Not Open Up Exchange-Like Platforms to the Buy-Side — And Pressured Other Interdealer Brokers to Do the Same

167.    As early as 2007, the Dealer Defendants and the IDBs had an understanding that the dealers would direct IRS transactions between themselves onto IDB platforms and that, in exchange for this dependable revenue stream, the IDBs would not allow buy-side firms to trade on their platforms.  As part of this arrangement, the Dealer Defendants committed to the IDBs that they would prevent any client-facing platforms from expanding into the interdealer space, including into the IRS interdealer market.

168.    By the mid-2000s, a number of IDBs were otherwise well-positioned to bring all-to-all IRS trading platforms that included the buy-side to market.  Many already operated such platforms in the interdealer market, and opening access to buy-side entities would not have posed

---

TwoColPage.aspx?Pageid=1124&id=1881&LangType=1033&&LangType=1033&ekfxmen_nos cript=1&ekfxmensel=ef6f32368_6_84.

any additional technological burden.  In addition, since IDBs profit from fees on each trade on their platforms, they had strong financial incentives to open their platforms to buy-side entities.

169.    Similarly, many client-facing trading platforms, including Tradeweb, were also otherwise well positioned to bring IRS trading platforms to market.  Like the IDBs, these client-facing trading platforms faced few technological challenges and could easily extend their dealer-to-client platforms into "all-to-all" platforms.

170.    In April 2009, Tradeweb, which was historically only a client-facing trading platform, decided to enter the mortgage bond market, offering a trading platform through a division known as DealerWeb.[103]  DealerWeb was a creation of Tradeweb designed to service the IDB, or dealer-to-dealer trading market, that would be owned and controlled by the Dealer Defendants themselves through Tradeweb.  The result was that ICAP, a leading IDB, "lost 85 percent of its business over six weeks" in the mortgage bond market after DealerWeb "basically walked away with the market."[104]

171.    Tradeweb's move left ICAP and other IDBs concerned about whether Tradeweb would launch a similar platform in other asset classes, including IRS, in violation of the historic agreement between the IDBs and the Dealer Defendants.[105]  This expansion would clearly have been in DealerWeb's economic self-interest.

---

[103]    *See* Bryce Elder & Neil Hume, *Icap hurt by Banks' Platform*, FINANCIAL TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d300144feabdc0.html #axzz3o24oltu5.

[104]    Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009), http://www.bloomberg.com/apps/news?pid=news archive&sid=aCxaCOeOAPBE.

[105]    Louise Armitstead, *Banks' Platform Destroys Icap Trading Monopoly*, THE TELEGRAPH (Apr. 21, 2009), http://www.telegraph.co.uk/finance/newsbysector/banksandfinance /5194814/Banks-platform-destroys-Icap-trading-monopoly.html (noting that until DealerWeb

172.    In retaliation, ICAP threatened the Dealer Defendants with an all-to-all exchange for IRS.  ICAP was already developing an electronic-trading platform for the European IDB IRS market[106] called i-Swap that it could have launched as an "all-to-all" fully anonymous IRS trading platform in the United States and that could include the buy-side.[107]  This would threaten to collapse the bifurcated market the Dealer Defendants were seeking to maintain at all costs.

173.    To avoid damaging each other's business, ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer Defendants would not further expand (through DealerWeb) into the IDB space in exchange for ICAP not expanding into the dealer-to-client space by establishing an all-to-all anonymous IRS trading platform.  In addition to their economic leverage over ICAP, the Dealer Defendants were able to broker and maintain this agreement because they maintain close relationships with ICAP's CEO, Michael Spencer.

174.    Despite it being in Tradeweb's economic self-interest to repeat its rapid success in the mortgage bond interdealer market in other markets, in line with this agreement, DealerWeb did not expand into IRS or any other market.  Similarly, in line with this agreement, ICAP did not move the end user IRS market onto ICAP's "i-Swap" platform, limiting it only to dealers.[108]

---

launched, ICAP "had a near monopoly on the trading" and that "the move has led to fears the banks would attack other areas of Icap's business").

[106]    *See Half Year Report 2009*, ICAP (Nov. 17, 2009), http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/hy-presentation-2009.pdf (observing "record US and EU order book activity" in July and August 2009 for fixed income products such as IRS).

[107]    *See i-Swap*, ICAP, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Oct. 19, 2015); *see also* Michael McKenzie, *Rate Swap Traders Wait For No Man*, FINANCIAL TIMES (Oct. 19, 2010), http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html #axzz3p2lJ0933 (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market").

[108]    *See i-Swap*, ICAP, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Oct. 19, 2015) (noting that upon launch, i-Swap was not open to buy-side participants,

57

175.     In February 2013, ICAP expanded i-Swap to the United States, but again limited participation to the dealers.[109]  The Dealer Defendants supported i-Swap by directing their business to it, a strategy designed to keep ICAP happy and ensure that it saw no need to attempt to launch an all-to-all platform open to the buy-side.

176.     ICAP's restriction on the use of i-Swap was the result of the agreement between ICAP and the Dealer Defendants to maintain the bifurcation of the market for IRS.  Absent Defendants' conspiracy, it would have been in ICAP's interest to launch i-Swap as an all-to-all anonymous trading platform where the buy-side could trade directly with each other without going through a dealer.

