# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO and MAYOR AND CITY COUNCIL OF BALTIMORE, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>                    - against -<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO.; GOLDMAN SACHS BANK USA; GOLDMAN SACHS FINANCIAL MARKETS, L.P.; GOLDMAN SACHS INTERNATIONAL; HSBC BANK PLC; HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; ICAP CAPITAL MARKETS LLC; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; MORGAN STANLEY; MORGAN STANLEY BANK, N.A.; MORGAN STANLEY & CO. LLC; MORGAN STANLEY CAPITAL SERVICES LLC; MORGAN STANLEY DERIVATIVE PRODUCTS INC.; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY BANK INTERNATIONAL LIMITED; THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND PLC; RBS SECURITIES INC.; TRADEWEB MARKETS LLC; UBS AG; AND UBS SECURITIES LLC,<br><br>        Defendants. | No.  15 Civ. 9319 (SAS)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ................................................................................10

PARTIES ...................................................................................................................11

    A.    Plaintiffs..................................................................................................11

    B.    Defendants ..............................................................................................12

FACTUAL ALLEGATIONS ....................................................................................22

I.      THE MARKET FOR INTEREST RATE SWAPS ........................................22

    A.    Interest Rate Swaps Generally................................................................22

    B.    The Trading of Interest Rate Swaps........................................................23

II.     DEFENDANTS CONSPIRED TO BLOCK EXCHANGE TRADING OF INTEREST RATE SWAPS ...........................................................................27

    A.    The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform and to Use it As a Vehicle for Collusion ...............................................................................27

    B.    The Dealer Defendants Utilize Other Forums to Collude .....................36

    C.    The Dealer Defendants Prevented Interdealer Brokers From Opening Exchange-Like Platforms to the Buy-Side .............................................38

    D.    The Dealer Defendants Conspired to Block Swap Execution Facilities and Exchange-Like Trading Platforms From Entering the Market .............................44

          1.    The Dealer Defendants boycotted Javelin .................................47

          2.    The Dealer Defendants boycotted TeraExchange......................52

          3.    The Dealer Defendants boycotted TrueEX ................................57

          4.    The Dealer Defendants collectively refuse to clear trades from Javelin, TeraExchange, and TrueEx ..........................................59

          5.    The Dealer Defendants' boycotts chilled market progress .......63

    E.    The Dealer Defendants Penalize Buy-Side Customers Who Engage in Exchange Trading ..................................................................................63

1.  The Dealer Defendants withhold clearing services to buy-side firms that attempt to exchange trade IRS ...................................................64

2.  The Dealer Defendants insist on "name give-up" to deter buy-side participation on exchanges .......................................................66

3.  The Dealer Defendants place transgressors in the "penalty box" .............74

F.  The Dealer Defendants Collectively Prevented Clearinghouses from Bringing Exchange Trading to the Market ...........................................76

II.  ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY-SIDE...................................................78

A.  The Dealer Defendants Have Substantial Market Power ......................................78

B.  Defendants' Conspiracy Has Imposed Significant Harm on Buy-side Investors....................................................................................79

C.  Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes..........................................87

D.  Investigations and Litigation Concerning the Credit Default Swaps Market Show that the Dealer Defendants Collude to Block Exchange Trading...............89

III.  EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY ...................................93

A.  Defendants' Conspiracy Was Concealed From Plaintiffs ...................................94

B.  Plaintiffs' Inability to Discover the Conspiracy Did Not Result from a Lack of Diligence..................................................................................99

CLASS ACTION ALLEGATIONS ........................................................................100

CAUSES OF ACTION ...........................................................................................103

FIRST CAUSE OF ACTION (CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT)...........................................103

SECOND CAUSE OF ACTION (UNJUST ENRICHMENT) ...................................105

PRAYER FOR RELIEF ..........................................................................................105

JURY DEMAND ....................................................................................................107

Plaintiffs Public School Teachers' Pension and Retirement Fund of Chicago and the Mayor and City Council of Baltimore, individually and on behalf of all persons and entities who, during the period of January 1, 2008, through the present, entered into interest rate swaps transactions with Defendants in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.      Interest rate swaps ("IRS") are an important financial tool used by an array of investors in the United States and worldwide.  IRS allow investors, including Plaintiffs and other pension funds, asset managers, university endowment funds, corporations, insurance companies, and municipalities (*i.e.*, members of the proposed class here) to manage risk and protect themselves from movements in interest rates.  IRS comprise one of the largest financial markets with billions of dollars in swaps traded each day.

2.      This case concerns a conspiracy among the major banks who act as "dealers" or "market makers" in the IRS market (the "Dealer Defendants"[1]).  For years, many IRS have been standardized and ripe for a robust form of anonymous electronic trading, akin to exchange trading, that would bring greater price competition and transparency to investors.  Yet buy-side investors remain stuck trading IRS in an inefficient and antiquated market dominated by the Dealer Defendants.

3.      As detailed herein, based on an exhaustive investigation triggered by recent disclosures of misconduct in the market, this state of affairs is the result of the Dealer

---

[1]  As defined more fully below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

Defendants' collusive boycotting and conspiring to prevent the market from evolving to modern forms of electronic trading, which would allow buy-side investors (who are both the direct purchasers and "end users" of IRS) to enjoy more transparent and competitive pricing and faster execution.

4.      The Dealer Defendants conspired for one simple reason:  to continue to enjoy an extraordinary profit center.  By blocking the entry of exchanges and similar platforms into the IRS market, the Dealer Defendants force the buy-side to trade with them in an opaque and inefficient over-the-counter ("OTC") market in which the Dealer Defendants hold all the cards. By conspiring to keep the buy-side off IRS exchanges and exchange-like platforms, the Dealer Defendants extract billions of dollars in monopoly rents, year after year, from the class members in this case.

5.      The most common type of IRS is an agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time.  In the most common (or "plain vanilla") swap, one party pays a fixed interest rate to a receiving counterparty who, in return, pays a floating interest rate based on a benchmark.  This arrangement permits an investor to mitigate the risk of changes in interest rates or to speculate on the future movement of interest rates.

6.      The Dealer Defendants have historically acted as market makers (or "dealers") in the OTC market, meaning one of them was typically on one side of every IRS trade with end users.  In the OTC market, investors must request a quote from one or more of the Dealer Defendants.  While investors could obtain quotes from more than one dealer, they could only negotiate a final actionable price — which, due to market volatility, often has to be accepted on the spot — typically with one dealer at a time.  This inefficient form of trading does not allow for

2

competitive price shopping by customers, and it denies the buy-side immediate execution and access to real-time price information.

7.     In such a market, the deck is stacked against end users (*i.e.*, the class members here).  As a result of the lack of price transparency and limited direct price competition, the Dealer Defendants were able to buy IRSs lower and sell them higher than they would have been able to in a competitive market where prices are streamed to end users in real-time on an electronic platform.  Through their collusive control of the IRS market, the Dealer Defendants extracted monopoly rents from the buy-side in the form of inflated bid/ask "spreads."

8.     Absent collusion, the lack of transparency and limited price competition that pervades the IRS market would have disappeared long ago.  Because of the benefits of transparency, competitive pricing, and immediacy, markets for financial products historically move to exchanges or exchange-like trading platforms soon after the products become sufficiently standardized and liquid.  Because of its maturity, size, and high-level of standardization, the IRS market has long been primed for exchange or exchange-like trading. Faced with a variety of threats of evolution to this modern form of trading, the Dealer Defendants banded together via a horizontal conspiracy, joined by ICAP and Tradeweb, to protect a highly-profitable market structure that they dominated.

9.     The Dealer Defendants know well the benefits of exchange trading.  In fact, they trade IRS with *each other* on electronic, exchange-like platforms.  But they have conspired to ensure that *only the dealers* are allowed to trade IRS on these platforms.  Thus, even as they enjoyed the benefits of exchange trading among themselves, the Dealer Defendants deny those

benefits to their customers.  Class members have been effectively "shut out" of this "paradise of infinite liquidity and tight pricing."[2]

10.     Pursuant to their conspiracy, the Dealer Defendants met and agreed to work together to maintain the bifurcated market for trading IRS.  They agreed to squash every potential market entrant that threatened to bring competition and transparency to the IRS market.  Since at least 2008, as detailed herein, the Dealer Defendants have jointly threatened, boycotted, coerced, bought, or otherwise eliminated any entity or practice that had the potential to bring the benefits of exchange trading to buy-side investors in the IRS market.

11.     The primary forum for Defendants' collusion is Defendant Tradeweb Markets LLC ("Tradeweb").  In late 2007, the Dealer Defendants began to be concerned about the possibility that Tradeweb, which was then owned by Thomson Reuters, would introduce more competition to the buy-side, in the form of a buy-side friendly electronic trading platform.  To respond to this threat from Tradeweb, and other entities planning similar initiatives to bring competition and transparency to the IRS market, Goldman Sachs championed a "consortium" strategy.  As part of this strategy, Goldman Sachs would work together with the other main dealers in the IRS market (*i.e.*, Goldman's competitors) to neutralize Tradeweb by jointly taking it over and stopping Tradeweb from moving forward with its plans.  Goldman Sachs also saw Tradeweb as a vehicle to coordinate the conduct of the Dealer Defendants going forward.

12.     And that is exactly what the Dealer Defendants did.  As part of a coordinated effort they named "Project Fusion," nearly all of the Dealer Defendants (originally, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS, later

---

[2]   Joe Rennison, *Meet the New OTC Market Makers*, RISK (Feb. 27, 2014), http://www.risk.net/risk-magazine/feature/2331122/meet-the-new-otc-market-makers.

joined by Citigroup, Bank of America and then Barclays) jointly took control of Tradeweb. After doing so, they made sure Tradeweb would not convert its platform to an anonymous order book for the trading of IRS.  They also pledged to each other — that is, these competitors *agreed* — that they would commit certain liquidity to Tradeweb and would not support other trading platforms that threatened their privileged position in the market.

13.     The Dealer Defendants installed themselves on Tradeweb's Board of Directors and a variety of "committees" that meet to discuss the IRS market, secretly, under the cover of a supposedly legitimate and independent enterprise.  From 2008 to the present, key strategic personnel from the Dealer Defendants — many identified by name and position below — have used the auspices of Tradeweb to coordinate their conduct to ensure the IRS market does not develop in ways that threaten their collective dominance.

14.     To be clear, Tradeweb is not just a forum for collusion; it is an active participant and co-conspirator.  Before colluding with the Dealer Defendants, Tradeweb was poised to provide more modern and open trading services to IRS end users, disrupting the way the Dealer Defendants do business in the IRS market.  But Tradeweb agreed with the Dealer Defendants, against its own economic self-interest, to shutter the possibility of offering end users access to competitive IRS trading, and to forego the lucrative brokerage fees that would come from facilitating such transactions.  And Tradeweb has abided by that agreement until the present day.

15.     The same is true of Defendant ICAP Capital Markets LLC ("ICAP"), the largest IRS broker serving the dealers (known as an "interdealer broker").  As detailed below, ICAP was also developing an IRS trading platform that would have been available to end users, but then agreed with the Dealer Defendants to reverse course and discontinued its planned platform.

16.     More recently, the Dealer Defendants boycotted potential market entrants known as Swap Execution Facilities, or "SEFs," which were envisioned as exchange-like platforms that would allow the buy-side to trade on an all-to-all limit order book.[3]  In the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or the "Dodd-Frank Act"), Congress sought to bring more competition to derivatives markets, including the IRS market. Dodd-Frank mandates, for example, that standard IRS move to exchanges or SEFs with central clearing.  But the Dealer Defendants only redoubled their collusive efforts since the passage of Dodd-Frank, and either coerced SEFs into helping them maintain the OTC market structure or put them out of business entirely.

17.     The Dealer Defendants worked together to shut down three SEFs in particular — Javelin Capital Markets LLC ("Javelin"), TeraExchange Inc. ("TeraExchange"), and TrueEX Group LLC ("TrueEX").  Reflecting the tremendous demand for market entry, and the belief that the market was ready to open up to new platforms, these market entrants spent millions of dollars and invested years of resources in an effort to "loosen[] the stranglehold that the [Dealer Defendants] have on the multi-trillion dollar [IRS] market."[4]  But these entrants were unsuccessful because they did not realize — as *no one* realized at the time — that the Dealer Defendants had agreed to coordinate their conduct to prevent any such entrant from succeeding.

18.     In addition to these group boycotts, the Dealer Defendants worked together to police their conspiracy and to ensure that end users are unable to use exchange-like trading

_____

[3]  An "all-to-all limit order book" is an electronic trading platform where participants can submit bids and offers, which are then automatically matched in order to facilitate efficient trading.

[4]  Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

platforms.  For instance, the Dealer Defendants have refused to clear transactions for end users who participate in SEFs like Javelin, TeraExchange, or TrueEx.

19.     Perhaps the most nefarious of these practices is known as "name give-up," which allows the Dealer Defendants to police the threat posed by the buy-side trading on SEFs.  Name give-up requires the disclosure of the identity of each swap counterparty to the other on every trade.  By secretly coordinating their conduct, threats, and demands, the Dealer Defendants have forced SEFs in the IRS market to adopt this practice.  The sole purpose of name give-up is to enable the Dealer Defendants to ensure that no buy-side investor is trading IRS on the inter-dealer platforms.  Any SEF that steps out of line is put in the "penalty box," a colorful industry metaphor (borrowed from hockey), referring to the Dealer Defendants' collective boycott.

20.     As a result, the only SEFs that have any meaningful end user trading activity today *effectively require* that platform participants trade directly with a dealer.  These SEFs — including Tradeweb's — effectively allow only a Request for Quote ("RFQ") trading method with end users.  This prevents the buy-side from experiencing the true benefits of exchange trading because RFQ, which requires the end user to "request a quote" from a dealer, is the functional equivalent of transacting OTC.

21.     The Dealer Defendants' collusion is responsible for the irrational persistence of antiquated trading practices in the IRS market that deprive end users of the cost savings and transparency associated with exchange trading.  The Dealer Defendants "want[ed] desperately to preserve the status quo" so as to protect the extraordinary profits they made on IRS.[5]  The Dealer Defendants were driven to block entry of SEFs fully open to the buy-side because it was the only way they could protect their control over the lucrative IRS market.

---

[5]  *Id.*

22.     As the General Counsel of Tradeweb, Douglas Friedman, candidly conceded at a recent industry conference held at the Waldorf Astoria hotel in New York City,[6] even after SEFs entered the market, the "mode of execution has largely stayed the same" for investors seeking to trade in IRS.[7]  Similarly, Larry Tabb, the Founder and CEO of the TABB Group, a market research firm, recently described the market for IRS as "basically the same two-tiered market of before [Dodd Frank] with a greater percentage of the market cleared."  Will Rhode, Director of Fixed-Income Research at Tabb Group LLC noted in 2014 that "[t]he walls are not coming down."[8]  Michael Koegler, Managing Director at Javelin Capital Markets, LLC ("Javelin"), a SEF operator, has similarly observed:  "Almost all of the [dealer-to-client] business being done in the market is happening via RFQ which is essentially **business as usual**."[9]

23.     To make sure that business remained as usual, the Dealer Defendants have also conspired to ensure that interdealer brokers, or "IDBs," do not open their trading platforms to end users.  IDBs have long operated IRS trading platforms with exchange-like features.  But, under collective pressure from the dealers, they only allow *dealer-to-dealer* transactions.  If an

---

[6]   The conference, "SEFCON," is an annual industry event featuring panels composed of representatives from SEFs, dealers, buy-side firms, and government regulators.  All references to "SEFCON" herein are to "SEFCON VI," which was held on October 26, 2015.  Plaintiffs' counsel attended the conference, and all quotes attributed to SEFCON speakers and participants are direct quotes that were made during speeches or panel discussions.

[7]   *See also* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 12 (2016), http://www.bis.org/publ/mktc07.pdf ("*The majority of swap trading still occurs in response to an RFQ, rather than via a [central limit order book]*.  The growth in electronic trading has allowed some PTFs to enter as liquidity providers, but **banks remain the dominant market-makers**.") (emphases added).

[8]   Matthew Leising, *Swaps Revolution Falling Flat as Brokers Keep Grip on New Market*, BLOOMBERG (Mar. 4, 2014), http://www.bloomberg.com/news/articles/2014-03-05/swaps-revolution-falling-flat-as-brokers-keep-grip-on-new-market.

[9]   Jesse Colin, *SEF NY Interview: Michael Koegler, Managing Director, Javelin Capital Markets*, TOTAL ASSET (Aug. 18, 2014), http://blogs.terrapinn.com/total-asset/2014/08/18/sef-ny-interview-michael-koegler-managing-director-javelin-capital-markets/ (emphasis added).

IDB were to allow end users access to the dealer-only platforms, the bifurcation of the market desired by the Dealer Defendants would have collapsed long ago. But the Dealer Defendants made sure that any IDB that dared to consider opening its platform to the buy-side was put in the "penalty box" and blackballed. ICAP, the leading IDB for IRS, has agreed with the Dealer Defendants to not open its interdealer platforms to the buy-side in exchange for their promise of continued liquidity and the primary market share in the interdealer market.

24.     As a result of the Dealer Defendants' collusion, the IRS market has not developed in the manner that financial markets typically do. The Dealer Defendants have instead collectively kept it frozen in time for their own selfish purposes. In fact, many believe the IRS market is *less efficient* today than it was in 2008.