177.     As for those IDBs that did not enter into express agreements with the Dealer Defendants, as ICAP did, the Dealer Defendants threatened them with collective boycotts if they allowed buy-side access to their platforms.[110]  This strategy has proved successful, as the major IDBs today all still feature name give-up.

### C.     The Dealer Defendants Collectively Gained Control of a Key Clearinghouse (LCH.Clearnet) to Ensure It Did Not Collapse the Bifurcation of the Market

178.     As discussed above, a clearinghouse is an independent entity that operates as an intermediary to a trade.  Because, as a result of central clearing, there is no longer counterparty risk, there is no longer any necessity to know the identity of the counterparty to an IRS trade.

---

that i-Swap was "specifically developed to reflect the trading strategies of the banks" and that, even today, i-Swap is not directly open to the buy-side).

[109]  *See ICAP Launches i-Swap in the US*, ICAP (Feb. 19, 2013), http://www.icap.com/news/2013/130219-iswap-us.aspx.

[110]  *See, e.g.*, Levinson, *supra* note 7 (noting that when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform").  GFI's platform was targeted at the CDS market, but industry sources have confirmed that similar behavior has occurred in the IRS market.

179.    As a clearinghouse could easily evolve into an exchange, threatening disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse they saw as a threat to their bifurcation of the IRS market.  As a JP Morgan report stated:  "the main concern for the Investment Banking industry is that *clearing is the first step leading to exchange*/SEF trading for OTC products."[111]

180.    Many IRS transactions have long been cleared through SwapClear, a U.S. clearinghouse operated by the largest European clearing entity, LCH.Clearnet.[112]

181.    The Dealer Defendants have made sure that LCH.Clearnet and SwapClear remain under their collective control.  The following employees of the Dealer Defendants currently sit on LCH.Clearnet's board of directors, and allow the Dealer Defendants to exercise control over LCH.Clearnet's day-to-day activities:  Mike Bagguley (Barclays Capital), Laurent Curtat (Credit Suisse), Jacques d'Estais (BNPP), Ashok Krishnan (Bank of America), and Denise Wyllie (Goldman Sachs).[113]

182.    LCH.Clearnet was traditionally an "execution neutral" clearinghouse.  It cleared trades submitted by exchanges, swap dealers, or any other execution platforms.

---

[111]   J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks:  Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, Global Equity Research (Sept. 8, 2010) (emphasis added).

[112]   The Daily Volumes page of LCH.Clearnet's website states "SwapClear clears more than 50% of all OTC interest rate swaps and more than 95% of the overall cleared OTC interest rate swap market.  We regularly clear in excess of $1 trillion notional per day and have more than 2 million cleared trades outstanding."  *See Daily Volumes*, LCH.Clearnet, http://www.lch clearnet.com/en/asset-classes/otc-interest-rate-derivatives/volumes/daily-volumes-swapclear-global (last visited Nov. 19, 2015).

[113]   *See LCH.Clearnet Board of Directors*, http://www.lchclearnet.com/en/about-us/governance/board-of-directors (last visited Nov. 19, 2015).

183.    By the fall of 2008, LCH.Clearnet encountered financial difficulties and, as a result, was vulnerable to takeover.  One prospective purchaser was the Depository Trust & Clearing Corporation ("DTCC"), the major United States post-trade financial services company. Through its subsidiaries, DTCC provides clearing, settlement, and information services in equities, corporate and municipal bonds, unit investment trusts, government and mortgage-backed securities, money market instruments, and OTC derivatives.

184.    Historically, DTCC's governance was not dominated by the Dealer Defendants. DTCC also had substantial assets in the related areas of trade processing and trade record-keeping.  By combining its pre-existing assets with a clearinghouse, DTCC would have been well-positioned to create a vertically integrated entity — allowing clearing and exchange trading — that would pose a threat to the Dealer Defendants' conspiracy.

185.    On October 22, 2008, DTCC announced it had made a bid to purchase LCH.Clearnet.[114]  Donald Donahue, then DTCC's Chairman and Chief Executive Officer, explained:  "By combining DTCC and LCH.Clearnet's natural synergies and complementary skills, we expect our customers will not only see significant cost savings in the clearance and settlement of many securities and instruments we already service, but also greater access to a more diverse range of product offerings and support of emerging asset classes."[115] LCH.Clearnet and DTCC entered into a preliminary agreement to pursue a merger.

186.    Defendants opposed the merger, fearful it would diminish their governance and control over LCH.Clearnet and SwapClear and lead to "a one-stop transatlantic clearing

---

[114]  FINANCIAL TIMES, *DTCC and LCH.Clearnet Eye Clearing House Tie-In* (Oct. 23, 2008), http://www.ft.com/intl/cms/s/0/3298c504-a09b-11dd-80a0-000077b07658.html#axzz 3k1y LISOX.

[115]  *Id.*

system."[116]  Defendants were concerned that if they lost governance and control of

LCH.Clearnet, it would vertically integrate with an exchange platform and operate as a "vertical

silo," in which clearing is only made available for the exchange's own products.  DTCC had the

potential to be a "one stop shop" for exchange trading, clearing, trade processing, and record-

keeping.