25.     Yet, because Defendants' conspiracy to maintain a bifurcated market is not expressly prohibited by Dodd-Frank, the Commodity Futures Trading Commission (the "CFTC"), the Dodd Frank Act's primary regulator with respect to the swaps market, is unable to address the anticompetitive harms described herein. Dodd-Frank did not give the CFTC the authority to prevent investment banks from colluding to strong-arm market participants for the purpose of thwarting the growth of an efficient market and the CFTC is not policing the collusive activities alleged herein. As CFTC Chairman Massad recently explained, the CFTC has no plans to address name give-up, and Dodd-Frank "doesn't specifically go to the wholesale versus retail distinction."[10] Defendants' conspiracy is, however, prohibited by the Sherman Act, whose

---

[10]   FINANCIAL TIMES, *CFTC Not Planning on Anonymity for Swaps Market* (Oct. 26, 2015), http://www.ft.com/fastft/414101/us-swaps-market. The IRS market is sometimes described as bifurcated into "wholesale" (dealer-to-dealer) and "retail" (dealer-to-client) divisions.

crucial role in putting a stop to collusive conduct by competitors Congress carefully and expressly preserved.[11]

## JURISDICTION AND VENUE

26.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

27.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

28.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

29.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

30.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many Defendants are subject to personal jurisdiction in the United States because they, as set forth

---

[11]     *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."); *see also* H.R. REP. NO. E1347-01 (2010) (Conf. Rep.) (statement of Rep. Conyers, Jr.), 2010 WL 2788137 ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

below, were formed in or have their principal places of business in the United States.  In addition, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and class members residing in, located in, or doing business throughout the United States.  For example, and as set forth more fully below, the Defendants directly conspired through and with Tradeweb, whose principal place of business is in New York, New York, and at Tradeweb Board of Directors meetings in Miami and elsewhere. Further, the Defendants conspired to boycott exchanges, such as Javelin, TeraExchange, and TrueEx, that are based in New York.

31.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.  The IRS at issue in this action — which, indeed, often included a contractual clause submitting the parties to jurisdiction in this District — were regularly traded through desks at the major sell-side banks located in New York.  The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded IRS swaps in the United States as their agents, and if they did not, the Dealer Defendants would have to have made those trades themselves.

## PARTIES

### A.     Plaintiffs

32.     Established by the Illinois state legislature in 1895, the Public School Teachers' Pension and Retirement Fund of Chicago (also, the "Chicago Teachers' Pension Fund" or "CTPF") is the administrator of a defined benefit public employee retirement system, providing retirement, survivor, and disability benefits for certain certified teachers and employees of the

Chicago Public Schools.  During the class period, CTPF entered into IRS transactions directly with multiple Dealer Defendants.

33.     The Mayor and City Council of Baltimore ("Baltimore") is an independent city in the State of Maryland.  During the class period, Baltimore entered into IRS transactions directly with multiple Dealer Defendants.

**B.     Defendants**

34.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

35.     Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York.  BANA is a wholly owned subsidiary of BAC.  On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc.  Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  MLPFS is a wholly owned subsidiary of BAC.  In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the CFTC.

36.     As used herein, the term "Bank of America" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch

Bank USA, that entered into IRS contracts with the Class, including as a dealer.  During the

Class Period, Bank of America directly sold IRS to and bought IRS from class members.  Bank

of America also agreed with other Defendants to boycott the SEFs, which are located in New

York.  During the Class Period, Bank of America was a shareholder of Tradeweb.

37.     Defendant Barclays PLC is a corporation organized and existing under the laws of

England and Wales, with its principal place of business in London, England.  Defendant

Barclays Bank PLC is a corporation organized and existing under the laws of England and

Wales, with its principal place of business in London, England and branch locations in New

York, New York.  In addition, during the Class Period, Barclays Bank PLC was a shareholder of

Tradeweb.  Defendant Barclays Capital Inc. is a corporation organized and existing under the

laws of the State of Connecticut, with its principal place of business in New York, New York,

and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned

subsidiary of Barclays Bank PLC.  In addition, Barclays Capital Inc. is registered as a broker-

dealer with the SEC, and as an FCM with the CFTC.

38.     As used herein, the term "Barclays" includes Defendants Barclays PLC, Barclays

Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS

contracts with the Class, including as a dealer.  Barclays Bank PLC maintains a New York

branch.  Barclays transacts business in New York, New York.  During the Class Period,

Barclays, itself and through its affiliate agents, directly sold IRS to and bought IRS from class

members.  Barclays also agreed with other Defendants to boycott the SEFs, which are located in

New York.

39.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and

existing under the laws of the France, with its principal place of business in Paris, France and

13

branch locations in the United States, including its New York, New York branch.  Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA.  In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

40.     As used herein, the term "BNPP" includes Defendants BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  BNPP transacts business in New York, New York.  During the Class Period, BNPP, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  BNPP also agreed with other Defendants to boycott the SEFs, which are located in New York.

41.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.  Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup.  In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

42.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Citi, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Citi also agreed with other Defendants to boycott the SEFs, which are located in New York.  During the Class Period, Citi was a shareholder of Tradeweb.

43.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  In addition, during the Class Period, Credit Suisse Group AG was a shareholder of Tradeweb.  Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a New York, New York branch.  Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG.  In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

44.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Credit Suisse transacts business in New York, New York.  During the Class Period,

Credit Suisse, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Credit Suisse also agreed with other Defendants to boycott the SEFs, which are located in New York.

45.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany.  In addition, during the Class Period, Deutsche Bank AG was a shareholder of Tradeweb.  Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG. In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

46.     As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  Deutsche Bank transacts business in New York, New York, and maintains a New York branch.  During the Class Period, Deutsche Bank, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members. Deutsche Bank also agreed with other Defendants to boycott the SEFs, which are located in New York.

47.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  In addition, Goldman Sachs & Co. is registered as a broker-

dealer with the SEC, and as an FCM with the CFTC.  Defendant Goldman Sachs Bank USA is a New York state-chartered bank and a member of the Federal Reserve's system, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group.  Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group.  Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Goldman Sachs Group.

48.     As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Goldman Sachs, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Goldman Sachs also agreed with other Defendants to boycott the SEFs, which are located in New York.  During the Class Period, Goldman Sachs was a shareholder of Tradeweb.

49.     Defendant HSBC Bank PLC is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant HSBC Bank USA, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia, and branch locations in New York, New York.  Defendant HSBC Securities (USA) Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  In addition, Defendant

HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

50.     As used herein, the term "HSBC" includes Defendants HSBC Bank PLC, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  HSBC transacts business in New York, New York.  During the Class Period, HSBC, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  HSBC also agreed with other Defendants to boycott the SEFs, which are located in New York.

51.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York.  Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of JPMorgan Chase & Co.  In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co.

52.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Securities Plc, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, JP Morgan, itself and through its affiliate agents, directly sold

IRS to and bought IRS from class members.  JP Morgan also agreed with other Defendants to boycott the SEFs, which are located in New York.  During the Class Period, JP Morgan was a shareholder of Tradeweb.

53.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah, and is a wholly owned subsidiary of Morgan Stanley Delta Holdings LLC, the ultimate parent of which is MS.  Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS.  In addition, MS&C is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS.  Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of MS.  Defendant Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is MS.  Defendant Morgan Stanley Bank International Limited is a bank organized and existing under the laws of England and

Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS.

54.     As used herein, the term "Morgan Stanley" includes Defendants MS; Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and Morgan Stanley Capital Products LLC, that entered into IRS contracts with the Class, including as a dealer.  During the Class Period, Morgan Stanley, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  Morgan Stanley also agreed with other Defendants to boycott the SEFs, which are located in New York.  During the Class Period, Morgan Stanley was a shareholder of Tradeweb.

55.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut. In addition, during the Class Period, RBS Group PLC was a shareholder of Tradeweb. Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC.  In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

56.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  RBS PLC maintains a New York branch.  RBS transacts business in

New York, New York.  During the Class Period, RBS, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  RBS also agreed with other Defendants to boycott the SEFs, which are located in New York.

57.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.  In addition, during the Class Period, UBS AG was a shareholder of Tradeweb.  Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of UBS AG.  In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

58.     As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  UBS maintains a New York branch and transacts business in New York, New York.  During the Class Period, UBS, itself and through its affiliate agents, directly sold IRS to and bought IRS from class members.  UBS also agreed with other Defendants to boycott the SEFs, which are located in New York.

59.     Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities.  In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers.  As explained

below, ICAP agreed with the Dealer Defendants that it would not allow its platform to be accessed by the buy-side of the IRS market.

60.    Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  As used herein, the term "Tradeweb" includes Tradeweb Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS, CDS, and other asset classes.  Tradeweb's historical focus has been on providing electronic trading services in the dealer-to-client side of the market.  Tradeweb is jointly owned by Thomson Reuters and a consortium of Wall Street Dealers (the Dealer Defendants other than BNPP and HSBC).[12]  The Dealer Defendants exercise control over Tradeweb.  As explained below, the Dealer Defendants took control of Tradeweb to prevent it from developing a trading platform for IRS that would collapse the artificial bifurcation the Dealer Defendants have collectively imposed, and Tradeweb agreed with the Dealer Defendants to abide by their wishes.

## FACTUAL ALLEGATIONS

## I.    THE MARKET FOR INTEREST RATE SWAPS

### A.    Interest Rate Swaps Generally

61.    An IRS is a type of derivative.  It is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time.  The most common type of swap — often referred to as a plain vanilla swap — is one in which one counterparty pays the other a fixed interest rate in exchange for a floating interest rate.  The counterparty paying a fixed rate is typically referred to as the "buyer," and the counterparty

---

[12]  *See* Matthew Leising, *Tradeweb's Bank Owners Said to Consider New Bond-Trading System*, Bloomberg (Nov. 23, 2013), http://www.bloomberg.com/news/articles/2013-11-22/tradeweb-s-bank-owners-said-to-consider-new-bond-trading-system.

making payments at the floating rate is known as the "seller."  The value of the contract to each side moves (in opposite directions) depending on changes in interest rates.

62.     When the market for IRS began, IRS were not standardized and had to be negotiated and documented on a trade-by-trade basis.  As a result, IRS trading involved high transaction costs.  Nonetheless, because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of investors.  These entities also began to use IRS to speculate about interest-rate movements.

63.     The way in which IRS transactions took place also evolved.  The industry adoption of the ISDA Master Agreement — first created in 1987 — drove the standardization of IRS.  By no later than 2000, all of the material terms of most IRS — the tenor, the fixed rate, the benchmark rates used to calculate floating payments, and the timing of payments — were standardized, resulting in lower transaction costs and higher volumes.

64.     Consequently, the IRS market has grown exponentially over the last three decades.  From 2006 to 2014 alone, the outstanding notional value of IRS grew from $230 trillion to $381 trillion.

## B.     The Trading of Interest Rate Swaps

65.     As demand for IRS increased, major banks — including the Dealer Defendants here — took on the role of market making or providing liquidity in the IRS market.  As market makers (also called the "sell side"), these banks became the dealers of IRS, offering fixed and floating-rate cash flows to their customers — the so-called "buy-side" comprising the Plaintiffs and class members here.

66.     IRS trading typically works as follows:  A buy-side customer asks a dealer for a quote either:  (1) to pay the floating rate and receive a fixed rate, or (2) to pay the fixed rate and receive a floating rate.  The rate at which the dealer will pay the fixed rate is known as the "bid,"

and the rate at which it will receive the fixed rate is known as the "offer" or the "ask."  For

instance, a five-year IRS may be quoted by a dealer at a bid of 25 and an ask of 30, meaning that

the dealer will either pay the fixed rate at a 25 basis-point premium above the five-year U.S.

Treasury yield, or receive the fixed rate payments at a 30 basis-point premium above the five-

year U.S. Treasury yield.  The floating rate in either case is typically based on the London

Interbank Office Rate or another benchmark rate.  The fixed rate is the primary term that is

subject to negotiation when entering into an IRS trade.  A buy-side entity that is seeking to pay

the floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed

rate.  A buy-side entity seeking to pay the fixed rate and receive the floating rate will pay the

"ask" or "offer" price quoted by a dealer for the fixed rate.

67.     The Dealer Defendants profit by paying low on fixed rates (*i.e.*, the bid price) and

receiving higher fixed rates (*i.e.*, the ask or offer price).  This difference is known as the "bid/ask

spread" or the "spread."  The wider the spread, the more money the Dealer Defendants make.

The mid-point of the spread is generally known as the mid-market price.

68.     Trading between the Dealer Defendants and their customers occurs OTC,

meaning (at least historically) that an entity seeking to enter into an IRS had to call up various

market-making dealers in hopes of finding a counterparty with which to trade.  In the OTC

environment, a buy-side customer can realistically only call a limited number of dealers, and

because pricing in the market fluctuates there is no way to know how long a price offered by a

dealer will remain open and executable.  As a result, buy-side customers are unable to shop

around, compare all of the dealers' quotes, and force the dealers to compete directly on price.

69.     Even with the emergence of some electronic forms of trading — such as the use

of Bloomberg chats — dealers typically convey their "take-it-or-leave-it" quotes.  Similarly,

while over the last few years some companies have launched trading platforms for trading with buy-side customers, these platforms have done nothing to alter the traditional market dynamics. These trading platforms use a RFQ protocol whereby an end user can request quotes from several dealers at once.  The quotes provided are not live (or executable), and buy-side customers must then, as in conventional OTC trading, contact the dealer over the telephone or via Bloomberg chat to obtain a live price and formalize the swap.

70.     Simply put, whether trading occurs over the telephone, in a Bloomberg chat, or through a RFQ platform, the OTC market is devoid of price transparency or competitive pricing.

71.     In marked contrast, the Dealer Defendants here trade with *each other* in a considerably more competitive and transparent marketplace.  When dealers want to lay off risk on other dealers, they trade on dealer-only platforms provided by inter-dealer brokers ("IDBs").  These platforms are very different than the inefficient OTC trading mechanism to which the Defendants Dealers relegated their end-user customers.

72.     The dealers' exchange-like platforms for inter-dealer transactions offer immediate execution at or close to the mid-market price.  As many IRS products have been standardized for many years, IDBs use electronic exchange-like platforms known as "order books," "limit order books," or "central limit order books" ("CLOBs"), which automatically match the best bids and offers on an anonymous basis.[13]  Dealers submit their bid and ask prices to an IDB, which then publicizes the best quotes, making them viewable to and executable by other dealers.  A dealer can view multiple simultaneous quotes via an IDB platform, thereby giving it access to the best bids and asks in the market.  The dealer can immediately enter into an IRS contract at a quoted

---

[13]   Luke Jeffs, *GFI Boss Defends Hedge Funds Access to Platforms*, FINANCIAL NEWS (Oct. 1, 2007) (Mickey Gooch, the founder and Chief Executive of GFI,  stated that "[f]or the most liquid, electronic markets, there is little difference between the exchanges and the IDBs.").

price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price.  In return for facilitating dealer-to-dealer trades, an IDB earns a fixed-rate commission, known as a "brokerage fee" on each consummated trade.

73.     On an IDB platform, the dealers' identities are concealed from one another until they agree to enter into a trade.  Because IDB platforms allow dealers to view and choose from numerous bid and offer prices, in sharp contrast to the OTC "retail" side of the market, dealers trade with each other at or close to mid-market prices.

74.     This competitive price transparency in the dealer-to-dealer market further benefits the Dealer Defendants because, at the same time they provide bids and asks to the buy-side, they simultaneously see the true mid-market prices available in the interdealer market.

75.     While only dealers have access to limit order book trading, there is nothing inherent about the IRS market that requires that to be the case.  Quite the opposite:  because of the standardization of IRS, increased liquidity, and the availability of clearing, much of the IRS market should have moved years ago to trading on exchange-like limit order book platforms.[14] And there are a number of reasons why the buy-side would welcome order book trading.  "A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[15]  The introduction of all-to-all order book trading brings pricing transparency to the marketplace, typically resulting in a narrowing of bid/ask spreads.

---

[14]     *See* DARRELL DUFFIE, DARK MARKETS 6-7 (2012) ("[S]imple interest rate swaps . . . seem like natural candidates for exchange-based trade but are normally traded over the counter. At this point, we lack convincing theories that explain why such simple and heavily traded instruments are traded over the counter.").

[15]     *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS, *supra* note 7, at 23.

76.     As alleged herein, the buy-side remains locked in an archaic OTC market as a result of Defendants' conspiracy to block the buy-side's access to the trading tools that the sell-side has enjoyed for years.  When insurgent entities have to tried bring exchange trading to the market or open existing IDB exchange-like platforms to the buy-side, the Dealer Defendants have actively preserved the status quo by working together to use their collective market power to prevent such efforts from succeeding.

77.     The only reason this market structure has persisted is the greed and collective market power of the Dealer Defendants.  Trading amongst themselves in transparent efficient markets while relegating the buy-side to the equivalent of the antiquated OTC market allows the Dealer Defendants to extract enormous bid/ask spreads (*i.e.*, supracompetitive profits) from the buy-side.

## II.    DEFENDANTS CONSPIRED TO BLOCK EXCHANGE TRADING OF INTEREST RATE SWAPS

### A.    The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform and to Use it As a Vehicle for Collusion

78.     By 2008, the IRS market was primed and ready for the introduction of all-to-all electronic trading.  Most IRS were standardized, and volume was growing exponentially.  There was no procompetitive reason for the OTC trading system to continue to dominate the trading of IRS.  The benefits that central clearing and all-to-all exchange trading could bring to the IRS market were widely recognized by market participants, regulators, and economists.

79.     There was also tremendous demand from the buy-side for modern, electronic trading platforms for IRS.  Any dealer that would have acted to provide such a platform would have been rewarded with business, lucrative brokerage fees, and good will from the buy-side.  Indeed, by early 2008, Tradeweb was poised to introduce exchange trading to the IRS market —

a development that should have been embraced by the marketplace.  Instead, the Dealer

Defendants acted in concert to neutralize the threat Tradeweb posed.

80.     Tradeweb was initially founded as a private dealer-backed firm owned by a

consortium of banks that focused on creating an online marketplace for fixed-income products,

such as U.S. Treasuries.  Tradeweb offered a dealer-to-client RFQ platform for IRS that lacked

anonymous trading.  Investors could request non-executable and non-binding quotes from

multiple dealers.  Tradeweb's success was dependent on the dealers steering trading volume to

its platform.

81.     In 2004, Tradeweb was acquired by Thomson Reuters.  Not long after, though,

the Dealer Defendants had seller's remorse.  They became concerned that, by selling an

electronic trading platform to an independent company, they had relinquished control over an

entity that could set up a modern electronic trading platform with trading protocols favorable to

the buy-side and disruptive to the established order of the OTC market.  Tradeweb touted itself

as a "real-time trading platform" and boasted it was "well positioned to capture new business as

the market migrates to more efficient electronic trading platforms."[16]  As a result, the Dealer

Defendants resolved to regain control of Tradeweb.