187.    With the objective of maintaining control and preventing increased competition in

the market by DTCC, Defendants cooperated on what they codenamed "Project Lily."  Working

together, a consortium of banks, including Goldman Sachs, Deutsche Bank, Credit Suisse,

Barclays, JP Morgan, and RBS, along with ICAP, announced on November 20, 2008 that they

intended to make an offer to purchase LCH.Clearnet, and made an offer in or about May 2009.[117]

As a result of the consortium bid, around April 2009, DTCC withdrew from the race to own and

control LCH.Clearnet.[118]

188.    However, around September 2009, LCH.Clearnet announced a share buy-back

plan designed to streamline its list of shareholders, allocating a greater proportion to large users

of LCH.Clearnet services and, in particular, the Dealer Defendants.[119]

189.    The plan, code-named "Valkyrie,"[120] was "aimed at rationalising [sic] the

LCH.Clearnet shareholder base to give the [Project] Lily members a better representation in the

---

[116]   Jeremy Grant, *DTCC Pulls Out of Race for LCH.Clearnet*, FINANCIAL TIMES (Apr. 29, 2009), http://www.ft.com/intl/cms/s/0/d8917918-34c7-11de-940a-00144feabdc0. html#axzz3n4EqTwBo.

[117]   Jeremy Grant, *Consortium Prepares to Drop Bid for LCH.Clearnet*, FINANCIAL TIMES (Oct. 20, 2009), http://www.ft.com/intl/cms/s/0/adc119ee-bd72-11de-9f6a-00144feab49a.html#axzz3sFYwvyw0.

[118]   *Id.*

[119]   *Id.*

group while ensuring that the clearinghouse's governance did not end up just in the hands of a sub-group of members with no real interest in services other than [IRS clearing]."[121]  The Dealer-Defendant members of the consortium were satisfied by the proposed shareholder streamlining plan, which they "believed . . . contained many elements that would satisfy the consortium, including ensuring that the clearer's shareholder base more accurately reflected its users"[122] — which is to say, the Dealer Defendants themselves.

190.    In short, LCH.Clearnet's share buy-back plan ***satisfied the [Dealer] Defendants' demands for greater control of the clearer.***[123]  The consortium therefore dropped its offer to purchase LCH.Clearnet, knowing that the primary purposes of the consortium's bid — to give themselves control and prevent the clearinghouse from falling into the wrong hands — would be met under the proposed shareholder plan.

191.    The LCH.Clearnet "voluntary" shareholder redemption scheme was finalized by November 2009, resulting in large users of LCH.Clearnet, including each of the Dealer Defendants, owning an aggregate of 63% of the shares.[124]  As Kevin McPartland, then a Senior Analyst with the TABB Group noted, LCH.Clearnet remained "almost completely dealer-

---

[120]    The name they gave to this particular project — Valkyrie — speaks to the Dealer Defendants' motives:  In Norse Mythology, a valkyrie (from Old Norse *valkyrja* "chooser of the slain") is one of a host of female figures who choose those who may die in battle and those who may live.

[121]    PETER NORMAN, THE RISK CONTROLLERS:  CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS § 19.5 (2011).

[122]    Grant, *supra* note 117.

[123]    Jeremy Grant, *LCH.Clearnet Streamlines Ownership Structure*, FINANCIAL TIMES (Nov. 6, 2009), http://www.ft.com/intl/cms/s/0/9279e7fa-cac5-11de-97e0-00144feabdc0 .html#axzz3n4EqTwBo (emphasis added).

[124]    *Id.*

owned" through 2010, affording the Dealer Defendants a high degree of governance and control over LCH.Clearnet.[125]

192.    In or about September 2011, LCH.Clearnet entered into exclusive discussions with the London Stock Exchange about a possible takeover.  The deal, which was not finalized until 2013, was agreed to on the basis that LCH.Clearnet would not vertically integrate into an exchange platform.  In other words, even though free-market economics might move LCH.Clearnet in another direction, the Dealer Defendants would continue to be able to clear their trades through LCH.Clearnet, safe in the knowledge that the clearinghouse was committing to stay out of the exchange business.[126]

### D.    The Dealer Defendants Collectively Boycotted Swapstream, a Clearinghouse That Threatened to Improve the Market

193.    CME operates the world's leading derivatives marketplace, with exchanges offering an unparalleled diversity of products across all major asset classes, as well as one of the largest clearinghouses in the world.

194.    On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS.  At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IRS contracts.  CME publically announced that "the first order of business . . . is to broaden the product base.  The CME plans to

---

[125]    Matthew Leising, *CFTC Plan May Force Ownership Changes at LCH.Clearnet, Tradeweb*, BLOOMBERG (Sept. 30, 2010), http://www.bloomberg.com/news/articles/2010-09-29/cftc-said-to-propose-20-bank-ownership-of-swaps-clearinghouses.