82.     The scheme to take back control of Tradeweb was hatched by high-ranking

executives at the Dealer Defendants.  Goldman Sachs, in particular, championed a "dealer

consortium" strategy whereby the Dealer Defendants would take control of Tradeweb to

neutralize it as a threat and then use their joint control to provide a forum where the Dealer

Defendants could meet to secretly coordinate their conduct under ostensibly legitimate auspices.

---

[16]   *See* TRADEWEB, *Thomson to Acquire TradeWeb* (Apr. 8, 2004), http://www.tradeweb
.com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

83.     This "dealer consortium" strategy was largely devised by Goldman Sachs'

Principal Strategic Investments Group ("PSI").  Goldman Sachs uses this strategy to work with

its "biggest competitors," *i.e.*, the other Dealer Defendants, to control how markets evolve.[17]

The PSI group has been described as for Goldman Sachs to "control how the thing turns out."[18]

In fact, the Goldman Sachs PSI group was organized principally for the specific purpose of

protecting the "dealer community" from the growth of exchange-like trading.

84.     But Goldman Sachs could not execute the consortium strategy on its own, and the

use of the strategy extended to other Dealer Defendants.  JP Morgan has a similar, though

smaller, group which has worked to implement coordination with its competitions.  Other Dealer

Defendants, including Barclays, BNPP, Citigroup, Credit Suisse, and Deutsche Bank, conduct

similar strategic activities through their trading businesses.  As discussed in more detail below,

personnel in these divisions regularly communicate with their counterparts at other Dealer

Defendants to ensure that the dealers are acting in a coordinated fashion.

85.     In the IRS market, these strategic groups coordinated their conduct under a

consortium strategy, code-named "Project Fusion," designed to take back control of Tradeweb.

86.     In 2007, liquidity contracts that Tradeweb had with the Dealer Defendants to

drive volume to Tradeweb's RFQ platform were expiring.  Tradeweb began to worry that its

founding banks would steer liquidity to alternate trading platforms, starving it of necessary

---

[17]    Liz Moyer, *Goldman Group Takes Stakes in Market Evolution*, MARKETWATCH (Jan. 23, 2012), http://www.marketwatch.com/story/goldman-group-takes-stakes-in-market-evolution-2012-01-23.

[18]    *Id.*

trading volume and revenue.  According to one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[19]

87.    As part of "Project Fusion," the Dealer Defendants capitalized on Tradeweb's vulnerability to take back control of the company.  Certain Dealer Defendants — Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS — "agreed to provide liquidity into Tradeweb's markets, including interest-rate swaps."[20]  They also took equity stakes in the company.  In exchange, the Dealer Defendants obtained the right to determine how Tradeweb was governed.  This allowed the Dealer Defendants to ensure that Tradeweb would not convert its platform to one with protocols that would provide more competition and transparency to the buy-side.  HSBC had already been providing liquidity to Tradeweb.[21]

88.    As part of the agreement, the Dealer Defendants that invested in Tradeweb (*i.e.*, Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS) agreed with each other that they would not support

---

[19]    Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

[20]    *Id.*  As explained more fully below, Barclays was initially not allowed to participate in Tradeweb because the other Dealer Defendants had placed it in the "penalty box" for attempting to launch an IRS electronic trading platform.  *See infra* ¶¶ 231-32.  Barclays later was allowed to become an investor in Tradeweb in 2009 (after its penalty had expired).  Bank of America became an investor in 2008, after it acquired Merrill Lynch.  Citigroup also became an investor in 2008.

[21]    *See* TRADEWEB, *TradeWeb Goes Live With U.S. Dollar Denominated Interest Rate Swaps Online Trading and STP* (Sept. 19, 2005), http://www.tradeweb.com/News/News-Releases/TradeWeb-Goes-Live-With-U-S--Dollar-Denominated-Interest-Rate-Swaps-Online-Trading-and-STP/.

other trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all exchange trading.

89.     These Dealer Defendants filled Tradeweb's Board of Directors and governance committees with senior personnel so they could control Tradeweb and use it to collude in secret. They selected Lee Olesky, the former Chief Operating Officer for Fixed Income at Credit Suisse, to serve as CEO.  And they installed one of the chief architects of their consortium strategy, Vic Simone, a Managing Director at Goldman Sachs and the former head of Goldman Sachs' PSI Group, as Chairman of Tradeweb's Board of Directors.[22]

90.     Mr. Simone was succeeded as Chairman by Brad Levy, who also took over as the Global Head of Goldman Sachs' PSI Group.  In other words, the head of the Goldman Sachs division responsible for the consortium strategy designed to work with other dealers to control the infrastructure of the swaps market served as the Chairman of Tradeweb's Board.

91.     The Dealer Defendants packed the remainder of Tradeweb's Board with their personnel, a number of whom were drawn from the Dealer Defendants' groups responsible for coordinating market strategy and structure with other Dealer Defendants.

92.     In addition to Messrs. Simone and Levy, Goldman Sachs personnel on Tradeweb's Board of Directors included Colin Corgan, a partner on the Rates Desk.  Bank of America personnel on Tradeweb's Board of Directors included Shea Wallon, a Managing Director in the Strategic Investments Group, which is the functional equivalent of the PSI and tasked with addressing market structure changes through coordination with counterparts at other

---

[22]   *See* TRADEWEB, *Tradeweb Appoints New CEO* (Sept. 9, 2008), http://www.tradeweb. com/News /News-Releases/Tradeweb-Appoints-New-CEO/; TRADEWEB, *Citi Takes Equity Stake in Tradeweb* (Apr. 8, 2008), http://www.tradeweb.com/News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb/.

Dealer Defendants.  Other Bank of America personnel on the Tradeweb Board included Luke
Halestrap, the Head of Emerging Markets Interest Rates, David Moore, the Head of North
America Rates Trading, and Nicholas Brophy, the Head of the Americas Core Rates Trading.

93.    Barclays personnel on Tradeweb's Board of Directors included Dexter Senft, who
subsequently headed Morgan Stanley's Fixed Income E-Commerce division, Andrew Challis,
the Head of eFICC Distribution and Market Strategic Investments, and Christopher Mosher.
Citigroup personnel on Tradeweb's Board of Directors included Sandeep Arora, the Chief
Operating Officer, and Nicholas Brophy, the former Head of Rates Trading in the Americas.
Credit Suisse personnel on Tradeweb's Board of Directors included Sean Flynn, the Global Head
of Investment Banking Strategy, and Timothy Blake, the Head of Interest Rates Trading in the
United States.

94.    Deutsche Bank personnel on Tradeweb's Board of Directors included Michele
Faissola, the Head of Global Rates, and Stephen Wolff, the Head of Fixed Income e-Commerce
and the Head of Interest Rates Trading.  JPMorgan personnel on Tradeweb's Board of Directors
included Simon Maisey, Head Global Rates ecommerce & Market Structure, Christopher Paul
Wilcox, the Global Head of Rates Trading and the Head of Global Rates Strategic Investments,
and Kemal Askar, the Head of Rates Trading in the United States.

95.    Morgan Stanley personnel on Tradeweb's Board of Directors included Dexter
Senft, the Global Head of Fixed Income E-Commerce, and David Moore, the Global Head of
Structured Interest Rates.  RBS personnel on Tradeweb's Board of Directors included Michelle
Neal, the Global Head of Electronic Markets and co-head of FICC Prime Services, and Richard
Volpe, the Global Head of Dollar Interest Rates.  UBS personnel on Tradeweb's Board of

Directors included Stuart Taylor, the Head Global eBusiness in Fixed Income, Joan Lavis,

Global Head of Strategic Investments, and Paolo Croce, Head of European Rates.

96.     The Dealer Defendants used Tradeweb to meet in private and secretly to conspire

to control the IRS market.  The aforementioned individuals, and others, met regularly under the

cover of Tradeweb's Board and informally, outside of formal Board duties, to coordinate their

joint efforts to prevent the buy-side from being able to trade IRS in an all-to-all, limit order book

model.

97.     In addition to routine conference calls, which take place as often as every week,

the Board meets annually in person in Miami, Florida.  The Dealer Defendants used these

meetings to discuss and coordinate their strategy and to further their conspiracy to maintain a

bifurcated IRS market.

98.     These personnel also regularly discussed market structure issues outside of the

board or committee meetings.  Chris D'Annibale, the Head of Interest Rate Swaps for

Tradeweb's interdealer SEF, Dealerweb, regularly hosted dinners at his home in Long Island and

at restaurants in New York City that were attended by representatives of the Dealer Defendants.

At these dinners, the Dealer Defendants coordinated their strategies for the IRS market.  In such

formal and informal communications and meetings, the Dealer Defendants regularly discussed

their plans for keeping the market bifurcated and preventing the transition to exchange trading.

99.     The Dealer Defendants also exercise control of Tradeweb via its governance

committees.  Some examples of Tradeweb's governance committees are the "participation

committees" that determine who can participate on Tradeweb's SEFs.[23]  Acting through these

---

[23]     *See* TRADEWEB, *DW SEF LLC:  SEF Participation Committee Charter*, http://www.
tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Particip

committees, the Dealer Defendants met and agreed how to coordinate their conduct to ensure no threat to their collective dominance of the OTC market would succeed. To facilitate the conspiracy, Tradeweb keeps these committees and the identities of their members hidden from the public.

100.    Tradeweb holds itself out as an independent company, pursuing its own objectives in the market. The Dealer Defendants, however, pressured Tradeweb to agree to take actions against its own individual interest. For instance, the independent (*i.e.*, non-bank) managers of Tradeweb recognized it would be in Tradeweb's interest to launch an all-to-all anonymous electronic trading platform, and took steps to implement such a platform. But upon learning of these attempts by Tradeweb's personnel, the Dealer Defendants quickly pressured them to change course. In turn, the Tradeweb managers agreed with the Dealer Defendants that Tradeweb would not implement procompetitive changes to its trading platform.

101.    The Dealer Defendants publicly tout Tradeweb as a modern, efficient trading platform that can provide "accurate pricing information" and "greater market transparency."[24] But these "benefits" are a sham, and were introduced only to placate the buy-side's increasing demands for all-to-all trading. Pursuant to its agreement with the Dealer Defendants, Tradeweb merely put a new sheen on the OTC market structure — it facilitated *only* dealer-to-client trades

---

ation%20Committee%20Charter.pdf (last visited Feb. 24, 2016); TRADEWEB, *TW SEF LLC: SEF Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/uploadedFiles/ Tradeweb/Content/About_Us/Regulation/TW%20SEF%20Participation%20Committee%20Char ter.pdf (last visited Feb. 24, 2016).

[24]    TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007), http://www.tradeweb.com/MediaCenter TwoColPage.aspx?Pageid=1124&id=1881&LangType=1033&&LangType=1033&ekfxmen_nos cript=1&ekfxmensel=ef6f32368_6_84.

on an RFQ platform, rather than through an order book, and does not allow buy-side clients to trade directly with one another.

102.    As a result, the Dealer Defendants are able to use Tradeweb to extract the same supracompetitive profits on dealer-to-client trades that they had historically realized in the OTC market.  Absent a conspiracy, this would be against Tradeweb's independent interest.  Making an efficient, hotly demanded trading platform available to all market participants would increase the number of trades on Tradeweb and thus increase the fees that it obtained.  Tradeweb's conduct only makes sense as an instrument of the conspiracy.

103.    Today, pursuant to its agreement with the Dealer Defendants, Tradeweb plays an active role in maintaining a two-tiered market structure.  Tradeweb currently operates two different SEFs:  Dealerweb, which is "designed exclusively for dealers" and allows anonymous trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[25]  Tradeweb charges approximately $50,000 per month to trade on Dealerweb, but only approximately $100 per month to trade on Tradeweb.  It is "challenging to find a legitimate rationale for this enormous cost differential between these two platforms operated by the same company."[26]  That is because the real reason for this cost structure — which was set up jointly by the Dealer Defendants — is that it "effectively establishes and entrenches a bifurcated dealer-to-dealer and dealer-to-customer marketplace" in furtherance of Defendants' conspiracy.[27]  In fact, Tradeweb is so committed to denying the buy-

---

[25]    DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES DEALERS CLUB 12 (Feb. 2016), https://www.bettermarkets.com/sites/default/files/Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

[26]    *Id.*

[27]    *Id.* at 12-13.

side access to exchange-like platforms that while Tradeweb SEF technically offers an 'order book,' this platform is not available to users in any meaningful sense, and is not even viewed as an active trading platform by those in the industry.

104.    As Jon Williams, Managing Director and Head of U.S. Institutional Market Operations at Tradeweb, stated during a recent panel discussion at SEFCON in New York City: "we don't have buy-side participants" on Dealerweb.  Again, this is the result of Tradeweb's agreement with the Dealer Defendants, and of their agreement with each other.

**B.**    **The Dealer Defendants Utilize Other Forums to Collude**

105.    While Tradeweb is the principal consortium through which the Dealer Defendants secretly work together to control the IRS market, the Dealer Defendants coordinate their conspiracy through other forums as well.

106.    One of these is the International Swaps and Derivatives Association ("ISDA"). ISDA is nominally an industry trade group, but in reality, during the Class Period, it served the interests of the Dealer Defendants.

107.    From 2008 to the present, the Dealer Defendants controlled ISDA's Board of Directors and used those roles to discuss the IRS market and their conspiracy.  The following employees of the Dealer Defendants hold positions on the ISDA Board of Directors, and use ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-all electronic platforms for IRS trading:  Stephen O'Connor (Morgan Stanley:  Chairman), Ciaran O'Flynn (Morgan Stanley:  Director), Keith Bailey (Barclays:  Secretary), Diane Genova (JP Morgan:  Treasurer), Biswarup Chatterjee (Citigroup:  Director), Kieran Higgins (RBS:  Director), Thibaut de Roux (HSBC:  Director); Elie El Hayek (HSBC:  Director); Christopher Murphy (UBS:  Director), Will Roberts (Bank of America:  Director), and Eraj Shirvani (Credit Suisse:  Director).

108.    In addition, the Dealer Defendants meet and collude under the auspices of meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of various FIA "working groups."  The following employees of the Dealer Defendants currently hold positions on the Board of Directors of FIA America (FIA's American division):  M. Clark Hutchison (Deutsche Bank), Emily Portney (JP Morgan), Michael Dawley (head of Goldman Sachs' FCM), Craig Abruzzo (Morgan Stanley), Malcolm Clark Hutchison (Morgan Stanley), Jeffrey Jennings (Credit Suisse), Raymond Kahn (Barclays), Jerome Kemp (Citi), Najib Lamhaouar (HSBC), Edward Pia (UBS), George Simonetti (Merrill Lynch, Pierce, Fenner & Smith).

109.    ISDA and FIA often coordinate to create "working groups" that provide a forum for collusion.  One such working group was devoted to the drafting of the "Cleared Derivatives Execution Agreement" ("CDEA") — a standard form contract intended to govern the relationship between FCMs and their customers.  The "CDEA Drafting Committee" was chaired by Maria Chiodi, a Director and In-House Counsel at Credit Suisse.

110.    The CDEA Drafting Committee held numerous meetings throughout 2010 and 2011.  One such meeting was held on April 8, 2011 at the offices of Credit Suisse at 11 Madison Avenue, New York, NY.  Employees from Javelin, a potential trading platform discussed further below, learned of the meeting in advance, and requested an invitation because they were concerned that the CDEA Drafting Committee was being used to prevent or limit trading on all-to-all anonymous trading platforms.  At the meeting, a Javelin employee asked how the CDEA — which appeared to have been drafted solely for OTC transactions, and did not seem to cover IRS trades executed on a SEF — would work for trades executed on a SEF.  Athanassios Diplas, then a Managing Director at Deutsche Bank and Co-Chair of ISDA's Industry Governance

Committee, immediately asked to know the Javelin employee's name and who she worked for, and refused to answer her question. After the meeting, Ms. Chiodi emailed Javelin employees and told them that it was inappropriate for any representatives of SEFs to attend future CDEA Drafting Committee meetings.

111. The Dealer Defendants also met and conspired through Tradition SEF, another IDB. From 2013 to 2015, Tradition personnel hosted monthly meetings in New York with the collective heads of the Dealer Defendants' IRS trading desks to discuss issues relating to SEFs. The Dealer Defendants used these meetings to coordinate their positions regarding the IRS market and to ensure that none of them broke ranks from each other to support electronic trading platforms that would threaten the Dealer Defendants' control of the market.

### C.   The Dealer Defendants Prevented Interdealer Brokers From Opening Exchange-Like Platforms to the Buy-Side

112. In addition to taking control of Tradeweb and preventing it from offering more competitive trading, the Dealer Defendants conspired to prevent other market actors from opening exchange-like platforms. In particular, the Dealer Defendants identified IDBs as a potential platform for facilitating buy-side exchange trading, and moved decisively to quash that threat.

113. By 2008, a number of IDBs were well-positioned to bring to market all-to-all IRS trading platforms that included the buy-side. Many already operated such platforms in the interdealer market, and opening access to buy-side entities would not have posed any additional technological burden. Since IDBs earned brokerage fees on each trade on their platforms, they had strong financial incentives to open their platforms to buy-side firms. Great demand existed for this to happen.

114.    The Dealer Defendants, however, jointly used a carrot and stick approach to prevent IDBs, including ICAP, from opening their platforms to the buy-side.  As a carrot, the Dealer Defendants agreed with ICAP and other IDBs that the dealers would direct IRS transactions between themselves onto IDB platforms and that, in exchange for this dependable revenue stream, the IDBs would not allow buy-side firms to trade on their platforms.  As part of this arrangement, the Dealer Defendants committed to the IDBs that they would prevent any client-facing platforms from expanding into the interdealer space, including into the IRS interdealer market.  At the same time, the Dealer Defendants also threatened the IDBs with collective boycotts if they allowed buy-side access to their platforms.[28]

115.    In 2009, ICAP, the leading IDB in IRS, was poised to break from this arrangement and begin offering IRS exchange trading to the buy-side.  In April 2009, one of ICAP's competitors, Tradeweb (which was at this point owned by the Dealer Defendants), decided to enter the mortgage bond market, offering a trading platform through a division known as Dealerweb.[29]  The result was that ICAP "lost 85 percent of its business over six weeks" in the mortgage bond market after Dealerweb "basically walked away with the market."[30]  Tradeweb's move left ICAP and other IDBs concerned about whether Tradeweb would launch a similar

---

[28]    *See, e.g.*, Levinson, *supra* note 4 (noting that when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform").  GFI's platform was targeted at the CDS market, but industry sources have confirmed that similar behavior has occurred in the IRS market.