[126]    Jeremy Grant & Anousha Sakoui, *LSE Set to Take Control of LCH.Clearnet*, FINANCIAL TIMES (Mar. 9, 2012), http://www.ft.com/intl/cms/s/0/d30eb9f2-69c0-11e1-a26e-00144feabdc0.html#axzz3n4EqTwBo.

roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[127]

195.    In July 2007, CME announced its plans to offer the market a cleared IRS product, including IRS denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

196.    CME has always been a threat to the Dealer Defendants, as it can offer integrated exchange trading and central clearing of IRS.  In fact, CME intended to offer anonymous all-to-all trading.  CME's announcement, dated July 17, 2007, stated "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[128]

197.    The threat to the Dealer Defendants was compounded on February 4, 2008, when CME announced that thirty three buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[129]  The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

198.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream.  They instead jointly committed to clear IRS

---

[127]   Daniel P. Collins, *CME Acquires Swapstream*, FUTURES MAGAZINE (July 24, 2006), http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

[128]   *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants*, CME GROUP (July 17, 2007), http://investor.cme group.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[129]   *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap*, PR NEWSWIRE (Feb. 4, 2008), http://www.prnews wire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

transactions only through the clearinghouse they knew they could control — LCH.Clearnet. They also used their market power and influence to prevent other sell-side banks and IDBs from dealing with Swapstream.[130]  Because the Dealer Defendants jointly agreed to refuse to deal with Swapstream, the platform never launched.[131]

199.    As a result of the Dealer Defendants' concerted action and agreements to refuse to deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked the emergence of electronic CLOB trading of IRS.

## III.    ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE EFFICIENT AND TRANSPARENT FOR THE BUY-SIDE

### A.    The Dealer Defendants' Substantial Market Power

200.    Currently, the Dealer Defendants continue to account for most IRS dealing, and continue to earn extraordinary profits in their OTC-like trading with the buy-side in IRS trades. As a result of the conspiracy, it is virtually impossible for a buy-side Class member to trade directly with another buy-side Class member.  The Dealer Defendants, therefore, participate in nearly the entirety of IRS transactions.

201.    Each of the Dealer Defendants possesses a significant share of the IRS market, and they collectively dominate the market.  Based on available market share information, the Dealer Defendants collectively controlled at least 70% of the market.  Indeed, in 2014, five of the ten Dealer Defendants collectively controlled over 50% of the IRS market by themselves

---

[130]    E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond:  The Path to Electronic Markets* (Jan. 2010), http://www.derivalert.org/Portals/75625/docs/OTC%20Interest%20Rate%20Swaps%20and%20Beyond%20-%20The%20Path%20to%20Electronic%20Markets.pdf.

[131]    *Id.*

while the remaining five Dealer Defendants controlled at least an additional 20% of the IRS market.[132]

202.    The Dealer Defendants' market power is well-recognized.  As Paul Rowady of the TABB Group stated:  "Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."[133]  Mr. Rowady also stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the moves, as they are counterparty to every trade."[134]  That is, the Dealer Defendants not only possess substantial market power, they employ it to ensure that the only structural changes that occur in OTC derivatives markets are those that operate to their benefit.

### B.    Defendants' Conspiracy Has Negatively Impacted the Market

203.    The Dealer Defendants have colluded to maintain this artificial bifurcation of the IRS market (between a "wholesale" dealer side of the market and a "retail" end user side of the market) up to the present day.  Although the interdealer IRS market came to be traded on exchange-like platforms, the Dealer Defendants had a common interest in relegating the buy-side to the functional equivalent of OTC, so as to ensure that the Dealer Defendants would continue to enjoy huge profits.  This bifurcation is wholly artificial.  According to John Brady of MF

---

[132]   In 2014 Bank of America was reported to control 12.6% of the IRS market, JP Morgan was reported to control 11.4% of the IRS market, Deutsche Bank was reported to control 9.5% of the IRS market, Citigroup was reported to control 9.2% of the IRS market, and Barclays was reported to control 8.2% of the IRS market.  In 2012 Goldman Sachs was reported to control 6.9% of the IRS market and BNPP was reported to control 4.9% of the IRS market.  The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012.  See GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES:  DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

[133]   Michael Mackenzie & Gillian Tett, *Markets:  Frozen in Time*, FINANCIAL TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0 .html#axzz3sFYwvyw0.

[134]   *Id.*

Global, "IRS could theoretically be put on to a exchange — were it not for the fact . . . that dealers tend to want to control the way that prices are set — particularly when they deal with corporate clients, because the business is so lucrative."[135]

204.    The Dealer Defendants recognized that if the retail side of the IRS market shifted to all-to-all platforms, buy-side entities would be able to trade directly with one another, thereby disintermediating the Dealer Defendants and denying them the substantial profits they were deriving from intermediating trades in the OTC market.[136]  The Dealer Defendants also knew that all-to-all anonymous trading of IRS would bring more direct price competition between more entities, thereby leading to the tightening of bid/ask spreads.  All-to-all anonymous exchange-like trading would also encourage alternative providers of liquidity to enter the market in competition against the traditional market makers such as the Dealer Defendants, yielding further spread compression.

205.    In sum, if exchange-like features had been made available in a truly competitive marketplace — *i.e.*, one where Defendants were not colluding — there would have been a rapid migration of IRS onto those platforms which, in turn, would have led to a significant tightening of bid/ask spreads paid by the buy-side.

206.    There is expert consensus, based on numerous studies of historical examples, that standardization, migration to anonymous all-to-all trading, and spread compression is a natural progression of financial products.  For instance, the introduction of electronic trading to equity

---

[135]    *Id.* (citing a statement from John Brady, then a derivatives broker at MF Global).