[29]    *See* Bryce Elder & Neil Hume, *Icap Hurt by Banks' Platform*, FINANCIAL TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz 419KBvtLz.

[30]    Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009), http://www.bloomberg.com/apps/news?pid=news archive&sid=aCxaCOeOAPBE.

platform in other asset classes, including IRS — a move that clearly would be in Tradeweb's self-interest.

116.    In retaliation for capturing the mortgage bond market, ICAP threatened the Dealer Defendants with an all-to-all exchange for IRS.  ICAP was already developing an electronic-trading platform for the European IDB IRS market called i-Swap that it could have launched as an all-to-all fully anonymous IRS trading platform in the United States and that could have included the buy-side.[31]  This threatened to collapse the bifurcated IRS market the Dealer Defendants were working together to maintain.

117.    But ICAP never launched the platform.  To avoid damaging each other's business, ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer Defendants would not further expand (through Dealerweb) into the IDB space in exchange for ICAP not expanding into the dealer-to-client space by establishing an all-to-all anonymous IRS trading platform.  In addition to their economic leverage over ICAP, the Dealer Defendants were able to broker and maintain this agreement because they maintain close relationships with ICAP's CEO, Michael Spencer.

118.    Despite it being in Tradeweb's economic self-interest to repeat its rapid success in the mortgage bond interdealer market in other markets, DealerWeb did not expand into IRS or any other market, pursuant to its agreement with the Dealer Defendants.  Similarly, pursuant to

---

[31]    *See* Michael McKenzie, *Rate Swap Traders Wait For No Man*, FINANCIAL TIMES (Oct. 19, 2010), http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html #axzz3p2lJ0933 (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market").

its agreement with the Dealer Defendants, and against its own economic self-interest, ICAP did

not move the end user IRS market onto ICAP's i-Swap platform, limiting it only to dealers.[32]

119.   In February 2013, ICAP expanded i-Swap to the United States, but again limited

participation to the dealers.[33]  Although ICAP publicly promoted that its platforms were open to

all entities in order to comply with certain provisions of Dodd-Frank, its brokers in actuality

prevented buy-side access to i-Swap by refusing to accept bids or offers from buy-side entities

for voice-brokered trades or for inclusion on the order book platform.  ICAP refused such access

to buy-side entities as a result of an agreement with the Dealer Defendants.

120.   In return, the Dealer Defendants supported i-Swap by directing their business to

it, a strategy designed to keep ICAP happy by prolonging its status as the lead IRS IDB and

ensure that it saw no need to open up the platform to the buy-side.  Certain of the Dealer

Defendants also entered into written agreements covenanting they would not support other

electronic IDB platforms, and would inform each other if they were approached by such a

platform.

121.   ICAP's restriction on the use of i-Swap was the result of the agreement between

ICAP and the Dealer Defendants to maintain the bifurcation of the market for IRS.  Absent

Defendants' conspiracy, it would have been in ICAP's interest to launch i-Swap as an all-to-all

anonymous trading platform where the buy-side could trade directly with each other without

going through a dealer.

---

[32]   *See* ICAP, *i-Swap*, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Feb. 24, 2016) (noting that upon launch, i-Swap was not open to buy-side participants, that i-Swap "has a number of features that are specifically developed to reflect the trading strategies of the banks" and that, even today, i-Swap is not directly open to the buy-side).

[33]   *See* ICAP, *ICAP Launches i-Swap in the US* (Feb. 19, 2013), http://www.icap.com/what-we-do/electronic/i-swap.aspx.

122.     In exchange for ICAP's agreement to block exchange trading, the Dealer Defendants continue to direct liquidity only to SEF operators, such as co-conspirators ICAP and Tradeweb, that play by the agreed-upon rules of the market.  Trading platforms that comply with the rules of the conspiracy receive the vast majority of the trading volume of the Dealer Defendants, resulting in high revenues.

123.     Industry data demonstrates the market bifurcation resulting from Defendants' conspiracy.[34]  Clarus reports daily trading volume for each SEF, and each SEF is categorized as either a "D2C" (Dealer-to-Client) or "D2D" (Dealer-to-Dealer) SEF.

124.     As shown in the figure below, approximately 98% of what Clarus considers Dealer-to-Client trading volume occurs on Tradeweb and Bloomberg.  Trading on these two platforms occurs exclusively through the RFQ protocol with post-trade "name give-up."  These trading features are at the core of the conspiracy, and any buy-side-facing SEF that breaks these rules is left *de minimis* (or no) trading volume.



---

[34]   The data below comes from Clarus SEFView, *Data for 02/16/2016 – 02/22/2016*.

125.     The D2D side of the market is made up of SEFs that have agreed to play by the rules of the conspiracy.  *None* of the D2D SEFs shown below allow end users to trade on their platforms.



126.     Notably, the Dealer Defendants have maintained the market share of Dealerweb, the inter-dealer SEF owned and operated by Tradeweb, at a mere 2%.  This reflects the fact that the Dealer Defendants are — *jointly* — rewarding the IDBs for complying with their demands that IDB platforms remain off-limits to the buy-side.  At the same time, the Dealer Defendants — *jointly* — maintain Dealerweb as a nascent threat to those IDBs, by providing it with minimal liquidity.  The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their liquidity to Dealerweb, as they had done before, for example, in the mortgage-bond market,

when the Dealer Defendants abruptly shifted 85% of trading volume to Dealerweb, "walking away with the market."[35]

### D.   The Dealer Defendants Conspired to Block Swap Execution Facilities and Exchange-Like Trading Platforms From Entering the Market

127.    Consistent with their agreement to block all-to-all trading on limit order books, Defendants acted in concert to boycott existing exchange-like trading platforms and prevent the emergence of new trading platforms that would have brought such trading possibilities to the buy-side.  By their agreement reached originally under the auspices of Tradeweb, and maintained by mutual assurances thereafter, the Dealer Defendants have collectively refused to trade on all-to-all anonymous platforms that are open to the buy-side, effectively starving those platforms of the liquidity necessary to operate.

128.    The heads of the Dealer Defendants' IRS trading desks maintained an ongoing dialogue about their preferred structure of the IRS market during the Class Period.  These "heads of rates" regularly communicated with each other during the Class Period through email, Bloomberg messages, lunches and dinners, industry conferences, and other similar events.  In these discussions, these heads of rates desks discussed their mutual desire to maintain the status quo and prevent electronic trading.

129.    In 2010, Congress passed the Dodd-Frank Act in an effort to bring increased transparency and competition to swaps and other derivatives markets.  Among other things, Dodd-Frank mandated that certain derivatives, including IRS, be traded on exchanges or SEFs.  Congress envisioned that exchanges or SEFs would include trading platforms on which the buy-

---

[35]   Leising & Shenn, *supra* note 30.

side could trade electronically with other buy-side members or dealers — thereby reaping the benefits of exchange trading in the form of price transparency and competitive pricing.

130.    Faced with the threat that electronic trading platforms or SEFs would upset the market order in which they sat at the top, the Dealer Defendants worked together to prevent exchange-like trading platforms from introducing greater competition and transparency to the buy-side.  Among other things, the Dealer Defendants conspired to ensure that no SEF would succeed if it tried to offer anonymous all-to-all trading platforms.

131.    Personnel from the Dealer Defendants' strategic groups, including Messrs. Levy and Hartnett, met regularly in informal settings to carry out an ongoing dialogue concerning the Dealer Defendants' views on, and coordinate their respective Dealer Defendants' strategy with respect to market strategy in furtherance of the conspiracy.  They discussed their joint opposition to the exchange-trading of IRS and the fact that exchange trading would result in the compression of bid/ask spreads and lower profits.  These interactions were routine during the Class Period.  During these secretive discussions, these bank personnel mapped out strategies for neutralizing the threat posed by SEFs.

132.    The Dealer Defendants did this, principally, by boycotting market entrants that dared to try to open up exchange-like trading of IRS to the buy-side.  These efforts have "been relentless — sometimes buried in SEF rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[36]  As a result of these collective steps, Defendants have successfully prevented meaningful change in the market.[37]  As Richard Mazzella, Chief

---

[36]    KELLEHER et al., *supra* note 25, at 12.

[37]    *See* Leising, *supra* note 8 ("Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change — and little indication that it's coming.  Banks

Operating Officer for Global Fixed Income at Citadel explained, there remains "a two-tier market today on the S[EF]s — dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."[38]

133.   The IRS market does not have to operate this way.   In fact, not long ago, reflecting the fact that the extent of Defendants' collusion was previously unknown to the market, market participants forecasted "that 40 to 50 firms could end up competing for swaps execution business."[39]   Today, however, only a few independent SEFs offer anything close to anonymous all-to-all trading, and those few are on their last legs.[40]

134.   At least three different SEFs — Javelin, TeraExchange, and TrueEx — developed the necessary technology, secured the required regulatory approvals, and were able to garner sufficient buy-side support to bring exchange-like trading platforms to the buy-side.   These platforms would have introduced anonymous all-to-all trading of IRS for the buy-side, bringing more competition and transparency to the market.

135.   The Dealer Defendants effectively killed off each of these SEFs by refusing to trade on and clear for them.   That is, the Dealer Defendants conspired to boycott these entities.

136.   Each of these three SEFS — Javelin, TeraExchange, and TrueEx — are headquartered in New York City, and thus the Dealer Defendants' boycott, which involved the

---

are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another.").

[38]   Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, Risk (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-anonymity.

[39]   Mike Kentz, *SEF Start-ups Face Obstacles*, Int'l Fin. Rev. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[40]   *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

participation of foreign Dealer Defendants, was focused squarely on this District. All three SEFs had face-to-face meetings with Dealer Defendants in New York City. In addition, many of the secret meetings where the Dealer Defendants agreed to boycott these three SEFs were held in New York.

137. When new trading platforms, such as those operated by the SEFs described below, solicited the participation of the Dealer Defendants, the Dealer Defendants would speak with each other to ensure collective action with respect to the platform. When, for instance, a SEF approached Goldman Sachs, its point of contact would be a member of the ecommerce division, whose job was to review the platform and then present it to senior staff, including the Head of Interest Rates, members of the Principal Strategic Investments Group, and heads of the relevant trading desks, along with a recommendation as to whether Goldman Sachs should use the platform.

138. With respect to the SEFs described below, the Dealer Defendants shared with each other their joint intentions to keep these insurgent platforms from entering the market and threatening their positions as the incumbent market makers. They used a variety of tools to ensure that these platforms failed so they could keep the buy-side relegated to trading on platforms that are nothing more than the functional equivalent of the OTC marketplace.

139. The result is that each such SEF has done little or no IRS trading and the buy-side continues to be shut out of exchange-like trading.

1.    *The Dealer Defendants boycotted Javelin*

140. In 2011, Javelin began developing an anonymous all-to-all IRS exchange-like trading platform. Javelin planned "to offer firm pricing for swaps as opposed to the indicative

quotes that are offered on most other platforms."[41]  This would have been a major step forward for the buy-side, granting them access to an exchange-trading platform similar to those used by the Dealer Defendants.

141.    In 2013, Javelin began soliciting support for its platform by demonstrating its utility to many buy-side entities and dealers, including Dealer Defendants such as Deutsche Bank, Goldman Sachs, JP Morgan, and RBS.  Many such meetings were held at Javelin's offices in New York.

142.    Despite tentative initial support from RBS, and a number of second-tier dealers, the remaining Dealer Defendants refused to agree to support Javelin.  This is because, as noted above, they had agreed with each other only to support platforms they could control.  For instance, Mark Millindorf, a Vice President at Deutsche Bank, repeatedly informed Javelin that the bank would not use the platform.  At these meetings, Javelin learned that Deutsche Bank was holding weekly meetings to discuss its strategy for responding to SEFs like Javelin.

143.    Javelin also met with Cassandra Tok (Head of Futures and OTC Clearing Sales) and Tony Smith (Vice President, Network Engineering) from Goldman Sachs in New York, on September 24, 2013.  At the meeting, Ms. Tok and Mr. Smith were careful not to state outright that Goldman Sachs would not support Javelin, but they demonstrated hostility to Javelin operating as a CLOB trading platform.

144.    Despite these warning signs, and with the support of RBS, by 2013, Javelin was preparing to launch its platform.  The Dealer Defendants, however, became increasingly concerned as Javelin prepared to go live.  They recognized that if Javelin successfully launched an anonymous, all-to-all trading platform for IRS, it would attract liquidity, increase price

---

[41]    Kentz, *supra* note 39.

transparency, and therefore imperil their privileged status as market makers in a bifurcated market.  Accordingly, they collectively took steps to sabotage the platform.

145.    In September 2013, Javelin conducted a series of mock trading sessions to showcase its all-to-all anonymous trading platform to dealers and buy-side entities.  In advance of the trading sessions, Javelin asked many of the Dealer Defendants' FCMs[42] to conduct pre-trade credit checks for their buy-side customers to participate in the sessions.  Many of the Dealer Defendants' FCMs refused to provide pre-trade credit checks or push credit to the platform.  While some of the Dealer Defendants, including JP Morgan and RBS, were willing to test the platform's operability, others, such as Deutsche Bank and Goldman Sachs, flatly refused to engage.  Around this time, at least one Javelin employee was informed by an acquaintance who worked for a Dealer Defendant that he should "look for a new job."

146.    Nonetheless, many buy-side firms, and certain second-tier dealers, were impressed by Javelin's platform.  Based on the strength of its technology, Javelin signed up a number of entities to provide liquidity to the platform, including Citadel, ING Group, Natixis, RBS, and Scotiabank.  Even with this limited initial liquidity, the immediate price transparency and anonymity resulted in remarkably competitive pricing on the platform, with bid/ask spreads routinely one-quarter basis point wide, and often as low as one-eighth of a basis point wide.  These prices were routinely better than the prices that a buy-side firm could obtain from a dealer on a dealer-to-client RFQ platform such as Tradeweb.

---

[42]    An FCM is a dealer-owned entity that facilitates clearing for end users.  Because buy-side entities cannot meet the large capital requirements of clearinghouses, they clear their trades through FCMs, which are members of the clearinghouses.  If an FCM refuses to clear a trade for its buy-side client on a platform, the client is effectively prevented from trading on the platform.

147.    With the exception of RBS (and then only for a short period of time), the Dealer Defendants collectively refused to trade on or provide liquidity to Javelin.  Despite its successful test of the platform, JP Morgan held firm with the other Dealer Defendants and refused to provide liquidity or trade on the platform.

148.    In addition, the Dealer Defendants' FCMs refused to clear buy-side trades coming from Javelin, effectively preventing the buy-side from using its CLOB.  Goldman Sachs, for instance, explicitly told Javelin that there was "no way" that its FCM would ever clear trades for any client coming from the platform.  Deutsche Bank and JP Morgan similarly made explicit their refusal to clear trades for Javelin.

149.    Some Dealer Defendants went even further, and actively pressured their customers not to trade on Javelin.  In particular, in October 2013, NISA Investment Advisors LLC ("NISA"), a large buy-side firm, was eager to trade on Javelin.  When Goldman Sachs, NISA's FCM, learned of this, a Goldman Sachs employee called a NISA employee and informed him that if NISA traded on Javelin, Goldman Sachs would withdraw all clearing services for the buy-side entity in any trading venue.

150.    Subsequently, Javelin employees met with Tony Smith (Vice President, Network Engineering) of Goldman Sachs, and confronted him about Goldman Sachs' refusal to clear trades for Javelin.  Mr. Smith responded that under no circumstances would Goldman Sachs deal with Javelin.  He also stated that, if Goldman Sachs was somehow forced to clear trades for Javelin, it would simply set the credit limits for all of its customers who attempted to trade on Javelin at "zero," thereby preventing them from clearing any trades.  That is, Goldman Sachs' FCM was *willing to forego clearing revenues and damage customer relationships in order to shut Javelin out of the market*.

151.    Despite these formidable obstacles imposed by the Dealer Defendants, Javelin

was able to get some trading volume from its participants and, by the spring of 2014, it had

signed up approximately 80 entities to trade on the platform.  However, as a result of difficulty

with FCMs and threats from the Dealer Defendants, few were able actually to execute trades on

the platform.

152.    Defendants' boycott was so successful that *only one customer* — Mitsubishi UFJ

Financial Group ("Mitsubishi") — was able to conduct more than a *single trade* on Javelin.

Unlike the Dealer Defendants, Mitsubishi, while technically organized as a bank, does not derive

significant revenues from market making, and instead focuses its IRS business on proprietary

trading, meaning its motivations are much more aligned with a traditional buy-side firm than

with the Dealer Defendants.  For approximately nine months in 2014, Mitsubishi repeatedly

attempted to trade on Javelin, but ultimately ceased all activity.  When asked why they had

stopped trading on Javelin, Mitsubishi traders informed Javelin that they had received "too much

static" from JP Morgan, their FCM, for doing so.

153.    In or around April 2015, after observing the Dealer Defendants' collective refusal

to provide liquidity to the platform, RBS abruptly withdrew its support to provide liquidity to

Javelin in order to close ranks with its co-conspirators.

154.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no

revenues and facilitates no IRS trading.[43]  Despite years of development and millions of dollars

in investment capital, less than 200 trades have been executed on Javelin since its launch.

Absent the Dealer Defendants' anticompetitive boycott, buy-side firms would have traded

---

[43]    *See* Mike Kentz, *Cawley Exit Signals SEF Troubles*, INT'L FIN. REV. (May 10, 2014),
http://www.ifre.com/cawley-exit-signals-sef-struggles/21144521.article.

between and amongst themselves on Javelin's platform, leading to greater competition in the IRS market and tighter bid/ask spreads, which would have benefited Plaintiffs and the Class.