[136]    *See, e.g.*, Adam Sussman, *US Interest Rate Swap Futures*:  *Why Market Participants Would Switch*, TABB GROUP (2012), http://www.cmegroup.com/education/files/tabb-strong-prospects-for-interest-rate-swap-futures.pdf ("[T]here is little doubt in our minds that dealers want to preserve the traditional swaps market for as long as possible.").

options and currency markets has had a major impact on spreads and the costs associated with trading in those markets.

207.    In 1973, for example, the Chicago Board Options Exchange introduced exchange trading for equity options, which had been until that point traded entirely OTC.  Eventually, the increased competition introduced by exchange trading tightened spreads drastically.  Option bid/ask spreads were typically ¼ cent or less, driven down in part by competition "from more than 15 market makers for each Order Book Official (OBO) station."[137]

208.    The FX market, which covers both spot currencies and derivatives, is extremely large, and until recently had been dominated by OTC dealer intermediation.  Eventually, dealer domination of the huge OTC FX market was reduced dramatically, in part by the increased use of electronic trading platforms that were accessible to non-dealers.  These trading platforms now account for over 50% of all trades.[138]  The bid/ask spreads for the less-liquid emerging market currencies declined by over 50% from 2004 to 2013.[139]

209.    But for Defendants' anticompetitive acts, members of the proposed Class would have similarly traded IRS on electronic platforms, with far greater transparency and substantially reduced bid/ask spreads than they experience in the functional equivalent of the OTC IRS market controlled by the Dealer Defendants.

---

[137]    JOHN C. COX & MARK RUBINSTEIN, OPTIONS MARKETS 23-24 (1985); *see also* Robert C. Klemkosky & Terry S. Maness, *The Impact of Options on the Underlying Securities*, 6 J. PORTFOLIO MGMT. 2, at 1 (1980); Joseph Finnerty, *The Chicago Board Options Exchange and Market Efficiency*, J. FIN. & QUANTITATIVE ANALYSIS, Mar. 1978, at 29-38.

[138]    *See* Dagfinn Rime & Andreas Schrimpf, *The Anatomy of the Global FX Market Through the Lens of the 2013 Triennial Survey*, BIS QUARTERLY REVIEW, Dec. 2013, http://www.bis.org/publ/qtrpdf/r_qt1312e.pdf.

[139]    *See id.*

210.    Bid/ask spreads did not meaningfully tighten even as SEFs entered the market in 2014, and thus spreads remain inflated even today.  This can be seen in the charts below, where the black line represents the "rolling average" bid/ask spread, calculated by using the average spreads for the prior 90 days for various tenors, after adjustments have been made for market volatility to make the numbers more directly comparable across multiple time periods (including those that span the financial crisis).[140]  This allows any trends to be seen more clearly.  While the line moves up and down sporadically, there is no downward trend (or any trend, for that matter) following the introduction of SEFs.  The introduction of SEFs has done nothing to improve the lot of buy-side entities, who continue to be prisoners of the antiquated OTC-like model, even after the passage of Dodd-Frank and the introduction of SEFs.



---

[140]    This was done by adjusting the spread being measured in relation to the volatility of the mid-market price for the same IRS.







211.     Statistical analyses confirms what is visually obvious in these charts:  bid/ask

spreads have not significantly changed at all since the passage of Dodd-Frank.  Economic

analysis establishes that spreads did not significantly change for a variety of IRS tenors.

212.     Empirically, the bid/ask spreads for each IRS tenor did not narrow as a result of

the entry of SEFs into the market.  It can be statistically established (using a well-accepted

Welch's t-Test methodology), that there was no statistically significant difference in bid/o

spreads for various IRS products (including two-year, five-year, ten-year, and thirty-year tenors)

as a result of the introduction of SEFs.  Had the introduction of SEFs truly increased

transparency and price competition for the buy-side, there would be a statistically significant

narrowing of bid/ask spreads following the introduction of the SEFs.

213.     Further, while not statistically significant, those changes in the bid/ask spreads

observed among different IRS tenors do not even coincide with the introduction of SEFs.  To the

contrary, the only observable, and short lived, changing of bid/ask spreads among various IRS

tenors were not only insignificant, but occurred at random times that bear no discernable

relationship to the passage of Dodd-Frank, the introduction of the SEFs, increased buy side price transparency, or increased price competition among dealers.

214.   Empirical analysis of IRS bid/ask trends (using the Quandt-Likelihood Ratio test) also establishes that entry of SEFs into the market did not result in any statistically significant change in bid/ask spread trends in two-year, five-year, ten-year, or thirty-year tenors.  Instead of identifying any structural break or other statistically significant change in the trend of IRS bid/ask spreads, this analysis — evaluated both on a daily and rolling average basis — confirms that the IRS bid/ask spreads for each tenor exhibited the same exact trends after the introduction of SEFs as they had before.  The absence of any structural break in the trend of IRS bid/ask spreads following the introduction of SEFs to the market underscores that the Dealer Defendants' collusion successfully kept the buy-side captive to an antiquated OTC-like trading mechanism following the introduction of the SEFs.