155.    The Dealer Defendants' joint opposition to Javelin was coordinated.  For example, Javelin employees had numerous conversations with representatives from the Dealer Defendants (*i.e.*, Bank of America, Barclays, BNPP, Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS) from August 2013–April 2015 (and RBS beginning in 2015), where they proffered nearly identical excuses for their refusal to deal, pointing to a supposed lack of buy-side participation on Javelin as the reason for their actions.

156.    In fact, these excuses were entirely pre-textual, given that the Dealer Defendants had gone to great lengths to ensure that buy-side firms did not trade on Javelin.  As noted above, Javelin had committed liquidity providers by this point, guaranteeing the Dealer Defendants would have counterparties to trade with, and frequently featured IRS prices that were competitive with or better than rival platforms like Tradeweb.  The real reason for the Dealer Defendants' collective refusal to deal was their unlawful agreement to boycott any platform that threatens to bring exchange trading of IRS to the buy-side.

### 2.    *The Dealer Defendants boycotted TeraExchange*

157.    TeraExchange was formed in 2010.  After raising $7 million in capital on a $27 million valuation, it developed an anonymous order book for several asset classes, including IRS.[44]  TeraExchange went to great lengths to create a viable CLOB trading platform.  It connected to the clearinghouse of the Chicago Mercantile Exchange ("CME"), and worked to

---

[44]   TERAEXCHANGE, http://www.teraexchange.com/teraexchange.html (last visited Feb. 25, 2016).

develop a portfolio margining system so participants could easily calculate and post collateral for their cleared IRS.[45]

158.    TeraExchange spent millions of dollars developing its platform.  It launched in 2011 with a robust offering that was, along with other SEFs "poised to take business from the big banks that have dominated swaps trading."[46]

159.    TeraExchange focused on attracting non-traditional liquidity providers to make markets on the platform, including buy-side entities and second-tier swap dealers.  TeraExchange knew these entities could provide sufficient initial liquidity for the platform to launch, even without the Dealer Defendants.  It believed that once trading on the platform began, other buy-side entities would join the platform to take advantage of the tighter bid/ask spreads, increased liquidity, and ease of execution available on an order book.  TeraExchange was confident that buy-side entities, seeing the advantages of trading on its CLOB, would demand that swap dealers trade with them on the platform, rather than OTC or on an RFQ platform.  TeraExchange believed that swap dealers, having no legitimate reason to refuse to utilize the platform, would follow, bringing their own liquidity.  Indeed, this is what would have occurred in a competitive market.

160.    In promoting its platform, TeraExchange met with hundreds of market participants, many of which committed to using the platform.  These included, among others,

---

[45]    *See* PR NEWSWIRE, *TeraExchange Connects to CME Clearing to Provide Margin Relief to Customers Trading Interest Rate Swaps, Eurodollar and Treasury Futures* (June 25, 2013), http://www.prnewswire.com/news-releases/teraexchange-connects-to-cme-clearing-to-provide-margin-relief-to-customers-trading-interest-rate-swaps-eurodollar-and-treasury-futures-212928021.html.

[46]    Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

Susquehanna International Group, LLP; Annaly Capital Management, Inc.; Mizuho Bank, Ltd.; DRW Holdings, LLC; and AQR Funds. These entities carried out successful tests of TeraExchange's technology in connection with their trading interfaces.

161. TeraExchange brought its CLOB online in 2011.

162. A number of the Dealer Defendants, including Goldman Sachs, initially voiced support for TeraExchange's CLOB. In reality though, the Dealer Defendants recognized that TeraExchange's CLOB would enable alternative liquidity providers to directly compete with them for business.

163. To undermine the platform, many Dealer Defendants' FCMs simply refused to clear trades executed on TeraExchange for any of their clients, despite clearing trades for those same clients on other SEFs. By refusing to clear trades from TeraExchange, the Dealer Defendants effectively kept their buy-side clients from trading on the platform.

164. Senior personnel from TeraExchange attempted to convince the FCMs to change their minds, but they ran into numerous brick walls. When, for instance, TeraExchange met with Bob Burke, the head of clearing for Bank of America, Burke said: "my bosses are never going to let me" clear trades for TeraExchange.

165. Similarly, Ray Kahn (Managing Director, Global Head of Futures Clearing & Americas Head of Agency Derivative Services, Barclays) told TeraExchange that Barclays could not clear trades from TeraExchange because it was "resource constrained." This excuse was plainly pre-textual, as clearing trades from TeraExchange required minimal resources, and Barclays performed similar services for clients using other SEFs.

166.    The FCMs of the other Dealer Defendants also universally refused to clear trades for TeraExchange.  As this was occurring, representatives from numerous Dealer Defendants informed personnel at TeraExchange that its platform would never succeed.

167.    For instance, ANZ Bank cleared its trades through FCMs at Bank of America and Citi.  When ANZ asked Citi to clear its trades from TeraExchange, Chris Perkins, the head of clearing at Citi, informed ANZ that it would not clear ANZ's trades from TeraExchange's platform.

168.    Observing the barriers that the Dealer Defendants had put into place, support for the platform began to waver.  Susquehanna International Group, LLP, for instance, withdrew its commitment to the platform.

169.    TeraExchange obtained temporary registration as a SEF in June 2013, causing the Dealer Defendants to be more vocal in their opposition.  As a result, many buy-side entities became concerned about meeting with TeraExchange for fear of reprisal from their FCMs.  One buy-side entity, for instance, feared that "JP Morgan knew" it was meeting with TeraExchange.

170.    Annaly Capital Management, Inc. and Mizuho Bank, Ltd. successfully conducted the first trade on TeraExchange's CLOB in the summer of 2013; the trade was for a notional amount of $10 million, and it was cleared through the CME's clearinghouse by BNP Paribas Securities Corp., the clearing affiliate of BNPP.  Upon observing that buy-side entities were trading via TeraExchange's CLOB, BNPP's clearing office notified its execution desk of the transgression, which contacted the parties and threatened them with a loss of access to clearing and other banking services if they continued to trade on TeraExchange.  Indeed, BNPP threatened not only loss of access to clearing, but also execution services in other asset classes and general market research.  In addition, BNPP told TeraExchange that it needed to conduct an

audit of TeraExchange's rule book, and that BNPP would not clear any further trades until the audit was complete.  The audit has never been completed.

171.    Word of BNPP's threat spread to other buy-side firms.  At around the same time, Bank of America's FCM threatened investors with inflated clearing fees and liquidity boycotts if they made markets or traded on TeraExchange's CLOB.  Not surprisingly, the buy-side caved to these threats, and have not traded on TeraExchange's platform since then.

172.    Throughout this period, the same FCMs discussed above were clearing trades for the same buy-side firms on Bloomberg and Tradeweb.  Again, there is no legitimate reason that an FCM should discriminate among SEFs because its risk comes from the client trading entity itself, not the platform on which the trade is executed.  The FCM earns a commission on every trade it clears.

173.    Absent Defendants' conspiracy, these end users could have simply found another FCM to clear for them.  But the Dealer Defendants coordinated their activities, and collectively made it clear to the buy-side that they would refuse to deal with any firm they caught trading on TeraExchange.

174.    The Dealer Defendants also collectively boycotted TeraExchange, starving it of the liquidity it needed to succeed after losing — to threats — buy-side liquidity.  Absent the Dealer Defendants' anticompetitive boycott, buy-side firms and other liquidity providers would have traded on TeraExchange's platform.

175.    As an alternate business strategy, TeraExchange offered to process trades matched by certain second-tier IDBs through its order book in order to comply with Dodd-Frank.  Under Dodd-Frank, certain instruments had to be traded through SEFs.

176.     Several IDBs responded positively to the proposal, recognizing that the use of TeraExchange's platform was necessary to their survival.  Somewhere between six and ten of these IDBs entered into agreements with TeraExchange, including RP Martin.

177.     The IDBs, however, had, as a practical matter, to obtain the consent of the major swap dealers, including the Dealer Defendants.  In striking parallel, the Dealer Defendants universally refused to give such consent, with many of them describing TeraExchange's program as a "Trojan Horse."  The CEO of ED&F Mann, one of the second-tier IDBs, informed TeraExchange that the major swap dealers would not allow him to sign up with the program.

178.     As a result, no IDB has been able to process a trade through TeraExchange's order book, and some, including ED&F Mann, have since gone out of business.  Despite this universal boycott, second-tier IDBs have continued to express interest in processing trades through TeraExchange's CLOB.

179.     Facing a boycott from the Dealer Defendants and knowing it had no chance of success, TeraExchange has left the swaps market.  TeraExchange "announced on Feb. 27 [2015] that it was shifting its focus to bitcoin derivatives."[47]

### 3.     *The Dealer Defendants boycotted TrueEX*

180.     In 2013, TrueEX sought to bring to market a SEF offering an IRS exchange-like trading platform open to both buy- and sell-side entities.  TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for CDS for an IDB called Creditex.

181.     TrueEX was the "first swaps exchange to be approved by the [CFTC]."[48]  It offered "trading features, such as anonymous trading, that regulators and traders at funds say will

---

[47]    Levinson, *supra* note 4.

encourage smaller banks and other players, such as hedge funds, to enter the market as dealers[, which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[49]  TrueEX "took a very old way of executing and brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[50]

182.    With these attractive features and Mr. Hirani's background in electronic CDS trading, TrueEX was ready and able to become a successful all-to-all trading platform for IRS. Mr. Hirani publicly stated that the platform had signed up sixty-two buy-side participants, explaining that "[c]learly the buyside demand is there."[51]

183.    But "[m]any of the top derivatives dealers, including Goldman Sachs, Deutsche Bank, Citigroup, Barclays, Bank of America Corp, and Morgan Stanley, have declined to use [T]rueEX," stonewalling the trading platform.[52]  The Dealer Defendants collectively blocked TrueEX from becoming a successful exchange-like trading platform for IRS.

184.    Today, TrueEX, like Javelin and TeraExchange, facilitates few trades in the IRS market.[53]  And the vast majority of trades that are conducted through TrueEX are conducted only

---

[48]    Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER (Apr. 1, 2013), http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-10574731.html.

[49]    Levinson, *supra* note 4.

[50]    Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INV'R. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

[51]    Levinson, *supra* note 4.

[52]    *Id.*

[53]    Timms, *supra* note 50.

on its *RFQ* platform, on a name-disclosed basis.[54]  Most of those trades are in actuality

"compression" trades — which merely consolidate multiple offsetting trades into one position —

done to reduce the overall number of trades in a firm's portfolio and to simplify its balance sheet.

No bid/ask spread is associated with "compression" trades, so TrueEX's execution of those

trades does not threaten the Dealer Defendants in the marketplace.  In sum, the Dealer

Defendants have successfully neutralized TrueEX from becoming a competitive threat.

4. <u>*The Dealer Defendants collectively refuse to clear trades from Javelin,*</u><br><u>*TeraExchange, and TrueEx*</u>

185. Clearing serves an important risk-mitigation function.  As a result, denial of

clearing services is a potent weapon the Dealer Defendants have in their arsenal, and they have

jointly deployed it against all-to-all anonymous SEFs — including Javelin, TeraExchange, and

TrueEx — with devastating results.

186. In the OTC market, counterparties face each other directly, meaning they bear the

full risk of loss if their counterparty defaults.  For IRS with high notional values and long tenors,

the effect of a counterparty default can be severe, amounting to millions of dollars in losses on an

individual trade.

187. Clearing resolves this problem.  For cleared transactions, a clearinghouse acts as

an intermediary between the counterparties and effectively guarantees their performance, greatly

reducing counterparty risk.  In order to remain safe, clearinghouses add an additional layer of

protection, in that they only transact directly with a limited number of counterparties known as

"clearing members," which must contribute large amounts of capital to the clearinghouse's

---

[54] *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, TABB FORUM (Feb. 26, 2015), http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print_preview=true&single=true.

default (or "guaranty") fund.[55]  This ensures that a clearinghouse can in all likelihood withstand the default of one of its members.

188.    Large banks, such as the Dealer Defendants, are generally the only entities that can afford these large capital requirements, and thus function as critical waypoints (or, in reality, roadblocks) on the path to clearing.  As noted above, the dealer-owned entities that serve as clearing members are known as Futures Commission Merchants, or "FCMs."  FCMs generate revenues by clearing trades on behalf of firms that are not clearing members of a clearinghouse, such as buy-side class members.  This relationship should be mutually beneficial — the FCMs earn fees on each trade they submit for clearing, and their buy-side customers are able to gain access to clearing without having to comply with onerous capital requirements.

189.    By way of example, suppose X and Y enter into an IRS contract in which X pays a fixed rate and Y pays a floating rate.  Without central clearing, X and Y would make these payments directly to each other, and each would bear the full risk of loss in the event its counterparty defaulted.

190.    By contrast, with central clearing, X and Y would each "give up" their sides of the trade to their respective FCMs, which would then submit each side of the trade to the clearinghouse.  In the end, X and Y "face" their respective FCMs, which, in turn, face the clearinghouse.  Because both X and Y face the clearinghouse (via their FCMs), neither bears counterparty risk with respect to the other.  If X defaults on its payments on the swap, X's FCM

---

[55]    For example, CME requires clearing members to hold $50,000,000 in capital *and* contribute at least $15,000,000 in cash to its guaranty fund in order to clear IRS.  *See* CME GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (Feb. 2016), http://www.cmegroup.com/ company/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

remains under the duty to satisfy X's obligation, and it will continue to make payments to and receive payments from the clearinghouse under the terms of the swap.[56]

191.    Notably, the Dealer Defendants' FCMs are operated separately from the Dealer Defendants' trading desks, and the FCMs derive no revenues from IRS trading.  Thus, in a competitive marketplace, FCMs would be agnostic as to which trading platforms their customers use, and as to their customers' counterparties.  In fact, an FCM operating in its own interest would, subject to credit limits, want to *maximize* the amount of trades it clears for clients, regardless of where or how the trades were executed.  This is because the only risk that FCMs face is the risk that their buy-side clearing clients default, a risk in no way connected to the platform on which a client conducts an IRS trade.

192.    Due to Defendants' conspiracy, however, this is not how the IRS market operates.  Instead, the Dealer Defendants collectively agreed that *they would not clear trades conducted on all-to-all anonymous SEFs such as Javelin, TeraExchange, and TrueEx*.[57]  Such conduct is nearly uniform across the Dealer Defendants and directly contrary to the economic self-interests of their FCM affiliates.  In reaching this agreement, the Dealer Defendants' FCMs capitulated to the demands of their trading desks — the heads of which are often Tradeweb board members — and management, who are focused on keeping buy-side entities from trading on anonymous all-to-all platforms.

---

[56]    Importantly, the payments received and paid on the swap are the same regardless of whether the trade is cleared or not — X pays fixed payments and receives floating payments, while Y pays floating payments and receives fixed payments.

[57]    *See* KELLEHER et al., *supra* note 25, at 12 (noting that dealers "deny[] their clearing customers the credit limits necessary to trade on SEFs that don't acquiesce to the dealers' demands").

193.    The Dealer Defendants' agreement not to clear trades conducted on all-to-all anonymous SEFs not only deters buy-side firms from trading on these platforms; it prevents IRS trades from ever occurring.  FCMs must confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place, and will not allow the trade to move forward if a customer fails this "pre-trade credit check."[58]  To prevent customers from trading on an all-to-all anonymous trading platform, the Dealer Defendants' FCMs frequently refuse to conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF.  When customers (such as buy-side firms) do attempt to trade on an all-to-all anonymous SEF, the trade thus *cannot occur*, because the Dealer Defendants' FCMs will not conduct a pre-trade credit check, "breaking" the trade before it takes place.

194.    At the same time, the Dealer Defendants routinely clear trades executed on co-conspirator Tradeweb's SEF, and other platforms they do not view as threats to the bifurcated market.  The Dealer Defendants' FCMs thus use their gatekeeping roles to steer business away from all-to-all anonymous SEFs and towards their co-conspirators and other, compliant, RFQ-only platforms as a reward for "playing by their rules."

195.    The Dealer Defendants' ability to block clearing has blocked market entry for all-to-all anonymous SEFs.  Without access to clearing, buy-side firms cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient structure of the OTC market.

---

[58]  A pre-trade credit check can occur via either a "ping" or a "push" system.  Under a "ping" system, a SEF will "ping" an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade.  Under a "push" system, an FCM will pre-authorize a customer to clear trades up to a certain credit limit, a practice commonly referred to as "pushing limits."  As an example, JP Morgan might "push" a limit of $500 million to a SEF for its customer, buy-side customer X, meaning that X could trade and clear up to $500 million of IRS on that SEF without needing to re-obtain approval from JP Morgan before every trade.

5.    *The Dealer Defendants' boycotts chilled market progress*

196.    The Dealer Defendants' boycotts also sent a message to the industry that *any* SEF platform attempting to offer the buy-side access to an anonymous CLOB platform would be collectively boycotted and crushed, and any buy-side partners would be punished through a denial of trading services and an imposition of excessive clearing fees.

197.    As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side entity, stated during a recent SEFCON panel discussion:  "No one wants to do anything because no one wants to be the next person to piss everyone off."

198.    SEFs are afraid even to apply to make IRS "available to trade" (and buy-side firms are afraid to trade IRS on exchange-like platforms) because of the risk of collective retaliation by the Dealer Defendants.

199.    Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background."  Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs, enforce market discipline by making direct threats to SEFs.  In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

200.    As a result, the Dealer Defendants have effectively deterred any new exchanges or SEFs from entering the market to offer anonymous all-to-all trading to the buy-side.

**E.    The Dealer Defendants Penalize Buy-Side Customers Who Engage in Exchange Trading**

201.    The Dealer Defendants have also conspired to block exchange trading of IRS by discouraging their customers from using exchanges or exchange-like trading platforms.  The

Dealer Defendants have withheld services to their buy-side customers who attempt to trade on anonymous all-to-all SEFs, they have insisted on post-trade disclosure practices to discourage exchange-like trading, and they have even put their customers in a "penalty box" in an attempt to discourage future transgressions.