215.   As a result of the Dealer Defendants' efforts, the SEFs that have been successful are either controlled by the Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing an RFQ platform (Bloomberg).[141]

216.   As a result of Defendants' collusion, the Dealer Defendants trade amongst and between themselves on state-of-the art, electronic, exchange-like platforms where they enjoy efficient execution, price transparency, and direct competition, while buy-side entities are

---

[141]   While Bloomberg nominally offers a "CLOB," this platform sees little activity in IRS because the Dealer Defendants refuse to trade on it and buy-side firms fear that they will face retaliation from the Dealer Defendants if they do so.

restricted to the functional equivalent of the antiquated OTC market where they must transact with dealers and operate at material price and informational disadvantages.

C.   **Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes**

217.   Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solution to the buy-side.  Without the Defendants' collusion, such an offering would have generated large new revenue streams through increased volume and market share.

218.   Absent a conspiracy, it would be economically rational for a SEF to offer a fully anonymous order book trading platform for IRS.  This would enable it to attract a greater volume of IRS trades and earn higher revenues.  But, as the Chairman of the CFTC has recognized, "no individual SEF can afford to be the first to prohibit name give-up practices . . . because of potential retaliatory action."[142]  That is, no individual SEF is willing to risk retaliation from the Dealer Defendants by flaunting their collective trading rules.  SEFs that have attempted to abolish name give-up have received threats from the Dealer Defendants.[143]

219.   Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well.  Absent a conspiracy, evolution to an exchange would have been seen as inevitable — it is the natural progression when financial products become, as IRS have long been, highly standardized, high-volume products.  This is particularly true where, as here, there were solution providers chomping at the bit to make it happen.  Given its inevitability, each Dealer Defendant, absent coordination, should have been

---

[142]   Madigan, *supra* note 36.

[143]   Karen Brettell, *Banks' Pressure Stalls Opening of US Derivatives Trading Platform*, Reuters (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

looking out for its own self-interest — which would have been to partner with a solution provider in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.

220.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to the buy-side in the form of fully anonymous CLOB trading, as clients shifted their trades away from other dealers onto the trading platform.  Additionally, an individual Dealer Defendant could have obtained an equity share in the trading platform, allowing it to share in the profits of the platform.

221.    Absent a conspiracy to punish them for doing so, it would have been in the self-interest of buy-side members to support, and flock to, the resulting all-to-all platforms that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency, and the opportunity to trade with market participants other than the dealers.

222.    But that is not the world we have.  Not because IRS are not ready for all-to-all trading.  Not because nobody wants all-to-all trading.  Not because solution providers were not ready, willing, and able to offer all-to-all trading.  Instead, we have this world because the Dealer Defendants collectively blocked the market's evolution.  Only a conspiracy that gave each Dealer Defendant an assurance that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

223.    Defendants' agreements were *per se* illegal agreements to thwart competition among horizontal competitors.  The Dealer Defendants' collective refusals to deal with those

74

institutions that would not play ball amounted to group boycotts that are illegal under the antitrust laws.

224.    With respect to IRS, the Dealer Defendants used their market power to enforce a division between the interdealer and the dealer-to-client markets.  The effect of the Dealer Defendants' anticompetitive agreements (such as with each other, IDBs, clearinghouses, and SEFs) and collective refusals to deal (with similar platforms that did not go along with the scheme) was to maintain the divided market structure where the buy-side was limited to trades with dealers, and to deny buy-side firms access to interdealer trading platforms or other opportunities to trade through an exchange-like platform.  All Class Members were harmed by these illegal acts because they were all deprived of the opportunity to transact IRS at tighter bid/ask spreads.

### D.    Investigations and Litigation Concerning the Credit Default Swaps Market Show That the Dealer Defendants Collude to Block Exchange Trading

225.    This is neither the first time the Dealer Defendants abused their collective influence over the market's infrastructure to preserve their supracompetitive profits nor the first time they did so with respect to a derivatives product.  To the contrary, the Dealer Defendants' strategy here is in parallel with alleged misbehavior in the CDS market.

226.    The Dealer Defendants' misconduct in the CDS market has been the subject of two separate investigations by the United States Department of Justice ("DOJ") and the European Commission ("EC").  The DOJ and EC investigations were spurred by complaints by market participants that the Dealer Defendants, who were the major CDS dealers, were abusing their control of the market to limit price transparency and competition.[144]  In one widely reported

---

[144]    *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL STREET J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain, lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[145]

227.    The concerns expressed by the DOJ and EC are similar to present-day complaints about anticompetitive behavior in the IRS market.  For example, the EC stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[146] The EC believed that "the investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[147]

228.    The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group boycotts.  For instance, CME (which, as discussed above, also tried to create an open trading platform for IRS) backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through a CLOB.  Modeling showed that CMDX would support "the trading and clearing of the most extensive CDS product set in the industry."[148]

---

[145]    Serena Ng, *Friction on Swaps Response*, WALL. ST. J. (Jun. 3, 2009), http://online. wsj.com/news/articles/SB124390301244674747.

[146]    European Commission, *Press Release — Antitrust:  Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[147]    *Id.*

[148]    *About CMDX — Overview*, CMDX.COM (Feb. 15, 2009), http://web.archive.org/web/ 20090215203639/http://cmdx.com/about-us-overview.html.