202.    These acts, which the Dealer Defendants have done in concert, are designed to make exchange trading unattractive to customers and, in some cases, to scare them from attempting to disrupt the OTC market.  "[T]his meaningfully disincentivizes [dealer-to-client] SEFs from making any changes that may receive retaliation from the biggest dealer banks.  As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[59]

1.    *The Dealer Defendants withhold clearing services to buy-side firms that attempt to exchange trade IRS*

203.    The Dealer Defendants have conspired to dissuade buy-side firms from trading on exchange-like SEFs by threatening them with the complete withdrawal of clearing services or across-the-board increases in clearing fees that make IRS trading cost prohibitive.

204.    Because clearing performs an important risk mitigation function for many IRS, denial of clearing services effectively hamstrings the buy-side's ability to trade IRS.  Therefore, the mere possibility that the Dealer Defendants can, through their FCMs, cut off access to clearing is sufficient to deter many end users from even attempting to trade on exchange-like platforms or push for exchange trading.

205.    The Dealer Defendants' FCMs are able to coordinate their activities because, among other things, their clearing operations communicate regularly with each other.  For

---

[59]    KELLEHER et al., *supra* note 25, at 12.

example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan.[60]  Mr. Murray regularly communicates with his counterparts at other Dealer Defendants, such as Robert Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services, and Michael Dawley, the head of Goldman Sachs' FCM.

206.     For example, in July 2015, certain of the Dealer Defendants' FCMs, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began collectively penalizing certain transgressor buy-side firms by hiking their clearing fees "by as much as ten-fold," while obedient buy-side entities "have been protected."[61]  In a competitive market, the Dealer Defendants' FCMs would compete with each other to provide clearing services to their clients.  Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others have collectively threatened to raise or actually raised clearing fees for certain buy-side firms due to their attempts to trade on all-to-all anonymous SEFs.  Absent collusion, the FCMs would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants.

207.     The Dealer Defendants' conduct is strikingly consistent.  For example, an interest rates head at a high-frequency trading firm "noticed … indirect push-back," including that "one dealer … put the brakes on talks to clear for the firm."[62]  The clearing talks "just stalled" after

---

[60]   Matt Cameron, *Deutsche Snares JP Morgan's Murray for Clearing Role*, Rɪsᴋ (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

[61]   Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Rɪsᴋ (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

[62]   *Id.*

the dealer learned that the buy-side firm "wanted to start acting as a market-maker on Sefs."[63]
"A number of other sources at hedge funds and proprietary trading firms" encountered similar
"resistance from their dealers."[64]  Several buy-side firms have told "similar stories."[65]

2.    *The Dealer Defendants insist on "name give-up" to deter buy-side*
*participation on exchanges*

208.    The Dealer Defendants have agreed to insist on "name give-up" in order to
discourage buy-side participation on exchange trading platforms, like SEF CLOBs.  Name give-
up refers to the practice of identifying the names of each counterparty to an IRS to the other.
This practice has been widely decried by buy-side firms and independent SEFs because, "[i]n
practice, in a SEF environment, this unnecessary disclosure of swap counterparties only serves to
inform the dealers of the non-dealer firms [or] banks that are attempting to trade on their
platforms, and invit[es] retaliation."  Name give-up thus serves as a policing mechanism because
it allows the Dealer Defendants to determine which trading platforms are abiding by the Dealer
Defendants' unwritten rules.

209.    For instance, if an order book transaction closes with a dealer on one side, that
dealer is able immediately to see if a buy-side participant has (a) been allowed access to the
order book, and (b) had the audacity to try to capitalize on that access by entering into a
transaction over the order book rather than in the OTC (or, more recently, RFQ) systems.  And
because the Dealer Defendants are the primary liquidity providers to the market, they are likely
to be the counterparties in most trades with end users, even on an all-to-all trading platform,
meaning that they are able to quickly identify any buy-side entity trading on such a platform.

---

[63]  *Id.*

[64]  *Id.*

[65]  Rennison, *supra* note 2.

210.    There is no reason for name give-up's continued existence in the IRS market. Name give-up is a historical artifact, and, because IRS trades conducted on SEFs are now centrally cleared, there is no legitimate justification for maintaining the practice on SEFs. Neutral commentators, regulators, and even the Dealer Defendants' employees agree as much.

211.    For instance, Declan Graham of UBS admitted as much during a panel discussion at SEFCON on October 26, 2015, noting that name give-up on CLOBs is pointless for cleared swaps.  CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling justification" for the practice of name give-up in today's IRS market.[66]  Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you should also be post-trade anonymous . . .  [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[67]  And former CFTC Commissioner Mark Wetjen has stated publicly that it is "difficult to rationalize trading protocols that reveal the identities of counterparties on an anonymous, central limit order book."[68]

---

[66]    Peter Madigan, *Massad:  Sefs Fear Retaliation if They End Name Give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up.  The CFTC does not police secret, horizontal collusion between direct competitors in the IRS or any other market.  Moreover, the CFTC Chairman has recently stated that the CFTC has no plans to combat name give-up.  *See* FINANCIAL TIMES, *supra* note 10.

[67]    Madigan, *supra* note 38.

[68]    *See CFTC Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit* (Nov. 14, 2014), http://www.cftc.gov/PressRoom/Speeches Testimony/opawetjen-10.

212.    At the same time, getting rid of name give-up is also very popular with buy-side

firms, where there is pent-up demand on the buy-side for all-to-all, anonymous trading.[69]  As a

result, "[s]ome asset managers have claimed their use of [CLOBs] will increase if they are

allowed to trade anonymously."[70]  Richard Mazzella explained that "removing these barriers is

important in allowing" a true order book to come to market.[71]  Ken Griffin noted that

"anonymous markets foster competition," adding that "[i]t should not matter who provides the

best price."[72]  And George Harrington, CFA, Global Head of Fixed Income, Currency, and

Commodity Execution at Bloomberg LP stated during a panel discussion at SEFCON on October

26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

213.    Although central clearing eliminated all legitimate reasons for requiring name

give-up, the Dealer Defendants recognized its importance in maintaining market bifurcation.

Specifically, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft

of Barclays and Morgan Stanley, among others, conspired to keep the practice in place by

---

[69]    *See* Rennison, *supra* note 2 (quoting Sam Priyadarshi, head of fixed income derivatives at Vanguard Asset Management, as stating "[w]e have a deep desire to be able to access these markets"); *id.* (quoting Marc Vesecky, Chief Risk Officer for Tower Research Capital, as stating "Tower is definitely supportive of swap trading moving toward open, efficient electronic trading"); *id.* (quoting the Chief Risk Officer of a large hedge fund as stating:  "I might have an interest in being a liquidity provider.  We already have people on our team who can do that and we are interested in showing bids and offers to the market both for our own portfolio and to take advantage of pricing discrepancies").

[70]    Madigan, *supra* note 66; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, Risk (Aug. 6, 2015), http://www.risk.net/risk-magazine/ feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading firm as stating:  "If volume moves more towards Clobs, then that's where we'll get more engaged").

[71]    Madigan, *supra* note 37.

[72]    Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, Risk (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

making their Defendant Dealers' provision of liquidity to a trading platform conditional on the use of the practice.  The remainder of the Dealer Defendants thereafter joined the agreement.

214.    Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform that refused to include name give-up as a feature.  As a former IDB employee explained, when the IDB attempted to bring buy-side entities onto its trading platform in a different asset class, the Dealer Defendants discovered as much through name give-up and responded with collective threats "to simply move their business to another broker."[73]  He stated that, as a result, the IDB relented, limiting its platform to dealers.  The employee added:  "We didn't have much choice but to shut it down."[74]  When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition SEF (an IDB), bluntly explained that SEFs were not willing to stand up to the dealers and go anonymous because of the risk "of the loss of liquidity."

215.    The Dealer Defendants also ensure that name give-up persists through a service known as MarkitWIRE, which is operated by MarkitSERV.  MarkitSERV is dominated by the Dealer Defendants:  Brad Levy (formerly of Goldman Sachs' PSI group) is currently the CEO of MarkitSERV, and Stephen Wolff (formerly the Head of Interest Rate Trading at Deutsche Bank) is the Head of Group Corporate Strategy at MarkitSERV.

216.    MarkitWIRE is a trade processing service for IRS and other asset classes offered by MarkitSERV, meaning it delivers trades to clearinghouses once they have been executed by

---

[73]    Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, RISK (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

[74]    *Id.*

counterparties. While it is possible to design IRS trading platforms to feature "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed — the Dealer Defendants force IDBs to send trades to MarkitWIRE *before* they are cleared.[75] MarkitWIRE then offers the counterparties to an IRS transaction a "last look" at the trade, where they learn each other's identities and have the option to terminate the transaction. This process is inefficient and more cumbersome than exchange trading, and it subjects the parties to unnecessary post-trade name give-up.[76] Javelin's platform, for instance, has the capability to confirm trades and send them to the clearinghouse directly while maintaining full anonymity.

217. The IDBs only use MarkitWIRE, and disclose the names of the parties to an IRS transaction post-trade, because the Dealer Defendants collectively insist that they do so. Buy-side firms have complained that this practice "is applied to please dealers and that it discourages non-banks from trading, helping to preserve the traditional market structure in which dealer-to-client and interdealer markets were separate."[77]

218. As a result of collective pressure from the Dealer Defendants, numerous SEFs have agreed to impose name give-up on their platforms. Today, the largest interdealer SEFs — BGC, DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up,

---

[75]  *See* Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, Risk (Aug. 5, 2015), http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[76]  *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire"). During a recent SEFCON panel discussion, Declan Graham of UBS stated that the lack of straight-through processing delays trade processing and clearing by up to six hours.

[77]  *Id.*

thereby effectively preventing buy-side entities from trading on them.[78]  These entities recognize

the collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are

careful about "not biting the hand that feeds you."[79]

219.    When, in February 2013, Tradition launched an IDB order book by the name of

"Trad-X," it made sure to include name give-up.  As a result, the Dealer Defendants supported

the platform, meaning that while they were boycotting the anonymous all-to-all SEF order books

open to the buy-side, they jointly supported an order book open only to themselves.

220.    The Dealer Defendants even touted the benefits of order book trading of IRS,

while neglecting to note that they had conspired to save those benefits for themselves alone.

Christian Mundigo, Global Head of Rates Trading and Co-Head of Americas Fixed Income at

BNPP, for instance, stated that "BNP Paribas believes Trad-X will provide the USD swap market

with an efficient electronic execution venue for trading interest rate swaps.  We are pleased to

support the expansion of this market leading platform across both the Euro and USD markets,

where we are committed to be strongly engaged with both the dealer community and our

clients."[80]  Elie El Hayek, Managing Director, Global Head of Rates Global Banking and

Markets at HSBC stated "HSBC is very pleased to support the launch of Trad-X in USD interest

rate swaps.  Trad-X has proved the concept of a hybrid solution with deep liquidity in EUR

---

[78]    *See* RISK, *Top of the Swaps* (Nov. 2014), https://www.citadelsecurities.com/
_files/uploads/sites/2/2014/12/Ken-Griffin-Risk-Magazine-Top-Of-The-Swaps-November-
2014.pdf (noting that dealer-run platforms feature name give-up).

[79]    Mike Kentz, *New Dawn as Non-bank Enters Interdealer Order Book*, INT'L FIN. REV.
(July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-
book/21154986.article.

[80]    TRADITION, *Trad-X launches USD Interest Rate Swaps*, http://www.trad-x.com
/media/2939/trad_x_launches_usd_interest_rate_swaps.pdf (last visited Feb. 25, 2016).

swaps and we look forward to continue to be a key player in an industry initiative in the US that brings transparency and trade certainty to the market."[81]

221.    Ciaran O'Flynn Managing Director Global Head of Rates eTrading at Morgan Stanley commented that "Morgan Stanley is committed to supporting execution of swaps trading on electronic venues like Trad-X.  These venues increase the transparency of the swaps market and facilitate the move towards mandatory clearing."[82]  Christopher Murphy, Global Head of Rates & Credit at UBS, added:  "UBS is very pleased to be supporting the launch of Trad-X in USD interest rate swaps. We believe that Trad-X brings a compliant, transparent solution for interest rate swap trading along with deep and firm liquidity. We hope that the launch in USD will build on the success of Euro interest rate swaps."[83]

222.    Name give-up is an effective deterrent to the buy-side's use of all-to-all platforms. Therefore, when Mitsubishi UFJ Financial Group, a second-tier dealer (and buy-side entity in the eyes of some Dealer Defendants), attempted to trade IRS on Trad-X, its identity was disclosed and it immediately received a phone call from Tradition SEF at the behest of a Dealer Defendant demanding to know why the buy-side firm had done this instead of trading directly with the Dealer Defendant.  The Dealer Defendants and IDBs thus work together to ensure that buy-side firms are not trading on IDB platforms.  As a direct consequence of maintaining name give-up, "[t]o date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[84]

---

[81]    *Id.*

[82]    *Id.*

[83]    *Id.*

[84]    Timms, *supra* note 50.

223.    Name give-up also serves as an effective roadblock to all-to-all trading by forcing the end user to reveal its trading positions, and thus elements of its trading strategies, to both dealers and other end users, which may be able to exploit that information against them.  Many end users go to great lengths to keep their trading strategies confidential.  As Ken Griffin, founder of Citadel Investment Group ("Citadel"), explained, name give-up allows dealers to unfairly "position their book by taking advantage of their trading counterparties' market insights."[85]

224.    Michael O'Brien, Director of Global Trading at Eaton Vance, has stated:  "I don't want to show the size of my trades, I don't want people to know how I'm trading.  Information is the most valuable asset we have."[86]  As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel has explained:  "Forcing end-users to disclose themselves if they are in a [CLOB] is a means to discourage alternative market participants from participating in what were historically interdealer [CLOBs.]"[87]

225.    Paul Hamill, formerly employed by UBS and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment, stating that exchanges without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[88]  CFTC Chairman Timothy Massad has said that numerous "[i]nvestors have complained that they are unable to break into the inter-dealer markets because

---

[85]    Devasabai, *supra* note 72.

[86]    Levinson, *supra* note 4.

[87]    Madigan, *supra* note 38 (O'Brien:  "I would like my desk to be executing any trades possible on central limit order books").

[88]    MARKETS MEDIA, *SEFs Win Qualified Praise* (Oct. 8, 2013), http://marketsmedia.com/sefs-win-qualified-praise/.

they are not anonymous — with names given up after trading."[89]  Indeed, one U.S.-based hedge

fund manager stated that "[e]nding name give-up on broker Sefs [would] remove[] the ability for

dealers to effect retribution on their clients."[90]

### 3.     *The Dealer Defendants place transgressors in the "penalty box"*

226.    At the same time the Dealer Defendants collectively prevent anonymous all-to-all

SEFs from succeeding, they themselves use identical platforms.  Tradeweb and a number of

IDBs, including ICAP, operate such exchange-like SEFs, but they are open only to dealers.

227.    There is no technical reason why these entities could not allow buy-side entities to

trade on their platforms as well, but the Dealer Defendants pressure them not to allow this.  In

fact, the Dealer Defendants have "threaten[ed] to withdraw liquidity from any trading platform

that admits buy-side firms onto its [order book]."[91]  Such a practice is commonly referred to as

being placed in "the penalty box."

228.    For example, when an interdealer SEF "run by GFI Group said it would allow

anonymous trading, several banks threatened to pull their business off the platform."[92]  In

particular, GFI "received heated phone calls from executives at Credit Suisse Group AG and J.P.

Morgan Chase" over the introduction of trade anonymity.[93]  GFI promptly reversed course.

229.    The Dealer Defendants similarly threaten any buy-side investor with being put in

the "penalty box" if it attempts to trade on an exchange-like platform, whether it is operated by

---

[89]   FINANCIAL TIMES, *supra* note 10.

[90]   Rennison, *supra* note 2.

[91]   Madigan, *supra* note 66.

[92]   Levinson, *supra* note 4.

[93]   Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015),
http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

an IDB or an independent SEF.[94]  In such instances, the Dealer Defendants often refuse to trade with the investor in any venue.  Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the investor from trading IRS as long as it is in the penalty box.  In even more egregious circumstances, the Dealer Defendants collectively threaten a transgressing investor with withdrawal of key banking services.  Such threats carry great weight and have had the intended deterrent effects.

230.    The Dealer Defendants also use the "penalty box" to prevent any conspiring dealer from breaking ranks, and will refuse to trade with co-conspirators who are suspected of supporting exchange-like trading.

231.    For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.[95]  The other Dealer Defendants promptly put Barclays in the "penalty box" and refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.

232.    BARX eventually ended its IRS business and became devoted mainly to foreign exchange ("FX") trading.  Even then, Barclays was only allowed out of the "penalty box" and into the Dealer Defendants' clubhouse in 2008, when Barclays acquired the assets and personnel of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep connections with the other Dealer Defendants and went on to bring those relationships and that network to Morgan Stanley in 2010.  This acquisition significantly bolstered Barclays' share of the IRS market, and Mr. Senft used his connections to help Barclays ingratiate itself with the

---

[94]    *See* Rennison, *supra* note 2 (quoting a U.S.-based hedge fund manager as stating:  "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

[95]    *See* FINEXTRA, *Bloomberg and Barclays Capital Launch Interest Rate Swaps Trading* (July 21, 2003), https://www.finextra.com/news/fullstory.aspx?newsitemid=9515.

other Dealer Defendants, including by taking a stake in Tradeweb.  Mr. Senft similarly used his connections to maintain Morgan Stanley's involvement in the conspiracy after he joined in 2010.[96]

### F.    The Dealer Defendants Collectively Prevented Clearinghouses from Bringing Exchange Trading to the Market

233.    Defendants' collusion thus squashed the most imminent threat to their IRS trading profits — exchange or exchange-like trading via Tradeweb, IDBs, or SEFs.  Yet, the Dealer Defendants were not satisfied.  They also coordinated on their preferred IRS clearinghouse and boycotted any clearinghouse that might open the door to exchange trading.

234.    As noted above, because, as a result of central clearing, there is no longer counterparty risk, there is no longer any necessity to know the identity of the counterparty to an IRS trade.  As a clearinghouse could easily evolve into an exchange or a SEF, threatening disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse they saw as a threat to their bifurcation of the IRS market.  As a JP Morgan report stated:  "the main concern for the Investment Banking industry is that *clearing is the first step leading to exchange*/SEF trading for OTC products."[97]  The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[98]

---

[96]  TRADEWEB, *Barclays Capital Takes Equity Stake in Tradeweb* (Sept. 10, 2009), http://www.tradeweb.com/news/news-releases/barclays-capital-takes-equity-stake-in-tradeweb/.