229.     In June 2008, CMDX was presented to the market.  Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.  Initially, some dealers were tempted.  A Barclays report found that such offers should help the already "well positioned" venture "get off the ground," which was also helped by the fact that at least some CDS "already lend themselves to trade in an exchange-like fashion."[149]  Chris Adams, Global Products Head, Alternative Funds at BNPP, praised the venture in an interview with the *Financial Times*.[150]

230.     CMDX was operationally ready by the fall of 2008[151] and was initially backed by several dealers.[152]  CMDX ran into a brick wall, however, once the CDS dealers, including the Dealer Defendants, were able to circle the wagons.  Further, as here, the dealers enjoyed the benefit of being on the board of entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

231.     Though CMDX announced operational readiness, it believed it first needed to seek licenses from Markit and ISDA to use certain intellectual property.  But government investigations indicated that the dealers used their control over Markit and ISDA, and thus over licensing decisions, to prevent CMDX from launching with exchange-like features—instead

---

[149]   Barclays Capital Equity Research, *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008).

[150]   Hal Weitzman & Jeremy Grant, *CME-Citadel Form Clearing Facility*, FINANCIAL TIMES (Oct. 7, 2008), http://on.ft.com/1lQEfNs.

[151]   Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

[152]   *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

insisting that a dealer stand on one side of every transaction, just like they did in the OTC market.[153]

232.    Government investigations also indicated that the dealers in the CDS market had collectively boycotted clearinghouses that — as here — they feared would use their position in the market to evolve into an exchange platform.  As noted by the EC, the "investment banks [] sought to shut out exchanges . . . by coordinating the choice of their preferred clearinghouse."[154]

233.    A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS.  The cases were consolidated into a single action.  Though the defendants continue to deny liability, a class-action settlement was recently given preliminary approval, whereby the defendants would collectively pay over $1.86 billion, and agree to injunctive relief that would help clear the way for exchange trading of CDS.[155]

234.    It is telling that today SEF operators and buy-side firms lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants.  While the markets and time periods at issue are different, today's complaints by SEF operators and buy-side firms — that the Dealer Defendants work together as a cartel to squash outright or take control over any

---

[153]    European Commission, *Press Release:  Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[154]    *Id.*

[155]    *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL STREET J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

235.    As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[156]  As a trader at one buy-side firm noted regarding the challenges that independent SEFs face, "[i]t's been a really tough environment for the start-up SEFs, [because] the market is designed not to allow new entrants."[157]  Similar to how the major CDS dealers allegedly used their control over the CDS market to block new entrants and artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

## **EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT**

236.    Plaintiff and the Class did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to prevent exchange-like trading in the IRS market, much less who caused that injury, until at the earliest March 2015, when CFTC Chairman Massad publicly stated that the dealers were forcing SEFs to maintain name give-up and when it became clear that Defendants had successfully blocked market entry by SEFs that were prepared to open their exchange-like platforms to the buy-side.[158]

---

[156]    Levinson, *supra* note 7.

[157]    *See* Mike Kentz, *Make or Break Time for SEFs*, INT'L FIN. REV. (May 2014), http://www.ifre.com/make-or-break-time-for-sefs/21146200.fullarticle.

[158]    *See* Madigan, *supra* note 36.

237.    By its very nature, Defendants' conspiracy to divide the IRS market and boycott IRS exchanges was self-concealing.

238.    Defendants implemented their conspiracy, in part, through meetings of the Tradeweb board of directors which were not open to the public.  Defendants also used their positions in other industry consortia to meet regularly.  These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities.  Plaintiff and the Class had no reason to believe these meetings were being used by Defendants to execute a conspiracy to block the all-to-all trading of IRS.

239.    Defendants colluded in part through industry consortium efforts such as Project Colin.  These efforts are "top secret" and protected by non-disclosure agreements, making it nearly impossible for Plaintiff and the Class  to learn of their conspiratorial nature.[159]  Indeed, one industry insider recently commented regarding Project Colin that he tries "to not be aware of the various initiatives out there, because I would have to sign an NDA if I was aware of what they are working on."[160]

240.    Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging.  Plaintiff and the Class  had no way to access such communications.

241.    In addition, the nature of the IRS market kept Defendants' conspiracy concealed from the public.  The OTC market is opaque and controlled by the Dealer Defendants.  Market

---

[159]    *See* Peter Madigan, *Project Colin:  Why Goldman-led Margin Hub Fell Apart*, RISK (June 1, 2015), http://www.risk.net/risk-magazine/feature/2410443/project-colin-why-goldman-led-margin-hub-fell-apart.

[160]    *Id.*

participants are fearful of speaking out against the Dealer Defendants because of the real threat
of retaliation.  And Defendants' blocking of exchange trading has reduced price transparency,
making it difficult for the public to compare IRS prices among competitors.

242.    It is telling that while certain government regulators have made comments
criticizing Defendants' conduct, there have been no public investigations to date against
Defendants for their conspiracy to preserve the OTC IRS market.  Defendants' conduct has been
so thoroughly concealed that it has, to this date, escaped the attention of the very regulators
charged with keeping the IRS market transparent and competitive.

243.    Because Defendants employed acts and techniques that were calculated to conceal
the existence of their conspiracy, Plaintiff and the Class could not have discovered the existence
of this unlawful conduct any earlier than March 2015, when reports emerged that the Dealer
Defendants were collectively refusing to trade on all-to-all anonymous SEFs.[161]  Indeed, even
after this, Plaintiff had to undertake substantial efforts and conduct an exhaustive factual
investigation, including meeting with many industry insiders, in order to piece together
Defendants' conspiracy.