[97]  J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks:  Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, GLOBAL EQUITY RESEARCH (Sept. 8, 2010) (emphasis added).

[98]  PETER NORMAN, THE RISK CONTROLLERS: CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS 302 (2011).

235.    On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS.  At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IRS contracts.  CME publicly announced that "the first order of business . . . is to broaden the product base.  The CME plans to roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[99]

236.    In July 2007, CME announced its plans to offer the market a cleared IRS product, including IRS denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

237.    CME is a threat to the Dealer Defendants because, as an established exchange, it had the potential to offer integrated exchange trading and central clearing of IRS.  In fact, CME stated in July 2007 that "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[100]

238.    The threat to the Dealer Defendants was compounded on February 4, 2008, when CME announced that thirty three buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[101]  The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

---

[99]    Daniel P. Collins, *CME Acquires Swapstream*, FUTURES MAGAZINE (July 24, 2006), http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

[100]    CME GROUP, *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants* (July 17, 2007), http://investor.cme group.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[101]    PR NEWSWIRE, *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap* (Feb. 4, 2008), http://www.prnews

239.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream.  They instead jointly committed to clear IRS transactions only through the clearinghouse they knew they could control — LCH.Clearnet. They also used their market power and influence to prevent other sell-side banks and IDBs from dealing with Swapstream.[102]  Because, unbeknownst to Plaintiffs, the Dealer Defendants jointly agreed to refuse to deal with Swapstream, the platform never launched.[103]

240.    As a result of the Dealer Defendants' concerted action and agreements to refuse to deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked the emergence of electronic CLOB trading of IRS.

## III.    ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY-SIDE

### A.    The Dealer Defendants Have Substantial Market Power

241.    Currently, the Dealer Defendants continue to account for most IRS dealing, and continue to earn extraordinary profits in their OTC-like trading with the buy-side in IRS trades. As a result of the conspiracy, it is virtually impossible for a class member to trade directly with another buy-side class member.  The Dealer Defendants, therefore, still participate in nearly the entirety of IRS transactions with end users.

---

wire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

[102]   E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond:  The Path to Electronic Markets*, DERIVALERT (Jan. 2010), http://www.derivalert.org/Portals/75625/docs/OTC%20 Interest%20Rate %20Swaps%20and%20Beyond%20-%20The%20Path%20to%20Electronic %20Markets.pdf.

[103]   *Id.*

242.     Each of the Dealer Defendants possesses a significant share of the IRS market,

and they collectively dominate the market.  Based on available market-share information, the

Dealer Defendants collectively control at least 70% of the market.  Indeed, in 2014, five of the

ten Dealer Defendants collectively controlled over 50% of the IRS market by themselves while

the remaining five Dealer Defendants controlled at least an additional 20% of the IRS market.[104]

243.     The Dealer Defendants' market power is well-recognized.  As Paul Rowady of

the TABB Group stated:  "Given the indispensable role of dealers in the OTC derivatives market,

it is clear that few structural changes can occur without dealer support."[105]  Mr. Rowady also

stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the

moves, as they are counterparty to every trade."[106]

### B.     Defendants' Conspiracy Has Imposed Significant Harm on Buy-side Investors

244.     As detailed herein, he Dealer Defendants have colluded to maintain an artificial

bifurcation of the IRS market (between a "wholesale" dealer side of the market and a "retail"

end-user side of the market) up to the present day.  Although the interdealer IRS market came to

---

[104]   In 2014, Bank of America was reported to control 12.6% of the IRS market, JP Morgan was reported to control 11.4% of the IRS market, Deutsche Bank was reported to control 9.5% of the IRS market, Citigroup was reported to control 9.2% of the IRS market, and Barclays was reported to control 8.2% of the IRS market.  In 2012 Goldman Sachs was reported to control 6.9% of the IRS market, HSBC was reported to control 5.0% of the IRS market, BNPP was reported to control 4.9% of the IRS market, and Morgan Stanley was reported to control 3.2% of the IRS market.  The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012.  *See* GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES:  DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

[105]   Michael Mackenzie & Gillian Tett, *Markets:  Frozen in Time*, FINANCIAL TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0.html#axzz 3sFYwvyw0.

[106]   *Id.*

be traded on exchange-like platforms, the Dealer Defendants had a common interest in relegating the buy-side to the functional equivalent of OTC, so as to ensure that the Dealer Defendants would continue to enjoy huge profits.  This bifurcation is wholly artificial.  According to John Brady of MF Global, IRS "could theoretically be put on to a exchange — were it not for the fact . . . that dealers tend to want to control the way that prices are set — particularly when they deal with corporate clients, because the business is so lucrative."[107]

245.    The Dealer Defendants recognized that if the retail side of the IRS market shifted to all-to-all platforms, buy-side entities would be able to trade directly with one another, thereby disintermediating the Dealer Defendants and denying them the substantial profits they were deriving from intermediating trades in the OTC market.[108]  The Dealer Defendants also knew that all-to-all anonymous trading of IRS would bring more direct price competition between more entities, thereby leading to the tightening of bid/ask spreads.  All-to-all anonymous exchange-like trading would also encourage alternative providers of liquidity to enter the market in competition against the traditional market makers such as the Dealer Defendants, yielding further spread compression and other benefits.[109]

---

[107]    *Id.*

[108]    *See, e.g.*, Adam Sussman, *US Interest Rate Swap Futures*:  *Why Market Participants Would Switch*, TABB GROUP (2012), http://www.cmegroup.com/education/files/tabb-strong-prospects-for-interest-rate-swap-futures.pdf ("[T]here is little doubt in our minds that dealers want to preserve the traditional swaps market for as long as possible.").

[109]    All-to-all, anonymous electronic trading platforms yield numerous procompetitive benefits common to all class members:  "An electronic trading venue can enhance market quality due to the so-called liquidity externality.  Concentrating a trade at one place and time reduces search costs and intensifies competition over price.  Electronic venues can bring together a large and diverse participant pool and hence reduce the need for intermediaries that match demand and supply between segmented traders.  Also, they can lower operational costs by automating processing, settlement and record-keeping.  Still, venues must be carefully designed to avoid the unwanted dissemination of information.  Participants may avoid venues if they believe

246.     There can be no doubt that this is exactly what would have happened absent

Defendants' conspiracy.  As noted by a recent report:

> In a free market populated by competitive, profit-maximizing dealers and price
> conscious customers, it would not make sense to expect otherwise.  The margins
> from making markets in such a liquid marketplace with still sizable bid/offer[]
> spreads to capture would surely be attractive to many market participants outside
> the few traditional incumbent swaps dealers.  As risk-reduction mechanisms, such
> as netting, compression, and clearing, became easier and more prevalent, the
> attendant counterparty risks and balance sheet usage declined sharply year after
> year, further reducing barriers to entry.  There is no question that other derivatives
> market participants wanted to be dealers in this market, and were actively —
> seemingly unlawfully — kept out.[110]

247.     Indeed, as explained in a recent report by the Bank for International Settlements,

anonymous, all-to-all trading has had precisely this impact on *inter-dealer* fixed income markets,

similar to IRS:  "Electronification of trading platforms is often associated with increased

competition over price, which ensures low transaction costs (at least for small tickets).  A

centralised trading platform can bring together a large set of traders with opposing trading

interests, reducing search frictions and raising competition to fill an order."[111]

248.     In sum, if exchange-like features had been made available in a truly competitive

marketplace — *i.e.*, one where Defendants were not colluding — there would have been a rapid

migration of IRS onto those platforms which, in turn, would have led to a significant tightening

of bid/ask spreads paid by the buy-side.

249.     There is expert consensus, based on numerous studies of historical examples, that

standardization, migration to anonymous all-to-all trading, and spread compression is a natural

---

negotiating or trading at the venue would expose their activity unnecessarily (information
leakage)."  BANK FOR INT'L SETTLEMENTS, *supra* note 7, AT 20 (internal citations omitted).

[110]  KELLEHER et al., *supra* note 25, at 2 (Feb. 2016).

[111]  *See* BANK FOR INT'L SETTLEMENTS, *supra* note 7, at 23.

progression of financial products.  For instance, the introduction of electronic trading to equity options and currency markets has had a major impact on spreads and the costs associated with trading in those markets.

250.    In 1973, for example, the Chicago Board Options Exchange introduced exchange trading for equity options, which had been until that point traded entirely OTC.  Eventually, the increased competition introduced by exchange trading tightened spreads drastically.  Option bid/ask spreads were typically ¼ cent or less, driven down in part by competition "from more than 15 market makers for each Order Book Official (OBO) station."[112]

251.    The FX market, which covers both spot currencies and derivatives, is extremely large, and until recently had been dominated by OTC dealer intermediation.  Eventually, dealer domination of the huge OTC FX market was reduced dramatically, in part by the increased use of electronic trading platforms that were accessible to non-dealers.  These trading platforms now account for over 50% of all trades.[113]  The bid/ask spreads for the less-liquid emerging market currencies declined by over 50% from 2004 to 2013.[114]

252.    But for Defendants' anticompetitive acts, members of the proposed Class would have similarly traded IRS on electronic platforms, with far greater transparency and substantially reduced bid/ask spreads than they experience in the functional equivalent of the OTC IRS market controlled by the Dealer Defendants.

---

[112]  JOHN C. COX & MARK RUBINSTEIN, OPTIONS MARKETS 23-24 (1985); *see also* Robert C. Klemkosky & Terry S. Maness, *The Impact of Options on the Underlying Securities*, 6 J. PORTFOLIO MGMT. 2, at 1 (1980); Joseph Finnerty, *The Chicago Board Options Exchange and Market Efficiency*, J. FIN. & QUANTITATIVE ANALYSIS, Mar. 1978, at 29-38.

[113]  *See* Dagfinn Rime & Andreas Schrimpf, *The Anatomy of the Global FX Market Through the Lens of the 2013 Triennial Survey*, BIS QUARTERLY REVIEW, Dec. 2013, http://www.bis.org/publ/qtrpdf/r_qt1312e.pdf.

[114]  *See id.*

253.    Bid/ask spreads did not meaningfully tighten even as SEFs entered the IRS market, and the spreads remain inflated even today.  This can be seen in the charts below, where the black line represents the "rolling average" bid/ask spread, calculated by using the average spreads for the prior 90 days for various tenors, after adjustments have been made for market volatility to make the numbers more directly comparable across multiple time periods (including those that span the financial crisis).[115]  This allows any trends to be seen more clearly.  While the line moves up and down sporadically, there is no downward trend (or any trend, for that matter) following the introduction of SEFs.  The introduction of SEFs has done little to nothing to improve the lot of buy-side entities, who continue to be prisoners of the antiquated OTC-like model, even after the passage of Dodd-Frank and the introduction of SEFs.[116]



---

[115]    This was done by adjusting the spread being measured in relation to the volatility of the mid-market price for the same IRS.

[116]    This is in marked contrast to the market for equities, where the introduction of non-conventional market makers such as high-frequency trading firms had a "dramatic" impact on bid/ask spreads, reducing them by as much as 50% in one European equity market.  *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 20 (2016) at 33, http://www.bis.org/publ/mktc07.pdf (internal citations omitted).







254.    Statistical analyses confirm what is visually obvious in these charts:  bid/ask spreads have not significantly changed at all for a variety of IRS tenors.

255.    Empirically, the bid/ask spreads for each IRS tenor did not narrow as a result of the entry of SEFs into the market.  It can be statistically established (using a well-accepted Welch's t-Test methodology), that there was no statistically significant difference in bid/ask spreads for various IRS products (including two-year, five-year, ten-year, and thirty-year tenors) as a result of the introduction of SEFs.  Had the introduction of SEFs truly increased transparency and price competition for the buy-side, there would be a statistically significant narrowing of bid/ask spreads following the introduction of the SEFs.

256.    Further, while not statistically significant, those changes in the bid/ask spreads observed among different IRS tenors do not even coincide with the introduction of SEFs.  To the contrary, the only observable changing of bid/ask spreads among various IRS tenors appear to be insignificant, short-lived, and random.

257.    Empirical analysis of IRS bid/ask trends (using the Quandt-Likelihood Ratio test) also establishes that entry of SEFs into the market did not result in any statistically significant

change in bid/ask spread trends in two-year, five-year, ten-year, or thirty-year tenors.  Instead of identifying any structural break or other statistically significant change in the trend of IRS bid/ask spreads, this analysis — evaluated both on a daily and rolling average basis — confirms that the IRS bid/ask spreads for each tenor exhibited the same exact trends after the introduction of SEFs as they had before.  The absence of any structural break in the trend of IRS bid/ask spreads following the introduction of SEFs to the market underscores that the Dealer Defendants' collusion successfully kept the buy-side captive to an antiquated OTC-like trading mechanism following the introduction of the SEFs.

258.    As a result of the Dealer Defendants' efforts, the SEFs that have been successful are either controlled by the Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing an RFQ platform (Bloomberg).[117]

259.    As a result of Defendants' collusion, the Dealer Defendants trade amongst and between themselves on state-of-the art, electronic, exchange-like platforms where they enjoy efficient execution, price transparency, and direct competition, while buy-side entities are restricted to the functional equivalent of the antiquated OTC market where they must transact with dealers and operate at material price and informational disadvantages.

---

[117]   While Bloomberg nominally offers a "CLOB," this platform sees little activity in IRS because the Dealer Defendants refuse to trade on it and buy-side firms fear that they will face retaliation from the Dealer Defendants if they do so.

### C.     Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes

260.    Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solutions to the buy-side.  Instead, because of Defendants' conspiracy, the SEFs that *have* tried to offer such platforms have been put out of business, and SEFs like Tradeweb that replicate the structure of the OTC market have remained successful.  Without the Defendants' collusion, offerings such as those by Javelin, TeraExchange, and TrueEX would have generated large new revenue streams through increased volume and market share.

261.    Absent a conspiracy, it would be economically rational for a SEF like Tradeweb to offer a fully anonymous order book trading platform for IRS that is open to the buy-side, or for an IDB to open its platform to the buy-side.  This would enable them to attract a greater volume of IRS trades and earn higher revenues.  But, as discussed herein, SEFs that attempted to abolish name give-up, such as Javelin, TeraExchange, and TrueEX, have received credible threats, backed up by business-destroying boycotts.[118]  As described more fully above, due to the Dealer Defendants' conspiracy *not a single all-to-all anonymous SEF open to the buy-side currently does any meaningful business in the IRS market*.

262.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well.  Absent a conspiracy, evolution to an exchange or any type of order book would have been inevitable — it is the natural progression when financial products become, as most IRS have long been, highly standardized, high-volume

---

[118]    *See also* Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, REUTERS (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

products.  This is particularly true where, as here, solution providers were actively entering the market to make this happen in response to strong buy-side demand.  Given its inevitability, each Dealer Defendant, absent coordination, should have been looking out for its own self-interest — which would have been to partner with a solution provider in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.

263.   Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to the buy-side in the form of fully anonymous order-book trading, as clients shifted their trades away from other dealers onto the trading platform.  Additionally, an individual Dealer Defendant could have obtained an equity share in the trading platform, allowing it to share in the profits of the platform.  Even leaving aside the potential to be an industry leader and gain first-mover advantage, each Dealer Defendant would have an independent interest in trading on the new platforms and providing clearing services, all of which could have been a profitable source of income.  Because no individual Dealer Defendant could prevent exchanges from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of exchanges.

264.   Absent a conspiracy to punish them for doing so, it would have been in the self-interest of buy-side members to support, and flock to, the resulting all-to-all platforms that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency, and the opportunity to trade with market participants other than the major dealers.

265.   But that is not the world we have.  Not because IRS are not ready for all-to-all trading.  Not because the buy-side does not want all-to-all trading.  Not because solution

providers were not ready, willing, and able to offer all-to-all trading.  Instead, we have this world because the Dealer Defendants collectively blocked the market's evolution.  Only a conspiracy that gave each Dealer Defendant an assurance that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

266.    Defendants' agreements were *per se* illegal agreements to thwart competition among horizontal competitors.  The Dealer Defendants' collective refusals to deal with those SEFs, end users, and other entities that would not play ball amounted to group boycotts that are illegal under the antitrust laws.

267.    With respect to IRS, the Dealer Defendants used their market power to enforce a division between the interdealer and the dealer-to-client markets.  The effect of the Dealer Defendants' anticompetitive agreements (such as with each other, IDBs, clearinghouses, and certain SEFs) and collective refusals to deal (with similar platforms that did not go along with the scheme) was to maintain the divided market structure where the buy-side was limited to trades with dealers, and to deny buy-side firms access to interdealer trading platforms or other opportunities to trade through an exchange-like platform.  All class members were harmed by these illegal acts because they were all deprived of the opportunity to transact IRS at tighter bid/ask spreads.

     **D.**    **Investigations and Litigation Concerning the Credit Default Swaps Market Show that the Dealer Defendants Collude to Block Exchange Trading**

268.    This is neither the first time the Dealer Defendants abused their collective influence over the market's infrastructure to preserve their supracompetitive profits nor the first

time they did so with respect to a derivatives product.  To the contrary, the Dealer Defendants'

strategy here parallels their alleged misbehavior in the CDS market.

269.    The Dealer Defendants' misconduct in the CDS market has been the subject of

two separate investigations by the United States Department of Justice ("DOJ") and the

European Commission ("EC").  The DOJ and EC investigations were spurred by complaints by

market participants that the Dealer Defendants, who were the major CDS dealers, were abusing

their control of the market to limit price transparency and competition.[119]  In one widely reported

email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain,

lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of

dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major

market structures in the credit markets.[120]

270.    The concerns expressed by the DOJ and EC are similar to present-day complaints

about anticompetitive behavior in the IRS market.  For example, the EC stated that "the banks

acted collectively to shut out exchanges from the market because they feared that exchange

trading would have reduced their revenues from acting as intermediaries in the OTC market."[121]

The EC believed that "the investment banks also sought to shut out exchanges . . . by

coordinating the choice of their preferred clearing house."[122]

---

[119]    *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL ST. J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

[120]    Serena Ng, *Friction on Swaps Response*, WALL. ST. J. (June 3, 2009), http://online.wsj.com/news/articles/SB124390301244674747.