244.    Throughout the Class Period, Plaintiff and members of the Class regularly
monitored news reports concerning the financial industry and the IRS market.  Plaintiff and
members of the Class undertook such activity in order to try to enter into IRS at good prices.
Throughout the Class Period, Plaintiff and members of the Class also regularly monitored prices
within the IRS market, to the extent such monitoring was possible.  In particular, Plaintiff and
members of the Class, directly or through their investment managers, regularly monitored
available IRS pricing data through electronic databases and other sources including Bloomberg.

---

[161]    *See, e.g.*, Levinson, *supra* note 7.

Practically speaking, there were limits to what could be done, given that so much of the IRS market was shrouded in secrecy due to Defendants' conduct. As described above, much of the pricing data available to Plaintiff and the Class did not reflect real-time market conditions as a result of Defendants' conspiracy.

245. Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class have been tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

246. Plaintiff, on behalf of itself and those similarly situated, seeks damages against Defendants based on the allegations contained herein.

247. Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

> All persons or entities who, from January 1, 2008 to the present, directly entered into fixed-for-floating interest rate swaps with the Dealer Defendants, or their respective affiliates, in the United States and its territories. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities (the "Class").

248. ***Numerosity.*** Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class, but believes that there are thousands of Class Members geographically dispersed throughout the United States.

249. ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiff and members of the Class to pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when there were on the other side of a swap.

250.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiff will prove other Class Members' claims as well.

251.     **Adequacy of Representation.**  Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiff can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

252.     **Commonality**.  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

    a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves, thereby inflating prices associated with the purchase and sale of IRS in the United States;

    b.     Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiff and other members of the Class;

    c.     The effect of Defendants' alleged conspiracy on the prices associated with the purchase and sale of IRS sold in the United States during the Class Period;

d.      The appropriate measure of damages sustained by Plaintiff and other

members of the Class;

e.      Whether Plaintiff and other Class Members are entitled to injunctive

relief; and

f.      The appropriate injunction needed to restore competition.

253.    **_Predominance._**  Questions of law and fact common to the members of the Class

predominate over questions that may affect only individual Class Members because Defendants

have acted on grounds generally applicable to the entire Class, thereby making a common

methodology for determining class damages as a whole appropriate.  Such generally applicable

conduct is inherent in Defendants' wrongful conduct.

254.    **_Superiority._**  Class action treatment is a superior method for the fair and efficient

adjudication of the controversy.  Such treatment will permit a large number of similarly situated,

geographically dispersed persons or entities to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or

expense that numerous individual actions would engender.  The benefits of proceeding through

the class mechanism, including providing injured persons or entities a method for obtaining

redress on claims that could not practicably be pursued individually, substantially outweighs

potential difficulties in management of this class action.  The Class has a high degree of

cohesion, and prosecution of the action through representatives would be unobjectionable.

255.    Plaintiff knows of no special difficulty to be encountered in the maintenance of

this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

256.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

257.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

258.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

259.    IRS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

260.    Other derivative products are not substitutable for IRS.  The rapid rise in IRS volume following their inception in the mid-1980s and the global financial crisis demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

261.    The relevant geographic market is the United States.  The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

262.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in IRS trades between Defendants and their non-dealer customers has been severely curtailed.  Plaintiff and Class Members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Plaintiff's and each Class Member's damages are directly attributable to Defendants' conduct, which resulted in all Class Members paying artificially inflated bid/ask spreads on every IRS they purchased or sold during the Class Period.  Plaintiff's injuries consist of artificially inflated costs associated with the purchase and sale of IRS in the United States caused by Defendants' misconduct.  Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

263.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

264.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

265.    Plaintiff and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

266.    WHEREFORE, Plaintiff, on behalf of itself and the proposed Class of similarly situated entities, respectfully requests that the Court:

a.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

b.    Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

c.    Award the Class treble damages;

d.    Award reasonable attorneys' fees and costs;

e.    Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

f.    Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of fully anonymous CLOB SEF trading of IRS in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff and the Class;

h.    Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market valuable to not only Plaintiff and Class Members but to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.    Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the

proposed Class, demand a trial by jury on all issues so triable.

DATED: New York, New York
November 25, 2015

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By :   /s/ J. Douglas Richards
J. Douglas Richards
Michael Eisenkraft
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com

Carol V. Gilden (pro hac vice application forthcoming)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Fax: (312) 357 0369
cgilden@cohenmilstein.com


**JACOBS BURNS ORLOVE & HERNANDEZ**
Joseph M. Burns (pro hac vice application forthcoming)
William W. Leathem (pro hac vice application forthcoming)
150 North Michigan Avenue, Suite 1000
Chicago, Illinois 60601
Telephone: (312) 327-3446
Fax: (312) 580-7175
jburns@jbosh.com
wleathem@jbosh.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By :   /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Daniel Cunningham
David LeRay
Miles H. Plant
William R. Sears (pro hac vice application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
danielcunningham@quinnemanuel.com
davidleray@quinnemanuel.com
milesplant@quinnemanuel.com
willsears@quinnemanuel.com

Jeremy D. Andersen (pro hac vice application forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com