[121]    European Commission, *Press Release — Antitrust:  Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[122]    *Id.*

271.     The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group boycotts.  For instance, CME (which, as discussed above, also tried to create an open trading platform for IRS) backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through a CLOB.  Modeling showed that CMDX would support "the trading and clearing of the most extensive CDS product set in the industry."[123]

272.     In June 2008, CMDX was presented to the market.  Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.  Initially, some dealers were tempted.  A Barclays report found that such offers should help the already "well positioned" venture "get off the ground," which was also helped by the fact that at least some CDS "already lend themselves to trade in an exchange-like fashion."[124]  Chris Adams, Global Products Head, Alternative Funds at BNPP, praised the venture in an interview with the *Financial Times*.[125]

273.     CMDX was operationally ready by the fall of 2008[126] and was initially backed by several dealers.[127]  CMDX ran into a brick wall, however, once the CDS dealers, including the

---

[123]     *About CMDX — Overview*, CMDX.COM (Feb. 15, 2009), http://web.archive.org/web/ 20090215203639/http://cmdx.com/about-us-overview.html.

[124]     Barclays Capital Equity Research, *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008).

[125]     Hal Weitzman & Jeremy Grant, *CME-Citadel Form Clearing Facility*, FINANCIAL TIMES (Oct. 7, 2008), http://on.ft.com/1lQEfNs.

[126]     Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

Dealer Defendants, were able to circle the wagons.  Further, as here, the dealers enjoyed the benefit of being on the boards of entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

274.    Though CMDX announced operational readiness, it believed it first needed to seek licenses from Markit and ISDA to use certain intellectual property.  But government investigations indicated that the dealers used their control over Markit and ISDA, and thus over licensing decisions, to prevent CMDX from launching with exchange-like features — instead insisting that a dealer stand on one side of every transaction, just like they did in the IRS market.[128]

275.    A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS.  The cases were consolidated into a single action.  Though the defendants continue to deny liability, a class-action settlement was recently given preliminary approval, whereby the defendants would collectively pay over $1.86 billion, and agree to injunctive relief that would help clear the way for exchange trading of CDS.[129]

---

[127]    *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

[128]    European Commission, *Press Release:  Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[129]    *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL ST. J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

276.     It is telling that today IRS SEF operators and buy-side firms lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants.  While the markets at issue are different, today's complaints by SEF operators and buy-side firms — that the Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

277.     As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[130]  As a trader at one buy-side firm noted regarding the challenges that independent SEFs face, "[i]t's been a really tough environment for the start-up SEFs, [because] the market is designed not to allow new entrants."[131]  Similar to how the major CDS dealers allegedly used their control over the CDS market to block new entrants and artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

## IV.     EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

278.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to prevent the entry of exchanges into the IRS market, much less who caused that injury, until at the earliest March

---

[130]   Levinson, *supra* note 4.

[131]   *See* Mike Kentz, *Make or Break Time for SEFs*, INT'L FIN. REV. (May 2014), http://www.ifre.com/make-or-break-time-for-sefs/21146200.fullarticle.

2015, which is the period when CFTC Chairman Massad publicly stated that the dealers were forcing SEFs to maintain name give-up and when it became clear that Defendants had successfully blocked market entry by SEFs that were prepared to open their exchange-like platforms to the buy-side.[132]

279.    Before that point, no one could have known about the Dealer Defendants' secret conspiracy to control the market.  Indeed, market observers expected SEFs to succeed in bringing all-to-all anonymous trading to the buy-side, and multiple entities spent millions of dollars based on the belief that such success was achievable.

A.    **Defendants' Conspiracy Was Concealed From Plaintiffs**

280.    By its very nature, Defendants' conspiracy to boycott exchange trading of IRS and refuse to deal with any entity that could facilitate such trading was self-concealing. Defendants executed their conspiracy, in large part, through secret meetings and discussions. These meetings were often, although not exclusively, carefully held under the cover of meetings connected with ostensibly independent market actors, like Tradeweb or ISDA.  Defendants used their positions in other industry consortia to meet regularly.  These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities.  Plaintiffs and the Class had no reason to believe these meetings were being used by Defendants to execute a conspiracy to block the all-to-all trading of IRS.

281.    Defendants also met secretly at the homes of their senior executives and at restaurants in New York City.  The details of these meetings were secret, as were the identities of the individuals attending the meetings.  Defendants' internal communications and

---

[132]    *See* Madigan, *supra* note 38.

communications among each other were not public information, rendering impossible any ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a whole. Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging. Plaintiffs and the Class had no way to access such communications.

282.    Additionally, the nature and structure of the IRS market that Defendants had fostered kept Defendants' conspiracy concealed from the public. As a direct result of the opaque, OTC market that Defendants sought to maintain, the Dealer Defendants' actual quotes and prices for IRS were not public information, making any comparison of quotes among competitors, or scrutiny of bid/ask spreads by a Dealer Defendant, an impossibility. Additionally, the Dealer Defendants' cooptation or boycott of exchange and exchange-like trading platforms was, by necessity, secretive — the boycotts would have been rendered ineffective, and likely broken down, if their existence was made public.

283.    As a result of the self-concealing nature of the Defendants' collusive scheme, no reasonable person would have discovered Defendants' conspiracy to block the emergence of exchange trading of IRS before that conspiracy became publicly known in 2015 and later.

284.    In addition, Defendants repeatedly offered public explanations for their conduct, which were intended to conceal the true reasons for Defendants' conspiracy. Defendants also made false and misleading statements about the reasons for their collusive actions, in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of market evolution, and they represented that their actions were beneficial to the market. Because of Defendants' affirmative efforts to mislead, Plaintiffs' continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

285.    When, for instance, the Dealer Defendants took control of Tradeweb in 2007, Tradeweb claimed that the deal would be beneficial to the buy-side because it would provide "[a]ccess to a deep pool of dealer liquidity for interest rate swaps," "[a]ccurate pricing information off which to drive analytics and modeling," and "[g]reater market transparency, increased trading effectiveness and reduced operational complexity for both the buy-side and sell-side."[133]  In reality, the Dealer Defendants purchased shares in Tradeweb to build a forum for collusion and market control through which they could prevent all of the market evolution that Tradeweb claimed would result from the deal.

286.    At the same time, the Dealer Defendants perpetuated the fraudulent claim that the investment was anything more than a consolidation of power for the banks.  Vic Simone, Global Head of Principal Strategic Investments for Goldman Sachs, stated, on behalf of the Dealer Defendants taking over Tradeweb, that they were "pleased to partner with TradeWeb to provide our clients with the transparency, price discovery and efficiency of electronic execution."[134] Simone added:  "Together, we will provide new solutions that reduce technology complexity, increase settlement accuracy and drive best-execution pricing."[135]

287.    Similarly, when Barclays acquired a stake in Tradeweb in 2009, Harry Harrison, the Head of Rates for Barclays, falsely claimed that the purchase was an effort to "deliver[] best-in-class service, liquidity and reliability in the electronic trading space to our clients."[136]  He added that "[o]ur stake in Tradeweb also complements our strategy for improving market

---

[133]  TRADEWEB, *supra* note 24.

[134]  *Id.*

[135]  *Id.*

[136]  TRADEWEB, *Barclays Capital Takes Equity Stake in Tradeweb* (Sept. 10, 2009), http://www.tradeweb.com/news/news-releases/barclays-capital-takes-equity-stake-in-tradeweb/.

efficiency and transparency alongside our market-leading electronic trading platform, BARX."

Billy Hult, President of Tradeweb, claimed that including Barclays in the venture was important

because of its ability to provide "improved price transparency, speed of execution and more

streamlined post-trade processing."[137]

288.    Defendants have also falsely indicted order-book trading of IRS to cover their

collusive efforts to keep it from being successful.  Dexter Senft, Morgan Stanley's Global Head

of Fixed Income E-Commerce, stated that "[f]ixed income securities[, which include IRS] just

aren't suitable to trade on CLOB as it's too risky to be a price maker."[138]  Laurent Paulhac, the

CEO of ICAP's SEF, has similarly warned that "[i]n electronic trading, market participants can

get hurt very quickly, especially if they are in a central limit order book. In times of stress you

need to be able to put buyers and sellers together."[139]  Such statements are plainly misleading in

light of the fact that ICAP offers an order book and that it is used by the Dealer Defendants,

including Morgan Stanley.[140]

289.    At the same time that the Dealer Defendants use their collective power to

constrain the buy-side to their positions as clients in the dealer-to-client market structure,

---

[137]    *Id.*

[138]    Helen Bartholomew, *Swaps Market Structure Changes Create Fragility*, INT'L FIN.
REV. (Sept. 24, 2015), http://www.ifre.com/swaps-market-structure-changes-create-fragility
/21217649.fullarticle.

[139]    *Id.*

[140]    Ironically, Senft, in a momentary lapse from Defendants' script, intimated that the
buy-side should use all-to-all anonymous order books, stating that the buy-side "should access
[SEFs] in the way that gives them the best execution.  At the moment, there's arguably not
enough liquidity in the central limit order books to constitute best execution, but once it's there,
and I think that's just a question of time, folks will experiment and determine what is best
execution."  Daniel O'Leary, *SEF Sector Participants Look Beyond Short Term Hitches*,
GLOBALCAPITAL (July 7, 2014), http://www.globalcapital.com/article/m438s24rf8l4/sef-sector-
participants-look-beyond-short-term-hitches.

representatives of the Dealer Defendants made statements that the buy-side could act as market makers if they wished.  Kevin Arnold, Head of FX Trading, Rates, and Credit for the Americas at UBS, for instance, has stated as recently as August 2015 that "[n]on-banks are welcome" to provide liquidity in interest rate swaps.[141]

290.    Defendants also intentionally provided pre-textual reasons for the persistence of post trade name give-up.  Laurent Paulhac, for instance, claimed in April 2015 that ICAP continues the practice because anonymity "would be a difficult step for any platform to take, but for operational and competitive reasons, rather than any fear of retaliation."[142]  Such claims falsely attribute the persistence of name give-up to market choice.

291.    Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the IRS market.  The Dealer Defendants have the power to make buy-side firms thrive or perish.  Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation.  Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.  Defendants' power, and willingness to use it to silence, penalize, and exclude those who oppose their interests, help explain why the first hints of Defendants' conspiracy did not emerge until 2015.

292.    These actions and statements by Defendants, individually and in the aggregate, affirmatively concealed Defendants' conspiracy.  These affirmative representations, acts of

---

[141]    Smith, *supra* note 70.

[142]    Madigan, *supra* note 66.

concealment, and the inherently self-concealing nature of the conduct at issue made it impossible for Plaintiffs to discover Defendants' conspiracy prior to 2015.

> **B.** **Plaintiffs' Inability to Discover the Conspiracy Did Not Result from a Lack of Diligence**

293. Because Defendants employed acts and techniques that were calculated to conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct through their exercise of due diligence any earlier than 2015.

294. Nonetheless, Plaintiffs and members of the Class regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.

295. Throughout the Class Period, Plaintiffs and members of the Class regularly monitored news reports concerning the financial industry and the IRS market. Plaintiffs undertook such activity in order to invest wisely and maximize the returns on their investments. Throughout the Class Period, Plaintiffs also regularly monitored prices and bid/ask spreads within the IRS market, to the extent such monitoring was possible. In particular, Plaintiffs, directly or through their investment managers, regularly monitored available IRS pricing data through electronic databases and other sources, including Bloomberg and ICAP.

296. Practically speaking, there were limits to what could be done, given that so much of the IRS market was shrouded in secrecy due to Defendants' conduct. The pricing data that were available to Plaintiffs did not reflect real-time bid/ask spreads available in the market. Plaintiffs' inability to obtain real-time data on bid/ask spreads was a direct result of the agreements Defendants reached to keep the IRS market opaque.

297. Plaintiffs and members of the Class also retained and consulted with sophisticated investment managers to manage their investments, including their IRS investments, monitor the

financial markets, including the IRS market and their IRS investments, and obtain the best possible IRS pricing.  In this regard, one of Chicago Teachers' investment managers that was retained to manage a portion of the Fund's assets, and is familiar with the market, invested in IRS contracts on behalf of Chicago Teachers.  For each IRS contract Baltimore entered into, it engaged a swaps advisor that advised Baltimore on the best hedging strategy for the city.  This included advising Baltimore on the structuring, execution and negotiation of IRS contracts, as well as helping it select the best counterparties and terms for its IRS purchases.  Neither of these Plaintiffs was informed by their investment managers of facts that would have put a reasonable person on notice of the fact that Defendants were colluding to prevent exchange-like trading in the IRS market.  These Plaintiffs relied on the advice, monitoring, and diligence of their investment managers.

298.    Thus, at no time prior to the 2015 disclosures identified above did any of the Plaintiffs believe or have reason to believe that the Dealer Defendants' pricing of IRS was a result of or affected by a secret and unlawful conspiracy among the Defendants to block competition from exchanges and to keep bid/ask spreads artificially inflated.

299.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

**CLASS ACTION ALLEGATIONS**

300.    Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

301.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

All persons or entities who, from January 1, 2008 to the present, directly entered into fixed-for-floating interest rate swaps with the Dealer Defendants, or their respective affiliates, in the United States and its territories.  Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities (the "Class").

302.   ***Numerosity.***  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are thousands of class members geographically dispersed throughout the United States.

303.   ***Typicality.***  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when they were on the other side of a swap.

304.   Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiffs will prove other class members' claims as well.

305.   ***Adequacy of Representation.***  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

306.    *Commonality.*   There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

     a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves and to boycott exchange and exchange-like trading platforms, thereby inflating prices associated with the purchase and sale of IRS in the United States;

     b.     Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

     c.     The effect of Defendants' alleged conspiracy on the prices associated with the purchase and sale of IRS sold in the United States during the Class Period;

     d.     The appropriate measure of damages sustained by Plaintiffs and other members of the Class;

     e.     Whether Plaintiffs and other class members are entitled to injunctive relief; and

     f.     The appropriate injunction needed to restore competition.

307.    *Predominance.*   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common

methodology for determining class damages as a whole appropriate.  Such generally applicable

conduct is inherent in Defendants' wrongful conduct.

308.    *Superiority.*  Class action treatment is a superior method for the fair and efficient

adjudication of the controversy.  Such treatment will permit a large number of similarly situated,

geographically dispersed persons or entities to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or

expense that numerous individual actions would engender.  The benefits of proceeding through

the class mechanism, including providing injured persons or entities a method for obtaining

redress on claims that could not practicably be pursued individually, substantially outweighs

potential difficulties in management of this class action.  The Class has a high degree of

cohesion, and prosecution of the action through representatives would be unobjectionable.

309.    Plaintiffs know of no special difficulty to be encountered in the maintenance of

this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

310.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

fully set forth herein.

311.    As alleged above, Defendants and their co-conspirators entered into and engaged

in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-

to-client IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly

boycott entities that would introduce competition on IRS bid/ask spreads in the United States in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or

conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an

unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

312.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

313.    IRS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

314.    Other derivative products are not substitutable for IRS.  The rapid rise in IRS volume following their inception in the mid-1980s demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

315.    The relevant geographic market is the United States.  The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

316.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in IRS trades between Defendants and their non-dealer customers has been severely curtailed.  Plaintiffs and class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Plaintiffs' and each class member's damages are directly attributable to Defendants' conduct, which resulted in all class members paying artificially inflated bid/ask spreads on every IRS they purchased or sold during the Class Period.  Plaintiffs' injuries consist of artificially inflated costs associated with the purchase and sale of IRS in the United States

caused by Defendants' misconduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

317.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

318.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

319.    Plaintiffs and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

320.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

b.    Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

c.    Award the Class treble damages;

d.    Award reasonable attorneys' fees and costs;

e.      Award all available pre-judgment and post-judgment interest, to the fullest

extent available under law or equity from the date of service of the initial

complaint in this action;

f.      Decree that Defendants and their co-conspirators have unlawfully

conspired to block the emergence of fully anonymous CLOB SEF trading

of IRS in the United States in violation of Section 1 of the Sherman Act,

15 U.S.C. § 1;

g.      Decree that Defendants have been unjustly enriched by their wrongful

conduct and award restitution to Plaintiffs and the Class;

h.      Permanently enjoin Defendants from continuing their unlawful conduct,

which has prevented competition from entering the IRS market, a market

valuable to not only Plaintiffs and class members but also to the nation's

financial system and broader economy for the risk management and

liquidity benefits it can provide; and

i.      Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED: New York, New York
February 25, 2016

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:      /s/ J. Douglas Richards
J. Douglas Richards
Michael B. Eisenkraft
Sharon K. Robertson
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com
srobertson@cohenmilstein.com

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Fax: (312) 357 0369
cgilden@cohenmilstein.com

Steven J. Toll (*pro hac vice* forthcoming)
Jeffrey Dubner (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408 4600
Fax: (202) 408 4699
stoll@cohenmilstein.com
jdubner@cohenmilstein.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:      /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Daniel Cunningham
David LeRay
Miles H. Plant
William R. Sears
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
danielcunningham@quinnemanuel.com
davidleray@quinnemanuel.com
milesplant@quinnemanuel.com
willsears@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*

**JACOBS BURNS ORLOVE & HERNANDEZ**

By:  /s/ Joseph M. Burns

Joseph M. Burns
William W. Leathem
150 North Michigan Avenue, Suite 1000
Chicago, Illinois 60601
Telephone: (312) 327-3446
Fax: (312) 580-7175
jburns@jbosh.com
wleathem@jbosh.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*

**SUSMAN GODFREY L.L.P.**

By:  /s/ William C. Carmody

William Christopher Carmody
Arun Subramanian
Seth Ard
Cory Buland
Elisha B. Barron
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
cbuland@susmangodfrey.com
ebarron@susmangodfrey.com

*Attorneys for Mayor and City Council of*
*Baltimore*