USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/23/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

IN RE:                                :

                                       :        16-MD-2704 (PAE)

INTEREST RATE SWAPS ANTITRUST LITIGATION  :        16-MC-2704 (PAE)

                                       :

*This Document Relates to All Actions*           :      OPINION & ORDER

------------------------------------------------------------------- X

PAUL A. ENGELMAYER, District Judge:

     This decision resolves a motion by the putative class plaintiffs in this multi-district

litigation for leave to file a Third Amended Complaint. For the reasons that follow, that motion

is granted in part and denied in part.

## I.      Background

     This case centers on claims of Sherman Act § 1 violations affecting the market for

interest-rate swaps ("IRS" or "IRSs"). Plaintiffs' core factual allegations and liability theories,

and the case's procedural background through July 28, 2017, are detailed in the 108-page

decision the Court issued that day. *See In re Interest Rate Swaps Antitrust Litigation*, 261 F.

Supp. 430 (S.D.N.Y. 2017) ("*In re IRS*"). It resolved motions to dismiss the two Second

Amended Complaints: one by the putative plaintiff class ("SAC"); the other by non-class

plaintiffs Javelin Capital Markets LLC ("Javelin") and Tera Group, Inc. ("Tera") ("JTSAC").

The Court incorporates that decision by reference and recites here only necessary background.

### A.      Initial Proceedings

     On November 25, 2015, the initial complaint before this Court was filed. *See* Complaint,

(No. 15 Civ. 9319). On June 2, 2016, the United States Judicial Panel on Multidistrict Litigation

("JPML") transferred all related cases to this Court for coordinated or consolidated pretrial proceedings with the actions pending in this District. Dkt. 1.[1]

On July 26, 2016, the Court held an initial conference and stayed formal discovery. *See* Dkt. 92. On August 3, 2016, the Court appointed Quinn Emanuel Urquhart & Sullivan, LLP, and Cohen Milstein Sellers & Toll, PLLC, as interim co-lead counsel for the putative class. Dkt. 99.

On September 9, 2016, class plaintiffs, Dkt. 113, and the Javelin/Tera plaintiffs, Dkt. 114, each filed an Amended Complaint. On November 4, 2016, defendants filed motions to dismiss. *See* Dkts. 123–134.

On December 9, 2016, class plaintiffs filed the SAC, Dkt. 142, and the Javelin/Tera plaintiffs filed the JTSAC, Dkt. 145 ("JTSAC"). The SAC was 145 pages and 406 paragraphs long.

On May 23, 2017, after extensive briefing on motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) by each of the then-13 groups of corporate defendants and their affiliates, the Court heard argument. *See* Dkt. 233 (transcript).

**B.     July 28, 2017: The Court's Ruling on the Motions to Dismiss**

In its ruling on the motions to dismiss, the Court drew a sharp distinction between the Sherman Act § 1 allegations regarding 2008–2012 (made by class plaintiffs only) and those regarding 2013–2016 (made by both sets of plaintiffs).

---

[1] Docket references here are to 16-MD-2704, insofar as many filings pertinent to the motion to amend have not been filed on the docket in No. 16-MC-2704, the "master case" docket established for filings of significance, Dkt. 11, which is intended to encompass motions to dismiss and associated filings. The Court asks counsel henceforth to file substantive motions and supporting submissions, as well as letters relating to discovery disputes and to counsel's monthly status calls with the Court, on the dockets in both 16-MD-2704 and 16-MC-2704.

The Court dismissed the former claims and sustained the latter. That was for three distinct reasons: (1) the character, depth, and overall plausibility of plaintiffs' claims of collusive conduct among the investment banks who dealt in IRSs ("Dealer Defendants" or "Dealers") in violation of § 1 differed markedly across the two periods; (2) plaintiffs' claims based on injuries incurred before November 25, 2011 fell outside the four-year statute of limitations and were time-barred; and (3) class plaintiffs lacked antitrust standing to pursue claims covering the pre-2013 period.

### 1. 2008–2012

The SAC's allegations of unlawful collusion during 2008–2012, the Court held, fell well short of plausibly alleging conduct violating § 1. That was so whether the SAC was construed to allege parallel conduct by competitors occurring under circumstances giving rise to an inference of a § 1 conspiracy, direct evidence of a § 1 conspiracy, or both. *See generally In re IRS*, 261 F. Supp. 3d at 463–472.

As for parallel conduct by the Dealer Defendants, the Court noted, the SAC contained scant allegations of such during this period. The main parallel conduct alleged—choosing in various ways not to support the eventual emergence of electronic all-to-all trading of IRS—did not give rise to an inference of collusion. That was because there was good reason, as a matter of "rational and competitive business strategy," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007), "for any individual Dealer independently to have sought to maintain the status quo and to discourage, not facilitate, all-to-all IRS exchange trading," because, as alleged, "such platforms presented an existential threat to the Dealers' profit margins as market makers," *In re IRS*, 261 F. Supp. 3d at 463–464.

The inference urged by the SAC of an all-Dealer conspiracy to inhibit future electronic all-to-all trading platforms from eventually coming into being was made all the less plausible, the Court held, given the state of the industry during 2008–2012. Key infrastructure to support electronic anonymous all-to-all IRS trading was not yet in place. These included mechanisms for central clearing accessible to and financially supported by the buy-side. *Id.* at 465.

Rather, the regulatory impetus for the development of all-to-all trading had come from the Dodd-Frank statute, enacted July 21, 2010, and its 2012–2013 implementing regulations. *See id.* at 445–447. These established a comprehensive regulatory framework for swaps including IRSs; required that swaps be traded on platforms ("swap execution facilities," or "SEFs"); required the buy side to trade IRSs via these new platforms; and mandated the central clearing of IRS trades. *See id.* The CFTC itself, the Court observed, had recognized that mandating central clearing would promote participation by the buy-side in anonymous all-to-all IRS trading in these new trading fora that Dodd-Frank had brought about. *See id.* at 446 (citing Clearing Requirements Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284, 74,287 (Dec. 13, 2012) ("CFTC Clearing Rule")). At the same time, the CFTC had recognized, buy-side participants would face significant costs and burdens adapting to such platforms. These included infrastructural, technological, and financial costs (*e.g.*, posting of financial collateral to enable clearing of their trades).

Further, during 2008–2012, the companies that later came to offer all-to-all anonymous trading platforms for IRSs—Javelin, Tera, and three others—did not yet offer such platforms. There were thus no extant all-to-all trading platforms for the Dealers to boycott. *See generally id.* at 465 ("Before Dodd-Frank made this vital infrastructure a looming reality, there would have been no urgency for collective action to block all-to-all exchange trading from emerging.").

4

As to purported direct evidence of a conspiracy, the Court noted, the SAC mainly relied on allegations regarding "Project Fusion." *See id.* at 465–466. There, Dealers had purchased a controlling interest in Tradeweb—an entity which had developed a dealer-to-client request-for-quotes ("RFQ") platform that operated consistent with the day's norms—allegedly to ensure that it would not expand to introduce all-to-all anonymous trading to the IRS market. *Id.* But the SAC's claims as to that venture fell well short of plausibly alleging a § 1 conspiracy. The SAC's claim of a plot to terminate a Tradeweb plan to open an all-to-all IRS platform was highly conclusory, both because the existence of such a plan was summarily pled, *id.* at 466, and because the SAC did not allege direct evidence of a conspiracy to quash such a plan, *id.* at 466–467. Further, the Court held, to the extent collective action was alleged in connection with Dealers' joint ownership in Tradeweb, this claim did not describe *per se* unlawful conduct. It described a joint venture among horizontal competitors that, as pled, was well-funded and had legitimate business objectives and potentially redeeming justifications. Under settled § 1 doctrine, it thus could be held unlawful only under the Rule of Reason. But, the Court held, the SAC failed to plead key facts to make out a Rule of Reason claim (including defining Tradeweb's product or geographic market and its market share or power within that market). The SAC also did not allege why Tradeweb's decision to focus its resources on trading platforms and asset classes other than a novel platform for all-to-all IRS trading had been, on balance, anti-competitive. *Id.* at 467–469.

Independently, the Court held that most of the SAC's § 1 claims as to 2008–2012 were time-barred. Rejecting plaintiffs' claim of fraudulent concealment, the Court held outside the four-year statute of limitations the SAC's claims based on injuries incurred before November 25,

2011. That ruling effectively supplied an alternative basis to dismiss the SAC's § 1 claim to the extent it covered 2008 through November 25, 2011. *See id.* at 487–490.

Finally, the Court held, class plaintiffs lacked antitrust standing to pursue claims of injury suffered before 2013. The putative plaintiff must be an "efficient enforcer" of the antitrust laws, and a central factor in that inquiry is whether the plaintiff's claimed injury is speculative. *Id.* at 491. But in the years before 2013—when Dodd-Frank's mandates had yet to take effect and the SEFs that first offered all-to-all IRS trading had yet to emerge—the SAC's § 1 claims failed this standard. The SAC's theory was the Dealers had blocked from emerging the species of IRS trading fora that emerged in 2013–2014: platforms enabling electronic all-to-all anonymous trading. It postulated that, had these platforms arisen in 2008–2012, the prices at which class plaintiffs would have traded IRSs would have been superior. This theory of injury, the Court held, was "extraordinarily conjectural," as the SAC's "alternative history of IRS trading for the first five years of the class period (2008–2012) requires too many leaps of imagination and guesswork for a claim of class injury to be viable." *Id.* at 494. That ruling provided a third basis for the dismissal of the claims covering 2008–2012. *See id.* at 490–495.

### 2. 2013–2016

In contrast, as to 2013–2016, the Court held, the SAC stated a viable § 1 claim of a group boycott. So did the JTSAC, which brought claims to the same effect on behalf of Javelin and Tera, which claimed to have been targeted by a Dealer boycott of the platforms they opened in 2013 and 2014. *See id.* at 472.

As to plausibility, by 2013–2016, the Court noted, platforms for all-to-all anonymous IRS trading had emerged, facilitated by Dodd-Frank and its implementing regulations. The background conditions and market infrastructure thus now made claims of a conspiracy to

6

destroy or marginalize these platforms more plausible. In this period, as alleged, five such platforms emerged. These included three (Tera, Javelin, and TrueEx) that plaintiffs claimed were targets of a Dealer conspiracy. *See id.*

Further, unlike in the 2008–2012 period, the SAC alleged numerous acts of parallel conduct by competing Dealers suggestive of a conspiracy to boycott these platforms, not merely a common decision not to support or trade on these platforms. These included similar Dealer tactics at meetings with Javelin and Tera, parallel withholdings by Dealers of affiliated clearing services, common excuses and vocabulary, parallel conduct towards the exchanges' customers, and parallel refusals to consent to smaller "inter-dealer brokers" doing business with the new exchanges. *Id.* at 472–474. Strikingly, the SAC alleged parallel ruses by four Dealers towards Tera the day after Tera's first IRS trade. The four Dealers feigned sudden interest in "auditing" Tera—in an apparent attempt to block Tera's progress. *Id.* at 473–474. Other alleged incidents and statements by individual Dealers supported the claim of collusion. *Id.* at 476–477. Viewed in total, these allegations made plausible the claim that the Dealers had conspired to stunt these emergent exchanges, which threatened Dealers' profit margins. *See generally id.* at 472–481.

Nor did the other deficiencies of the 2008–2012 claims preclude the 2013–2016 claims. The later claims were undisputedly timely. And, as to antitrust standing, class plaintiffs' theory of injury from 2013–2016 was not inherently unduly speculative. The Court, however, did caution—including in a later order clarifying the scope of trades that class plaintiffs could pursue—that due attention to the mechanics of trading would be necessary as the case progressed

to assure that plaintiffs' theories of injury were not unduly speculative. *Id.* at 494–495; *see also* Dkt. 251 (August 29, 2017 order).[2]

### C. Subsequent Progress of This Litigation

Following resolution of the motions to dismiss, this litigation moved productively forward. The parties negotiated, and in August 2017 the Court approved, a case management plan governing, *inter alia*, fact discovery. *See* Dkt. 246 (August 21, 2017 order); Dkt. 250 (August 28, 2017 order). The plan set a May 21, 2018 deadline for the substantial completion of document production and a December 21, 2018 deadline for the completion of fact discovery.

To meet these deadlines, the parties and the Court worked intensively. In brief:

Counsel engaged in extensive negotiations over discovery parameters. These involved counsel for numerous entities, including the putative class; non-class plaintiffs Javelin and Tera; the 11 groups of Dealer Defendants that remained in the case; and third-party institutions to whom discovery was directed. These negotiations addressed such matters as custodians, topics, search terms, and time-frames.

Multiple times, the parties briefed discovery disputes, which the Court resolved in a series of written decisions. *See, e.g.*, Dkt. 266 (October 10, 2017 decision); Dkt. 296 (October 25, 2017 decision); Dkt. 322 (January 8, 2018 decision).

---

[2] The balance of the July 28, 2017 decision involved issues not relevant here. On defendant-specific grounds, the Court dismissed plaintiffs' claims against three defendants or groups: a Dealer (HSBC Bank PLC), an inter-dealer broker (ICAP Capital Markets LLC), and an entity (TradeWeb Markets LLC) which allegedly first refrained from opening an all-to-all IRS platform and later opened such a platform but kept it minimally active. *See generally In re IRS*, 261 F. Supp. 3d at 483–487. The Court also rejected defendants' argument that the Dodd-Frank statute impliedly precluded plaintiffs' § 1 claims, *id.* at 495–498, and resolved challenges to state-law claims, *id.* at 498–501.

The Court also convened a monthly telephone conference with counsel. Each call was preceded by a joint letter from lead counsel giving a status update on the case, primarily focusing on discovery. These letters and calls enabled the Court to take stock of the progress of the case, including discovery; to give counsel direction on open issues; to receive a preview of unresolved discovery disputes; and to set briefing schedules as to discovery disputes. *See, e.g.*, Dkt. 302 (November 15, 2017 joint letter); Dkt. 308 (transcript of November 17, 2017 call); Dkt. 315 (December 13, 2017 joint letter); Dkt. 320 (transcript of December 15, 2017 call); Dkt. 324 (January 24, 2018 joint letter); Dkt. 331 (transcript of January 26, 2018 call).

Important here, these activities—and the production of documents, now well underway—were conducted against the backdrop of the decision on the motions to dismiss. The Court's rulings as to discovery were premised on—and took as durable—the Court's central holding that the surviving claims in the case were limited to the 2013–2016 period. Two examples illustrate the point.

***October 10, 2017 discovery ruling***: On October 10, 2017, the Court resolved a dispute as to the start date of the period as to which defendants were obliged to produce documents on topics relevant to the alleged conspiracy in 2013–2016. Plaintiffs argued that defendants should produce documents created on or after January 1, 2009, arguing that events before 2013 might be germane to the formation of the 2013–2016 conspiracy. Defendants proposed a start date of January 1, 2012.

The Court chose an intermediate start date: July 21, 2010, the date of Dodd-Frank's passage. This date, the Court held, balanced plaintiffs' interest in discovering defendants "pre-conspiracy dealings" against the burdens of obliging the 11 defendant groups to make pre-conspiracy discovery. Explaining why documents created after July 21, 2010 were more likely

to be relevant than those created before, the Court explained: "[A]fter Dodd-Frank was enacted, it became materially more foreseeable that electronic all-to-all platforms for IRSs would one day develop." Dkt. 266 at 2. The extensive negotiations and agreements among counsel that ensued regarding document production parameters—including the selection of custodians and the assessment of the burdens yielded by particular electronic-review search terms—were premised on this ruling.

*January 8, 2018 discovery rulings*: On January 8, 2018, the Court resolved an omnibus set of seven discovery disputes that the parties had briefed, after notifying the Court that they had reached an impasse on these issues. *See* Dkt. 311 (notice of impasse); Dkt. 319 (December 19, 2017 joint letter-brief); Dkt. 322 (January 8, 2018 decision). The disputes involved events that had occurred or entities that had existed before 2013. The parties centrally disputed whether these topics were relevant to the surviving (2013–2016) conspiracy claims, and, if so, whether the burden of producing materials as to these topics outweighed the benefits of ordering production.

Resolving these disputes, the Court noted that all seven topics "either exclusively or largely involved the pre-2013 period," with defendants contending that the topics were therefore wholly or largely irrelevant, and plaintiffs "argu[ing] that these topics remain relevant to . . . the alleged Sherman Act § 1 conspiracy in 2013–2016 that the Court has held adequately pled." *See* Dkt. 322 at 2. The Court recognized that discovery from earlier years might remain relevant to the 2013–2016 claims (as reflected in the July 21, 2010 discovery cut-off date). But, the Court noted, "requests for discovery as to pre-2013 events" must "be critically evaluated for relevance and . . . any discovery that is ordered [must] be carefully tailored to viable theories of relevance." *Id*. at 3.

Balancing the importance of each category of records sought against the burden and expense of its production, *see* Fed. R. Civ. P. 26(b)(1), the Court precluded discovery as to some topics altogether as irrelevant or scantly relevant to the surviving claims. As to others, the Court allowed discovery or targeted discovery where an adequate showing of relevance to the 2013–2016 period had been made. *See* Dkt. 322 at 4–13. The parties' ensuing negotiations and agreements regarding document production parameters turned on these rulings, too.

**D.      February 21, 2018: Plaintiffs Disclose the PTAC**

On February 21, 2018, in a letter submitted in advance of a monthly status call, plaintiffs' counsel disclosed their intention to move for leave to file a Proposed Third Amended Complaint ("PTAC"). *See* Dkt. 335 (February 21, 2018 joint letter). The motion, a memorandum of law in support, and the 198-page, 549-paragraph PTAC were filed later that day. *See* Dkt. 337 ("Pl. Mem."), 338-1 ("PTAC").[3] These were filed on the last day on which, under the case management plan, motions seeking leave to amend were permitted.

The PTAC proposed to amend the SAC in three ways. First, plaintiffs proposed to add a plaintiff—the Los Angeles County Employees Retirement Association ("LACERA")—to serve alongside the existing class plaintiff, the Public School Teachers' Pension and Retirement Fund of Chicago ("CPTF"). Second, plaintiffs proposed to amplify their allegations with respect to 2013–2016. Third, most consequentially, plaintiffs proposed to restore their claims as to 2008–2012. In support, the PTAC proposed to add approximately 150 new paragraphs of pre-2013 allegations.

---

[3] Javelin and Tera have not moved to amend their Second Amended Complaints. The Court hereafter uses "plaintiffs" to refer to class plaintiffs.

Before February 21, 2018, plaintiffs had not alerted the Court to the possibility of an amendment to revive the five years of dismissed claims. In contrast, plaintiffs had notified the Court in January 2018 of their intention to seek leave to amend to add LACERA as a plaintiff. *See* Dkt. 324 at 2.

The PTAC's new allegations as to 2008–2012 largely related to two topics as to which the Court had dismissed claims in July 2017 and denied discovery in January 2018.

***"Project Fusion"***: The first topic involved the 2007 "Project Fusion," addressed above, involving Tradeweb. The Court had dismissed the SAC's claims based on this episode. And in January 2018, the Court had precluded plaintiffs' bid for discovery on "Project Fusion" as irrelevant to the surviving claims. Dkt. 322 at 6.[4]

***Swapstream***: The second topic was a trading platform, Swapstream, which the Chicago Mercantile Exchange ("CME") had operated in 2008–2010. The SAC had alleged that, in 2008, CME had announced plans to introduce a clearing product called "CME Cleared Swaps" for all over-the-counter ("OTC") swaps executed on Swapstream. SAC ¶¶ 184–185. The Dealers, concerned that introduction of this product could lead CME one day to develop "successful clearinghouses and exchanges for other asset classes," *id.* ¶ 186, had "boycotted" Swapstream and relied instead on a different clearing entity, SwapClear, that cleared only inter-dealer trades, *id.* ¶ 188. In its ruling on the motions to dismiss, the Court had held that the Dealers' common decisions not to use CME's new clearing product did not make out a claim of collusion. *In re IRS*, 261 F. Supp. 3d at 464 & n.13. And, in January 2018, after plaintiffs had sought extensive

---

[4] The Court had allowed more limited discovery, after July 21, 2010, into the "Dealers' communications and collaboration in connection with operating Tradeweb." *Id.* This was to enable plaintiffs to test whether Tradeweb, in which Dealer personnel had served as directors or officers, had provided a forum in which Dealers had conspired to further the 2013–2016 conspiracy. *Id.* at 6–7.

discovery as to Swapstream and its clearing products on the theory that Swapstream had been a "SEF precursor," the Court had declined to authorize such discovery. Dkt. 322 at 4.

### E.     The February 23, 2018 Status Call

A monthly status call was held two days later. *See* Dkt. 345 (transcript of February 23, 2018 call). The Court questioned class plaintiffs' counsel about the PTAC.

Counsel acknowledged that, apart from the addition of LACERA, counsel had not notified the defense about a possible amendment of the complaint until February 14, 2018. Dkt. 345 at 19–20. Plaintiffs' counsel further acknowledged that they had been considering filing a PTAC that would revive the dismissed claims from the date (July 28, 2017) of the Court's ruling dismissing those claims. *Id.* at 20.

Plaintiffs' counsel further acknowledged that a decision had been made *not* to notify the defense or the Court earlier of the possibility of a motion to amend to restore the 2008–2012 claims: "We wanted to make sure the amended complaint was in a near final form so that we could tell them with certainty what the new allegations would be." *Id.* at 21. Asked whether counsel had given thought during the preceding six-to-seven months to whether a possible amendment to revive the 2008–2012 claims might bear on the ongoing discovery discussions and negotiations, plaintiffs' counsel stated that they had not viewed their silence as "an affirmative decision to withhold information," but as a decision "to make sure this complaint was in a near final form and that we were set on filing." *Id.* at 21–22. Plaintiffs' counsel admitted that, were the 2008–2012 claims revived, it "would have an effect on the scope of discovery." *Id.* at 22.

Asked whether it had occurred to counsel that the PTAC might moot "the substantial investment of time" that counsel and the Court had spent since August "resolving and discussing discovery issues," plaintiffs' counsel stated: "It did." *Id.* Plaintiffs' counsel added: "We

apologize for any inconvenience to the Court and defense counsel." *Id.* Counsel added that "[c]ertain critical witnesses only came to light recently and were still being talked to up through the time period that we notified defendants." *Id.* Reminded that they had given notice a month earlier to the proposed addition of LACERA, plaintiffs' counsel reiterated that while they had considered alerting the Court and defense in earlier status letters to the possible amendment to revive the dismissed claims, "we wanted to make sure it was something we were going to go through with . . . . And we again apologize for any inconvenience to the Court." *Id.* at 23.

Finally, plaintiffs' counsel clarified that, despite the PTAC's listing as defendants two entities (HSBC and ICAP) whom the Court had dismissed, plaintiffs had not intended to restore claims against those parties. But, plaintiffs' counsel stated, the PTAC was intended to restore claims against Tradeweb, another dismissed defendant. *Id.* at 26. Plaintiffs' counsel stated that they had not yet notified Tradeweb of the amended complaint that had been filed to restore claims against it. *Id.* at 26–28.

### F. Later Submissions Relating to the PTAC

On March 30, 2018, defense counsel filed a memorandum of law opposing the PTAC to the extent it sought to restore dismissed claims, Dkt. 353 ("D. Mem."), and a declaration of Richard F. Schwed in support, Dkt. 354 ("Schwed Decl."). The same day, counsel for Tradeweb submitted a letter opposing the restoration of claims against it. Dkt. 355.

On April 2, 2018, plaintiffs' counsel filed a letter seeking leave to file a reply, noting that the defense had filed with their brief a document (the Project Magellan Agreement) relating to Swapstream which plaintiffs had only recently seen, Dkt. 356, and a declaration of counsel addressing the filing of the PTAC, Dkt. 356-1. The Court authorized a reply on that point. Dkt. 357. On April 3, 2018, plaintiffs filed a reply. Dkt. 359.

## III.   Discussion

The PTAC proposes to amend the SAC by (1) adding LACERA as a plaintiff; (2) amplifying the factual allegations regarding the 2013–2016 period as to which plaintiffs' § 1 claims have been held viable; and (3) adding extensive new factual allegations regarding 2008–2012 and on that basis reviving plaintiffs' claims as to that period.  The Court reviews these three categories of proposed amendments in turn, after first reviewing the governing legal standards.

### A.   Applicable Legal Standards

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).   "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  Leave to amend is properly denied upon on a showing of prejudice or bad faith, and an "[a]mendment may be prejudicial when, among other things, it would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" *AEP Energy Servs. Gas Holding Corp. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *see also Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) ("The Court plainly has discretion . . . to deny leave to amend when the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant").

**B.     Leave to Add LACERA as a Plaintiff**

Plaintiffs seek leave to add LACERA, a California municipal pension fund, as a plaintiff. Defendants do not oppose this, while reserving the right later to challenge LACERA's standing depending on discovery.

The Court grants this motion. The PTAC alleges facts about LACERA that make it a suitable plaintiff: As of June 30, 2016, late in the class period, LACERA held net assets in trust for pension benefits totaling $53.8 billion, and during this period, "LACERA entered into IRS transactions directly with multiple Dealer Defendants." PTAC ¶ 39. Adding LACERA has the benefit of assuring, on the anticipated motion for class certification, that the universe of IRS trades involving putative class plaintiffs will be broader, more diverse, and potentially more representative of the variety of covered trades. Defendants, who have had notice of LACERA's prospective addition since January 2018, do not claim that adding LACERA would meaningfully add to discovery burdens or affect the existing schedule.

**C.     Leave to Amplify the 2013–2016 Allegations**

Plaintiffs seek leave to elaborate on the factual allegations regarding the 2013–2016 period as to which the Court has upheld the SAC's claims as viable. Defendants also do not oppose this amendment.

The Court grants this motion. The PTAC's new allegations about the 2013–2016 period fortify—and give defendants fuller notice of the nature of—plaintiffs' claims.

For example, the PTAC newly alleges: (1) a March 2013 meeting at which Tera demonstrated its trading platform, and after which an identified J.P. Morgan collateralized default swap trader warned a Tera employee that if Tera launched an anonymous central limit order book for swaps, the employee "would need personal security and should check his car for

bombs," PTAC ¶ 357; (2) Javelin's October 2013 filing of the SEF industry's first "Made Available-to-Trade" ("MAT") application to the CFTC, which, if granted, would have enabled a wide range of cleared IRSs to be executed on SEFs, *id.* ¶ 408, but which prompted complaints and a withdrawal of liquidity from a Dealer, RBS, *id.* ¶ 409; (3) a warning by a Dealer employee to a Javelin representative, following Javelin's MAT application, that he "would never work on Wall Street again," *id.* ¶ 411; (4) the existence of buy-side support as of November 2013 for Javelin's platform and the expressed hope of these firms that Javelin's new "phased-in approach" for certain swaps might appease the Dealer Defendants, but which proved a "non-starter" because the Dealers reacted with "hostility," *id.* ¶¶ 412–413; and (5) an October 2014 meeting with Barclay's at which a Javelin representative was told that the Dealer Defendants had already "boxed out" Javelin's platform and at which "Barclays personnel expressly warned against any further MAT application, and even raised the prospect of physical intimidation," *id.* ¶ 415.

The PTAC also adds an allegation that appears aimed at clarifying the scope of damages plaintiffs intend to pursue if liability is established as to the 2013–2016 period. It alleges that had the three SEFs against which plaintiffs claim the Dealer Defendants conspired not been impeded, there would have been greater transparency and price competition not only on all-to-all IRS trades, but also, derivatively, more beneficial pricing on trades executed over the counter and on non-anonymous RFQ platforms. *See id.* ¶¶ 477–478.

Defendants do not argue that these new allegations would impose material burdens, meaningfully affect ongoing discovery, or disrupt the existing schedule. The Court accordingly permits those proposed amendments that amplify plaintiffs' claims as to 2013–2016.

**D.      Leave to Revive Plaintiffs' Claims as to 2008–2012**

The thrust of the PTAC's new allegations as to 2008–2012 is that the Dealer Defendants colluded to impede from emerging two electronic-trading platforms that would have supported all-to-all anonymous trading of IRSs. One would have been operated by Tradeweb, *see, e.g., id.* ¶¶ 212–227, 238–240, 242, 277–282; the other, Swapstream, would have been operated by CME, *see, e.g., id.* ¶¶ 119–211; *see also id.* ¶ 14 (CME and Tradeweb, as of 2007, were "two threats to the Dealer Defendants' hold on the IRS market"). The PTAC attempts to cure the SAC's pleading deficiencies as to these potential platforms. It also includes new allegations to the effect that the buy-side would have responded favorably during 2008–2012 had an all-to-all platform for IRS trading existed, and that the "pillars" needed to support such all-to-all trading (such as mechanisms for central clearing, order routing, and post-trade processing) were being used for inter-Dealer trades before Dodd-Frank and were adaptable to the buy-side's use. *See, e.g., id.* ¶¶ 92, 100–101, 104–118.

For multiple independent reasons, the Court denies plaintiffs leave to file the PTAC to the extent that it attempts to revive plaintiffs' claims as to 2008–2012.

**1.      Futility**

The PTAC does not remedy the gauntlet of deficiencies that led the Court to dismiss the SAC's claims as to 2008–2012 for failure to state a claim. Amending these claims would thus be futile. Four points in particular merit discussion:

***Antitrust standing/speculative injury***: Even assuming a § 1 conspiracy were now well-pled based on the episodes alleged regarding the potential Tradeweb and CME platforms—and the Court does not so find—plaintiffs' theory of injury as to 2008–2012 would remain far too conjectural to survive.

18

A court determining whether a plaintiff is an "efficient enforcer" of the antitrust laws so as to have antitrust standing must consider factors including "the speculativeness of the [plaintiff's] alleged injury." *See In re IRS*, 261 F. Supp. 3d at 490–491 (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013) (internal quotations omitted)). On this basis, the Court previously held that even were the SAC's claims as to 2008–2012 otherwise viable, they would fail this requirement:

> [C]lass plaintiffs' theory of pre-2013 injury is extraordinarily conjectural, such that, had the § 1 claim as to that period not otherwise have been dismissed as implausible (and had the pre-2012 aspects of that claim not been dismissed as time-barred), the claim would not satisfy the requirements of antitrust standing. Among other infirmities, it is "entirely uncertain," *Gatt*, 711 F.3d at 79, that, absent the scheme, the necessary infrastructural preconditions for all-to-all trading, such as central clearing of IRS trades, would have developed before Dodd-Frank willed them into being in 2013. Plaintiffs' alternative history of IRS trading for the first five years of the class period (2008–2012) requires too many leaps of imagination and guesswork for a claim of class injury to be viable. *See Reading* [*Indus., Inc. v. Kennecott Copper Corp.*], 631 F.2d [10], at [14] [(2d Cir. 1990)] (no antitrust standing where indirect purchaser at end of vertical distribution line "predicate[d] its claim of injury on a basis too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages"); *see also Paycom* [*Billing Servs. Inc. v. Mastercard Int'l Inc.*], 467 F.3d [283,] 293 [(2d Cir. 2006)] (no antitrust standing where chain of causation was "highly speculative" and was built on "conclusory allegations").

*Id.* at 494.

The new allegations in the PTAC do not cure this fundamental problem. Plaintiffs' claim is still that, that but for defendants' conduct, all-to-all anonymous trading platforms would have developed years prior to Dodd-Frank, such that defendants' conduct caused them injury on their 2008–2012 IRS trades. But in various ways including the following, plaintiffs' 2008–2012 theory of injury remains a product of speculation, imagination, and guesswork.

First, the PTAC does not allege that any such platform actually developed in the pre-2013 period, or came anywhere close. In this respect, the PTAC's allegations as to 2008–2012, like the SAC's, sharply contrast with those regarding 2013–2016. With respect to 2013–2016, plaintiffs concretely allege collusion to boycott and otherwise stymie three extant all-to-all anonymous IRS trading platforms (Javelin, Tera, and TrueEx) accessible to the buy-side. Plaintiffs are joined in so alleging by two entities that operated such platforms, Javelin and Tera. In contrast, the PTAC does not allege that either CME or Tradeweb ever launched such a platform during 2008–2012. *See* discussion *infra*, at 23–29. Nor does the PTAC allege that— despite such a platform's ostensible business logic, its ostensible appeal at the time to the buy-side, and the ostensible existence of the technological and infrastructural "pillars" that could be adapted to support such a platform—*any* entity, including ones like Bloomberg that are not alleged to have been boycotted, ever launched or came close to launching such a platform until after Dodd-Frank's mandates took effect in 2013.

Second, while the PTAC adds detail to its allegations as to the existence *among Dealers* of clearing arrangements, post-trade processing technology, and the necessary legal infrastructure in the pre-2013 period, *see* PTAC ¶¶ 104–118, its repeated allegation that these building blocks would have been seamlessly *adapted* to the all-to-all context, *see, e.g., id.* ¶¶ 100, 110–111, 117, is conclusory. Plaintiffs posit the ready adaptation of such infrastructure as central clearing of trades from an inter-dealer environment in which swaps were traded among highly capitalized, repeat players to one that facilitated trading of sophisticated derivatives by any market participant, no matter how small, thinly capitalized, or inexperienced. But the PTAC does not concretely allege why this process would have been natural, fluid, or at all likely. On the contrary, the PTAC—tracking the observations of the CFTC when it later guided this

process—elsewhere notes some of the formidable hurdles to such an evolution. *See, e.g.*, PTAC ¶¶ 98, 100, 110, 115, 334, 345 (acknowledging that buy-side clearing would require "operational changes," "connections," legal arrangements, collateral arrangements, and retention of clearing agents).

Third, the PTAC's claim that buy-side firms would have participated in an anonymous, all-to-all platform had one been introduced before Dodd-Frank is an *ipse dixit*. Although the PTAC alleges that buy-side firms were interested conceptually in such a potential platform, the PTAC does not allege that any buy-side firm, before Dodd-Frank's mandates took effect, had invested in any of the collateral, technological, or legal arrangements needed to facilitate such participation in anonymous all-to-all trading.[5] Class plaintiffs CPTF and LACERA, large public pension funds, do not allege that they did so. And while the PTAC lists large buy-side firms that had expressed interest in using central clearing so as to permit trading on an all-to-all platform, *see, e.g.*, PTAC ¶¶ 133–134 (listing Allstate, BlackRock, DE Shaw, Freddie Mac and PIMCO as firms to whom CME "successfully reached out," and stating that Citadel, Countrywide Financial Corporation, Nomura, and other "asset managers, hedge funds, and proprietary trading firms" had committed to "an Early Adopter Program for clearing via Swapstream"), it does not allege that any such firm made any investment or took other concrete action toward this end pre-Dodd-Frank. None of these firms is party to this lawsuit.

Indeed, even after Dodd-Frank had *mandated* the central clearing and collateralization arrangements necessary to enable all-to-all swap trading, compliance with these obligations by buy-side participants proved challenging: Ultimately, the CFTC delayed implementation of its

---

[5] *See* CFTC Clearing Rule at 74,323 (IRS clearing requires "startup and ongoing costs relating to technology and infrastructure, new or updated legal agreements, . . . and costs related to collateralization").

mandates, recognizing as late as December 2012 that buy-side firms were still scrambling to achieve "operational readiness" to clear their trades.[6] As the Court earlier observed: "The CFTC delayed implementation of this mandate to 2013, in part due to 'multiple requests from buy-side entities for extra time to cope with the costs and burdens imposed by implementing mandatory clearing, which one commenter described as 'overwhelming.'" *See In re IRS*, 261 F. Supp. 3d at 446 (quoting CFTC Clearing Rule at 74,320).

Fourth and finally, to resolve reliably class plaintiffs' claim to have experienced pricing injuries on their 2008–2012 trades as a result of the absence of the IRS trading platforms they imagine, a jury presumably would have to do more than merely posit the existence of some such platform. A jury would also have to conjure features of the platform or platforms that might have been, such as their design, mechanics, costs, entry barriers, efficiencies, limitations, regulatory constraints, and trading metrics and modalities. The PTAC scarcely addresses such matters, even as to the platforms that it claims CME and Tradeweb, but for the alleged boycott, would have introduced.[7] Nor can the structural features of the allegedly aborted platforms be inferred from later events. While Dodd-Frank put into place a "SEF" framework for swaps trading, it cannot be assumed that the free market—but for the Dealers' allegedly illegal actions

---

[6] *See* CFTC Clearing Rule, at 74,324 (stating in December 2012 that, "[i]n response to . . . concerns about legal documentation and operational readiness, the Commission . . . clarified that compliance with the clearing requirement will not be required for any swaps until March 11, 2013").

[7] In contrast to the 2013–2016 allegations, the owner-operators of the two platforms allegedly quashed in earlier years do not join in this lawsuit. (CME is a non-party. Tradeweb was sued in the SAC but dismissed; the PTAC would restore the claims against it.) The PTAC does not allege that, prior to Dodd-Frank, concrete specifications were ever developed for a CME or Tradeweb all-to-all trading platform for IRSs.

to quell CME and Tradeweb—would organically have arrived at the same place. The PTAC leaves these important parameters, which may well be inherently unknowable, to speculation.

In light of these and other factors, a jury evaluating plaintiffs' claims to have experienced injuries between 2008–2012 from the alleged conspiracy would thus be required to imagine a mode of market trading that—until mandated by a landmark federal statute and its implementing regulations aimed at stabilizing this corner of the financial system—never came to be (or even close). The PTAC's 2008–2012 claims would unavoidably require a jury to conjure an alternative history in which a form of marketplace that took federal legislation to bring about would have organically sprung up. Such would require an unacceptable amount of conjecture.

The PTAC's claim of injury as to 2008–2012, anchored in an imagined alternate history, therefore remains unacceptably speculative. It is "too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages." *Reading*, 631 F.2d at 13.

***Tradeweb/"Project Fusion" allegations***: The PTAC also fails to rehabilitate the claim that "Project Fusion" violated § 1. The Court held conclusory the SAC's allegation that "Tradeweb was planning to introduce electronic all-to-all trading to the IRS market" by "late 2007." The PTAC abandons that claim. In its stead, the PTAC asserts that (1) Tradeweb was gradually upgrading its swap trading capabilities and by 2006 "was in a race with CME and Bloomberg to develop the most advanced swaps execution platform," PTAC ¶ 212; (2) introducing all-to-all IRS trading was a "competitive necessity" for Tradeweb, because its "formidable adversaries" Bloomberg and CME were capable of, and exploring, doing so, *id.* ¶ 219; (3) Tradeweb was "primed to adopt all-to-all trading with central clearing," *id.* ¶ 102, and (4) unidentified Tradeweb executives, at unspecified times, "discussed the threat" presented by

Bloomberg and CME and "discussed whether Tradeweb should upgrade its IRS trading platform to an all-to-all anonymous platform to fend off these threats," *id.* ¶ 223.

These reconfigured allegations about amorphous "discuss[ions]" and Tradeweb's being "primed" to adopt all-to-all trading, *id.* ¶ 102, again fall far short of plausibly alleging plaintiffs' "critical background premise," *In re IRS*, 261 F. Supp. 3d at 466: that Tradeweb was planning in 2007 to launch all-to-all IRS trading. Such a plan cannot be inferred, either, from the PTAC's general claims that Tradeweb intended to offer "efficient electronic trading," PTAC ¶¶ 215, 218, or that, but for a conspiracy, competitive pressure from Bloomberg and CME would have led Tradeweb to offer this form of IRS trading platform, *id.* ¶¶ 219, 221. CME never launched such a platform, *see id.* ¶¶ 135, 159, and Bloomberg—which plaintiffs do not claim was the subject of a boycott or anything other than a total free agent—elected not to do so until Dodd-Frank compelled it to, *id.* ¶¶ 226, 442 & n.166. The PTAC's theory of a plot to block a Tradeweb plan to introduce all-to-all IRS trading thus starts with the ill-pled premise that there ever was such a plan.

The PTAC also fails to rectify the other pleading deficiencies in the Project Fusion allegations. The Court earlier held that Project Fusion, as a joint venture, was subject to review only under the Rule of Reason. To elude this ruling, plaintiffs dub the Project Fusion joint venture a "sham" and a "formalistic shell," PTAC ¶¶ 271, 282. But as the Court has explained, the facts pled in the SAC were inconsistent with those labels. Rather, the SAC alleged that:

> (1) The Dealers invested $280 million in Tradeweb; (2) they owned Tradeweb alongside existing owner Thomson; (3) Tradeweb, post-acquisition, was organized consistent with customary corporate formalities; (4) Tradeweb proceeded to expand other aspects of its trading platforms; and (5) its decision not to offer an all-to-all trading platform until 2013 put it on par with all other trading platforms of the day, including . . . Tera, Javelin, TrueEx, and Bloomberg.

*In re IRS*, 261 F. Supp. 3d at 468 n.17.  Notably, the PTAC continues to plead these facts.  *See* PTAC ¶¶ 241–251, 268–276.  Accordingly, even assuming a well-pled agreement among owners to terminate a Tradeweb plan to open an all-to-all IRS trading platform, the Project Fusion joint venture as alleged remains subject to review only under the Rule of Reason.  *In re IRS*, 261 F. Supp. 3d at 467–468 (collecting cases).[8]

The PTAC adds two paragraphs of allegations as to application of the Rule of Reason. *See* PTAC ¶¶ 281–282.  These are far too spare and incomplete to close the gaps in the SAC's pleadings on this point.  *See In re IRS*, 261 F. Supp. 3d at 468–469.  Like the SAC, the PTAC lacks allegations defining Tradeweb's product or geographic market, *id.* at 469.  It loosely recites that "[t]he relevant market is the market for IRS," PTAC ¶ 281; *compare* SAC ¶¶ 398–400, but that allegation is a mismatch for Tradeweb's function as alleged, which was not as a buyer or seller of (nor a market marker for) IRSs, but as a provider of electronic trading platforms, *In re IRS*, 261 F. Supp. 3d at 468.  As to that market, the PTAC does not make any allegations as to Tradeweb's market power, let alone regarding its actual or potential competitors and/or the barriers to other entrants.  It is silent as to the market share of Tradeweb's then-competitors (*e.g.*, Bloomberg, the New York Stock Exchange, Nasdaq, CME, or others).  The assembled pleadings again do not allege "that Tradeweb had any presence, let alone power, in *any* market." *Id.* at 469.

---

[8] In a separate bid to avoid Rule of Reason review, the PTAC labels the Tradeweb joint venture a "naked restraint" that was the product of collusion between the Dealer investors and Tradeweb itself.  On this basis, it alleges that Tradeweb's decisions after Project Fusion to forgo a plan to open an all-to-all IRS platform warrant *per se* condemnation.  PTAC ¶ 277.  This label notwithstanding, on the facts pled, as under the SAC, Tradeweb was not a horizontal competitor of the Dealers, as "it was a provider of electronic trading platforms, not a market maker." *In re IRS*, 261 F. Supp. 3d at 468.  The label "naked restraint," which antitrust law uses in connection with horizontal competitors, therefore, does not fit.

The PTAC's failure to situate Tradeweb in any relevant market, as required, again leaves to conjecture the impact of this one market participant's alleged decision not to introduce a novel product (a new IRS trading platform) in favor of other business priorities. *See id.* at 469. And while the PTAC recites that this decision was anti-competitive because it "reduce[d] output," PTAC ¶ 280, it lacks non-conclusory allegations as to the pro-competitive benefits and anti-competitive harms of the joint venture's decision to focus Tradeweb's offerings (like those of competitor Bloomberg) on other products and platforms. Measured against the standards applicable to Rule of Reason claims, *see In re IRS*, 261 F. Supp. 3d at 468, the PTAC, like its predecessor, falls well short.

***CME/Swapstream allegations***: The vast majority of plaintiffs' new factual allegations concern CME's Swapstream platform. The PTAC substantially overhauls the SAC's claim of a Dealer boycott of that platform and an affiliated fledgling clearing mechanism, CME Cleared Swaps. While the new allegations significantly flesh out plaintiffs' claims, they do not, in the end, viably plead a § 1 violation.

The PTAC alleges that, in 2006, CME, an operator of derivatives exchanges and trading platforms, PTAC ¶¶ 121–122, acquired a trading platform known as Swapstream, which until then had focused on a limited set of dealer-to-dealer IRS swaps in Europe, *id.* ¶¶ 124–127. It alleges that CME envisioned transforming Swapstream into a worldwide electronic platform for all-to-all anonymous IRS trading, *id.* ¶¶ 125, 127, 194, and that "[b]uy-side firms were clamoring to trade on Swapstream," *id.* ¶¶ 132–133. But, it alleges, CME realized the platform needed "a critical mass" of Dealer support to succeed. *Id.* ¶ 135. CME approached multiple Dealers and offered them "equity in the platform and an opportunity for revenue sharing." Supplemental Declaration of Richard Cohen, Dkt. 319-2 ("Cohen Suppl. Decl."), at ¶ 11 (cited at PTAC ¶ 105

n.19); *see also* PTAC ¶ 136. It did not find takers: certain Dealers (including Bank of America, Citi, Credit Suisse, Goldman Sachs, and JPMorgan) initially stated that they would "not support an IRS execution platform," PTAC ¶ 144, while others "were less overtly hostile to Swapstream, but still would not support it," *id.* ¶ 145. The PTAC alleges that "[p]rior to the[ir] meetings with the CME, the Dealer Defendants met and coordinated their positions and messaging." *Id.* ¶ 145. It further alleges that Dealers articulated "pretextual" concerns with CME's platform. *Id.* ¶¶ 183–184. CME tried to induce smaller dealers to participate by extending them preferred "founding member" status, but these efforts also did not bear fruit. *Id.* ¶¶ 150–151.

In fall 2008, CME's discussions with individual Dealers entered a second phase. By that time, CME's negotiations had "morphed into a group discussion" between CME and multiple Dealers, Cohen Suppl. Decl. ¶ 11, as a result, the PTAC alleges, of Dealers' insistence on "collective negotiations" as a means to "monitor and control Swapstream's development," *id.* ¶ 152. The Dealers were represented in these negotiations by a common lawyer, Edward Rosen from the Cleary Gottlieb firm. *Id.* ¶ 153. In the negotiations, the Dealers allegedly took common positions, sought "governance" over the platform as a means "to ensure they could control [its] development," and discouraged CME from operating a joint trading-and-clearing platform. *Id.* ¶ 155. Ultimately, CME "was unable to secure a critical mass of liquidity providers" and therefore "abandon[ed] Swapstream" as a trading platform, focusing instead on IRS clearing. *Id.* ¶¶ 158–159.

The PTAC alleges that CME next initiated joint negotiations with the Dealers regarding a "clearing-only solution" that would be "open to the buy-side." *Id.* ¶¶ 160–161. During these "Project Magellan" discussions, CME offered Dealers "revenue sharing" and "equity" in exchange for commitments to send trades to the new clearing platform. *Id.* ¶ 165. In these

negotiations, the Dealers again took common positions, including insisting on means of control over CME's clearing platform. *Id.* ¶¶ 174–177. The negotiations led to a written "Clearing Revenue Share Agreement" between CME and most Dealer Defendants (save BPS). *See id.* ¶¶ 179–180. Under that agreement, the participating Dealers agreed to provide minimum clearing volume to CME in exchange for revenue sharing. *Id.* ¶ 179; *see also* Schwed Decl. Exh. K ("Magellan Agreement") §§ 2.01, 2.03, 4.02(e).[9] The PTAC terms the revenue-sharing provision a "poison pill" that provided that, "should CME ever launch an execution platform, the Dealer Defendants would capture nearly all the profits." PTAC ¶ 179.

The PTAC's allegations regarding Swapstream are more substantial than those regarding Tradeweb. And the PTAC pointedly presents the Swapstream allegations in a manner that plaintiffs argue "mirror[s] those already found sufficient by the Court as to the 2013–2016 period," including allegations of parallel conduct beyond refusing to agree to use the IRS platform that CME proposed to roll out. *See* Pl. Mem. 12–13. However, despite the PTAC's attempt to pattern the new allegations on those involving later years that the Court has sustained, the new allegations as to Swapstream differ materially from—and far less plausibly indicate a § 1 conspiracy than—plaintiffs' well-pled allegations of a 2013–2016 plot to boycott Javelin, Tera and TrueEx.

*First*, a number of the PTAC's core allegations as to the scheme against Swapstream must be discounted or disregarded altogether, because they are contradicted either by pled or cognizable facts and/or because they fail pleading standards.

---

[9] The Defendants filed the Magellan Agreement under seal pursuant to the protective order governing confidential material entered in this case, *see* Dkt. 300, and this Court's order, Dkt. 351.

Plaintiffs, for example, claim that CME was driven to open an all-to-all IRS trading platform in 2007 because it, "Tradeweb, and Bloomberg [were] racing to be the first to launch such a platform." Pl. Mem. at 7; *see* PTAC ¶¶ 212, 220–224. However, this figure of speech aside, the PTAC does not allege such a "race" with these competitors, neither of whom is non-conclusorily pled to have then, or at any time before Dodd-Frank, planned or intended any such platform.[10]

Plaintiffs also imply that CME launched the Swapstream IRS trading platform before abandoning it. *See* Pl. Mem. at 8. In fact, on close reading, the PTAC confirms that no such platform was built or launched. *See, e.g.*, PTAC ¶¶ 119, 131, 135, 159. The PTAC's Swapstream theory is thus best described not as a Dealer boycott of an extant platform—as plaintiffs adequately plead with respect to Javelin, Tera, and TrueEx—but of a plot to deter CME from rolling out a new offering.

Plaintiffs also claim that the Project Magellan Agreement contained a "poison pill" aimed at pretermitting any attempt by CME to open an all-to-all anonymous IRS trading platform. *Id.* ¶ 179. Defendants attached the Project Magellan Agreement to their papers opposing leave to add these new claims. It is undisputedly cognizable here. The agreement demonstrably does *not* contain a "poison pill" or anything close. Rather, as defendants observe, the provision at issue states only that if the CME "establish[es] a new Electronic Trading Platform for IRS," it will

---

[10] As noted above, the PTAC abandons the SAC's express claim of a Tradeweb plan to introduce such a platform in lieu of a generalized claim of "discussions" of such among its executives. *Id.* ¶ 223. The PTAC does not allege any plan by Bloomberg prior to Dodd-Frank to enter this space. Rather, it alleges that in 2011—a year *after* Dodd-Frank mandated SEF trading—a Bloomberg executive stated that Bloomberg was "very ready to commence SEF trading." PTAC ¶ 117.

grant the Magellan dealers a limited right to try to negotiate a Magellan-like agreement with the new trading platform. Magellan Agreement, § 5.05(b)(i). Specifically, CME agreed to:

> Negotiate in good faith with the Dealer Founding Members [i.e., the Magellan dealers] the terms of their participation in the Electronic Trading Platform on the most favorable terms offered to any other prospective participant supporting IRS Products on such Electronic Trading Platform (including . . . rights at least as favorable as the terms set forth in this Agreement, unless CME or such Electronic Trading Platform can demonstrate a reasonable commercial or regulatory basis for requiring adjustment of such terms) . . . .

*Id.* By its plain terms, the Magellan Agreement did *not* "poison" CME's plans to launch an IRS clearinghouse. And the contractual requirement that CME enter into good-faith negotiations towards a similar agreement in the event it launched an IRS clearinghouse cannot plausibly be painted as a "poison pill," either.

The PTAC also contains a significant number of conclusory allegations. These include the PTAC's central allegation relating to the period before joint discussions between the Dealers and CME began (*i.e.*, before the fall of 2008)—that some Dealers sought to bring other Dealers into line with respect to Swapstream. *See, e.g.*, PTAC ¶¶ 145, 151–152, 158. The PTAC's allegations on this score do not allege "a specific time, place or person involved." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007).

Finally, the PTAC's persistent claims as to the motivations or actions of "the Dealer Defendants" as a general collective bloc, or generalized claims of parallel conduct, must also be set aside, like the similar claims in the SAC, as impermissible group pleading. *See In re IRS*, 261 F. Supp. 3d at 478; *see also* discussion *infra*, at 32–33 (listing examples). In contrast, the claims of a conspiracy to boycott Javelin, Tera, and Tradeweb were held viable because they were backed by specifically pled acts of common conduct, most strikingly, that four Dealers on the same day—the business day after Tera's first trade—had separately notified Tera that they would

not clear trades on its platform until they had conducted a review of its rulebook, a move which was later mimicked by other Dealers and which the SAC credibly alleged was pretextual. *See In re IRS*, 261 F. Supp. 3d at 473–474.

*Second*, and significant, although the PTAC does plead collective action regarding Swapstream, the well-pled allegations of concerted action among Dealers are centered on the period *after* joint negotiations between CME and the Dealers are alleged to have begun (*i.e.*, from the fall of 2008 onwards). In that period, as pled, discussions and lawyered negotiations had begun between CME and the Dealers to reach agreement regarding the terms under which participating Dealers collectively would participate in CME's Swapstream platform. As reviewed above, the parleys during this period occurred in two phases: regarding (1) CME's initial proposal to revamp Swapstream; and (2) CME's ensuing proposal—which resulted in a negotiated business arrangement memorialized in the Magellan Agreement—to launch a stand-alone clearinghouse.

This paradigm of collective negotiations between multiple collaborating competitors and a shared counterparty or counterparties to explore facially legitimate business arrangements does not lend itself to *per se* condemnation. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) (standard setting is subject to the Rule of Reason). As the Court reviewed in its discussion of Tradeweb, legitimate joint business ventures, including at the point of their creation, are subject to the Rule of Reason, and "business practice[s]" involving the "core activity of [a] joint venture . . . do not fall within the narrow category of activity that is *per se* unlawful." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 8 (2006); *see id.* at n.1; *Nw. Wholesaler Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985) ("mere allegation of a concerted refusal to deal does not suffice" to merit *per se* condemnation "because not all

concerted refusals to deal are predominantly competitive"); *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 316 (2d Cir. 2008) ("*Per se* treatment is not appropriate . . . where the economic and competitive effects of the challenged practice are unclear"); *see also In re IRS*, 261 F. Supp. 3d at 467 (collecting cases and holding Project Fusion subject to Rule of Reason review).

The facts pled reveal potential pro-competitive justifications from the collaboration here in connection with the Dealers' negotiations with CME, enough to persuade the Court that the conduct alleged—in contrast to a horizontal price-fixing conspiracy or the boycott pled against Javelin, Tera, and TrueEx—is not by nature suitable to condemnation *per se*. Both sets of discussions among the Dealers and CME had the potential, *inter alia*, (1) to launch a new venture by assuring CME of the critical mass of Dealer support it claimed to need; (2) to help CME set standards for a new modality of IRS trading acceptable to a broad range of market participants; and, (3) as in other business contexts involving negotiations with a swath of industry players, to avoid the inefficiencies associated with duplicative one-on-one negotiations. *See, e.g.*, PTAC ¶ 135 (noting CME's goal to enlist one or more Dealers from each of "Tier 1" and "Tier 2").

That the second stage of Dealer/CME negotiations led to a counseled agreement between CME and most (although not all) Dealer Defendants also weighs against finding *per se* anti-competitiveness. The Magellan Agreement's text, too, reveals a pro-competitive justification: The revenue-sharing pact enabled the introduction of a novel clearing platform whose standing was enhanced by the agreed participation of reputable Dealers who agreed to provide minimum clearing volume to the CME. *See id.* ¶¶ 160, 179–180.[11]

---

[11] The above facts preclude the claim (PTAC ¶ 152) that the joint negotiations (*id.* ¶ 156) with respect to which the Dealers collaborated were an illegitimate sham that offered no efficiency enhancements so as to make Rule of Reason review unwarranted. That the Dealers had, and

That leaves the Rule of Reason. Potentially, a viable Rule of Reason claim could have been pled with respect to the Dealers' collective action as to CME, attempting to show overall anti-competitive effect in a defined market. But unlike with respect to Tradeweb, the PTAC does not even gesture in that direction with respect to Swapstream, confining itself to a theory of *per se* illegality.

In any event, the PTAC does not make the requisite pleadings to enable a Rule of Reason claim. It does not define the product or geographic market of the company, CME, whose offerings were allegedly skewed by the defendants' collective refusal to support an all-to-all IRS trading platform. Nor, although touting CME's capabilities, does it allege that CME had power in any market, including that for electronic exchanges with respect to swap trading generally or IRS trading in particular. *See In re IRS*, 261 F. Supp. 3d at 469. And while the PTAC denounces the Dealers' conduct as anti-competitive, *id.* ¶¶ 193–196, it does not assess these anti-competitive impacts against the potential pro-competitive benefits of the agreement that the collaborating Dealers negotiated towards, and eventually struck with CME, including those identified above.

The Court, finally, considers the PTAC's allegations of a boycott predating the initiation of "joint negotiations" (*id.* ¶ 156) with CME. By definition, the line of authority subjecting

---

coordinated privately with, common Cleary Gottlieb counsel, took common positions in the joint negotiations, and sought governance rights in the CME clearinghouse, *id.* ¶¶ 152–157, 161–167, 183, 186, likewise do not signal a sham. Under the circumstances pled, seeking "governance" of the platform was understandable given each Dealer's interest in control of the new clearinghouse. The Dealers were being asked to take an investment stake in the clearinghouse, stood to receive potential returns from the clearing services the clearinghouse offered, and could face financial exposure in the event the clearinghouse defaulted. *See, e.g.*, PTAC ¶¶ 98, 100, 106.

concerted activity in connection with competitors' joint ventures to Rule of Reason review does not apply to actions within this time window.

The limited allegations within this window, *see, e.g., id.* ¶¶ 136–151, however, do not adequately plead a § 1 conspiracy. The Dealers' parallel actions, motivations, perspectives, and intentions are largely pled generically and in undifferentiated fashion, with the PTAC not specifying a particular defendant or defendants. *See, e.g., id.* ¶ 139 ("[T]he Dealer Defendants became extremely concerned about losing valuable asset manager clients to a new CME-run IRS trading platform."); *id.* ¶ 141 ("Some of the Dealer Defendants' trading-desks initially expressed interest in Swapstream."); *id.* ¶ 143 ("The Dealer Defendants' strategic investment groups each responded to CME in a similar fashion."); *id.* ¶ 145 ("Prior to these meetings with the CME, the Dealer Defendants met and coordinated their position and messaging.").

As to this time window, the PTAC several times repeats the allegation that "the Dealer Defendants" traded on the Swapstream platform before, but not after, its acquisition by the CME. *Id.* ¶¶ 120, 124, 147. That allegation—if pled concretely—could certainly be telltale of illicit coordination among Dealers aimed at icing Swapstream, lest it expand in a manner threatening to the Dealers' interest. But this allegation is problematic, because, closely analyzed, the PTAC's factual allegations on this issue prove elusive. In all its 549 paragraphs, the PTAC identifies by name only two defendants (RBS and BNPP) that allegedly traded (or participated as market makers) on Swapstream before its acquisition by CME. *Id.* ¶ 124. And even if the PTAC's broad allegations to the effect that "the Dealer Defendants," *id.*, "many of the Dealer Defendants," *id.* ¶ 120, and/or "all of the Dealer Defendants," *id.* ¶ 147, had executed inter-dealer trades on Swapstream at some point before its acquisition by CME sufficed to implicate the 11 Dealer Defendants in such pre-CME trading, the PTAC nowhere alleges that Swapstream

was facilitating more than *de minimus* trades as of the time of the CME acquisition, or, notably, that *any* entity (defendant or otherwise) was trading on the platform as of the time the "Dealer Defendants" allegedly ceased doing so in August 2007. *Id.* ¶ 147. The facts pled are too generalized, threadbare, and question-begging to permit the inference of a coordinated plot among the Dealers, in this way, to neutralize Swapstream.

The PTAC, finally, alleges that the Dealer Defendants were unsupportive of Swapstream and that they communicated to CME—either at the outset, *id.* ¶ 144, or thereafter, *id.* ¶ 145—that they would not "support an IRS execution platform," *id.* ¶ 144. But the Dealers' parallel lack of interest is not indicative of an inter-Dealer agreement. As pled, such conduct was consistent with any Dealer's independent self-interest. *See id.* ¶ 29 (the Dealer Defendants "'want[ed] desperately to preserve the status quo' of the OTC market"). As the Court earlier explained in assessing why the SAC's similar allegation of the Dealers' common lack of support for all-to-all IRS trading was not indicative of collusion, "each Dealer had good reason to independently discourage . . . and not encourage, development of a new trading paradigm that threatened, someday, to cannibalize their trading profits." *In re IRS*, 261 F. Supp. 3d at 464; *see also Mayor and City Council of Baltimore v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2009) (inference of conspiracy will not arise when the coconspirators' parallel conduct "made perfect business sense").

As with its Tradeweb allegations, the PTAC's allegations as to CME and Swapstream therefore do not plead unlawful collusion among the Dealer Defendants. And viewing the PTAC's allegations in their entirety, it, like the SAC, does not plausibly plead a § 1 conspiracy among the Dealers.

*The statute of limitations*: A Sherman Act § 1 claim is subject to a four-year statute of limitations that runs from the date of injury. Class plaintiffs filed their initial Complaint on November 25, 2015. As in connection with the SAC, plaintiffs argue that the limitations period should be equitably tolled due to fraudulent concealment. This bid for relief from the statutory time bar is again unpersuasive.

In dismissing the SAC's claims of injury incurred prior to November 25, 2011, the Court found two required elements of fraudulent concealment lacking. *In re IRS*, 261 F. Supp. 3d at 487–490. First, as to the element of concealment, central facts as to the SAC's claim of a plot to block from emerging an all-to-all Tradeweb platform had *not* been concealed. These included the Dealers' collective ownership stake in Tradeweb and the visible nature of that platform's offerings. *Id.* at 488–489. Also in tension with a theory of concealment, the SAC's thesis was that, before 2012, the benefits of all-to-all IRS trading had been "widely recognized by market participants, regulators and economists" such that "absent a conspiracy . . . [e]volution to all-to-all trading that would have been open to the entire market would have been inevitable." *Id.* at 488 (quoting SAC ¶¶ 87, 342); *see id.* (quoting SAC ¶ 99 that "[t]here were . . . no natural or technological reasons why the IRS market did not evolve by 2008, at the latest, to allow the buy side to conduct all-to-all trading of IRS on electronic platforms"). Second, for similar reasons, the Court rejected plaintiffs' claim that they had not been on inquiry notice as to pre-2012 claims. *Id.* at 489 ("[A]ccepting class plaintiffs' premise that only a plot can explain the missing platform, class plaintiffs had every basis, in real time, to smell a rat."). As to a third element, diligence, defendants had raised substantial questions about the diligence of the class plaintiff, CPTF, before June 2014, when it claimed to have discovered that a conspiracy was afoot. The Court, however, had no occasion to resolve that element. *Id.* at 489–490.

The PTAC's new claims, focused on CME's decision not to introduce a Swapstream platform for all-to-all anonymous trading of IRSs, are subject to a similar critique.

Plaintiffs' theory remains that the failure of the IRS market to move towards such a trading model "was unnatural and contrary to expectations," as to suggest conspiratorial manipulation. *Id.* at 489; *see* PTAC ¶¶ 89, 102–103. And while the CFTC's post-Dodd-Frank assessments call into question plaintiffs' claims that the buy-side before Dodd-Frank was ready, willing, and able to move to such a trading model, *see, e.g.*, *In re IRS*, 261 F. Supp. 3d at 446, 465, the Court must take the PTAC at face value in claiming that the failure of such a platform to emerge was unnatural. The PTAC doubles down on that thesis, insofar as it adds the claim that the "pillars" or "pieces" needed to facilitate such a platform were all in place, "being utilized by the IRS Dealers well before Dodd-Frank," and adaptable to support an all-to-all IRS trading platform hospitable to the buy-side. *See, e.g.*, PTAC ¶¶ 92, 95, 102–103.

As to the element of inquiry notice, Swapstream's failure to evolve in this direction, as pled, occurred in broad daylight, putting plaintiffs on unusually acute inquiry notice. The PTAC alleges that, in 2007, CME had publicly announced a plan to offer all-to-all anonymous trading with central clearing for the buy-side. *Id.* ¶ 125 & nn.27–29 (quoting and citing July 2007 press release to this effect and prior news coverage). The PTAC further alleges that "[b]uy-side firms were clamoring to trade on Swapstream," *id.* ¶ 132, and that Swapstream had advertised these firms' interest in doing so, *id.* ¶ 133 (quoting Swapstream press release). But, the PTAC alleges, once the Dealers declined to participate, Swapstream aborted this plan. *Id.* ¶¶ 158–159. This too was a public event—CME announced it in a 2010 CME press release. *See* CME Group, Annual Report (Form 10-K) (February 26, 2010), *available at* https://www.sec.gov/Archives/edgar/data/

1156375/000119312510043180/d10k.htm (CME "began the process of winding down [its]

Swapstream operations" in 2009); D. Mem. at 23 n.14. On plaintiffs' theory that only a

conspiracy—as opposed to a common lack of interest among Dealers in moving their IRS trading

to such a platform, or a lack of buy-side readiness, or other lawful causes—can explain this

event, plaintiffs, like the buy-side firms who assertedly had been awaiting Swapstream's rollout,

had "reason to suspect the probability of any manner of wrongdoing," which is "all that is

necessary to cause the tolling period to cease." *In re IRS*, 261 F. Supp. 3d at 489 (quoting *131

Maine St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002)).

     As to the element of concealment, the PTAC generally alleges that there were secret

meetings and other clandestine communications among Dealers both before and during the

collective negotiations with CME. *See* PTAC ¶ 145 (Dealer Defendants "coordinated their

position and messaging . . . through email, electronic chat messages, formal and informal

industry events, dinners, and during and following meetings of Tradeweb's board of directors");

*id.* ¶ 146. But these general allegations, unspecific as to time and content, are, like their similar

forebears in the SAC, insufficient to show affirmative concealment. *See In re IRS*, 261 F. Supp.

3d at 489 ("The SAC's claims of secret meetings under the aegis of such groups to further the

pre-2012 plot are general and conclusory. These ill-pled allegations cannot discharge plaintiffs'

burden to show concealment.") (internal citation omitted).[12]

---

[12] The PTAC, finally, alleges that the Magellan Agreement contains a non-disclosure clause
which prevented outsiders from discovering its secret "poison pill provision." PTAC ¶ 199. In
fact, as noted, the Agreement does not contain a poison pill provision. Depending on the facts, a
non-disclosure agreement can serve as an affirmative act of concealment. *Compare In re Copper
Antitrust Litig.*, 436 F.3d 782, 790–791 (7th Cir. 2006) (nondisclosure agreement supported
equitable tolling), *with GO Comp. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007) (finding
claim time-barred and rejecting claim that nondisclosure agreements kept anti-competitive
activities secret). Here, however, the Magellan agreement is facially benign, post-dates the
alleged plot to terminate an all-to-all IRS trading platform, and governs a separate subject matter:

Because the PTAC fails adequately to plead the elements of either concealment or of inquiry notice, the Court again has no occasion to address the third element: whether plaintiffs acted with the required diligence in inquiring into pre-November 25, 2011 events, including with respect to why Tradeweb and Swapstream did not open the trading platforms that plaintiffs prefer. *See In re IRS*, 261 F. Supp. 3d at 490. As with the SAC, defendants raise substantial questions as to the adequacy of CPTF and LACERA's claims to have conducted such diligence, including noting that many of the new allegations in the PTAC rely on citations to public-record material. However, the burdens of undertaking this inquiry are, again, unjustified given the independent deficiencies found in plaintiffs' claims. *See id.*

For all the above reasons, granting the motion for leave to amend to restore plaintiffs' claims as to 2008–2012 would, therefore, be futile.

### 2.     Delay, Prejudice, and Gamesmanship

Independent of the finding of futility, the Court finds that granting leave to restore the claims covering 2008 through 2012 would substantially delay this litigation. It would also unduly prejudice the defense. Further, the Court holds, plaintiffs' counsel's communications with the Court and defense during the extended period of discovery negotiations and litigation conveyed a misleading impression—that plaintiffs' claims were fixed at 2013–2016—whereas in fact counsel had in mind, and were actively pursuing, a transformative amendment to restore plaintiffs' claims as to the five prior years. On close review of the assembled communications, the Court is, regrettably, constrained to find an unwelcome degree of gamesmanship meriting

---

the operation of and financial stakes of participants in CME's separate clearing platform. A non-disclosure clause in the agreement, therefore, lends no support to plaintiffs' claim of concealment.

denial of the motion for leave to amend. Because these considerations of delay, prejudice, and gamesmanship arise out of common events, the Court addresses them together.

*Delay*: Reviving the 2008–2012 claims would upend the schedule for discovery carefully negotiated by the parties and approved by the Court.

Relevant here, the case management plan set a May 21, 2018 deadline for substantial completion of document production and a December 21, 2018 deadline for the completion of all fact discovery. Most imaginable amendments, even if disclosed on the last date for a motion for leave to amend, could comfortably have been accommodated under this schedule. For example: an amendment adding claims of a fourth or fifth platform—alongside Javelin, Tera, and TrueEx—which the Dealers purportedly conspired in 2013–2016 to inhibit. Or the amendments to the 2013–2016 claims that plaintiffs separately pursue without objection, which add allegations of the Dealers' means and methods during 2013–2016 and sharpen or broaden theories of damages arising from the 2013–2016 conspiracy. Amendments of this nature would—and/or will—add to the parties' document production and other discovery obligations. But they can be accomplished within the framework of the parties' carefully negotiated agreements as to trading data, custodians, databases, and search terms. And they are not in tension with the Court's rulings as to the time frame of document production. The addition of plaintiff LACERA is, similarly, readily accommodated to the case schedule.

In contrast, allowing the PTAC's pre-2013 claims would be functionally tantamount—or close to it—to allowing a new MDL-sized lawsuit to be hitched to the existing claims. To be sure, at a concept level, plaintiffs' core theory across 2008–2016 is the same: that Dealers at all times coordinated to thwart all-to-all trading platforms, whether potential (2008–2012) or extant (2013–2016). But, in practice, the PTAC's narrative and its claims regarding 2008–2012

implicate a host of events, entities, concepts, and personnel outside the scope of the 2013–2016 claims and outside the scope of the post-Dodd-Frank discovery that the Court has allowed on those claims.

Among other things, the claims as to the earlier period uniquely implicate:

- the Dealers' acquisition of an ownership interest in, and stewardship of, Tradeweb, beginning in 2007, including Tradeweb's earlier business plans and its decisions following the acquisition as to which platforms and asset classes to pursue, and the role of individual Dealers' personnel in those decisions, PTAC ¶¶ 212–282;

- the Dealers' dealings with CME, beginning in 2007, as relevant to IRS trading and Swapstream, including CME's evolving plans for that platforms, the steps the Dealers took ostensibly to influence Swapstream, and the two rounds of negotiations between the Dealers and CME, culminating in the Project Magellan Agreement, *id.* ¶¶ 119–211;

- the state of the IRS market as of 2007 and the extent to which it was ready for all-to all trading, including the state of clearing and various post-trade services, the services offered by providers such as SwapClear, SwapsWire (today, MarkitSERV), and the International Derivatives Clearing Group, and the utility to potential buy-side clearing of the software system Calypso, *id.* ¶¶ 104–118;

- the interactions relevant to IRS trading between 2007 and enactment of Dodd-Frank among all Dealer groups (including numerous individual personnel named in the PTAC), both directly with one another and as accomplished

through industry fora like the ISDA, the Futures Industry Association, and working and drafting groups of these associations, *id.* ¶¶ 283–291;

- the conduct and communications of the Dealers, and numerous of their personnel named in the PTAC, relating to IRS trading between 2007 and enactment of Dodd-Frank towards interdealer brokers, including GFI Group, ICAP, and platforms under development in Europe such as i-Swap, *id.* ¶¶ 292–308; and

- the actions of the Dealers between 2007 and enactment of Dodd-Frank in allegedly erecting artificial barriers to buy-side clearing of IRS trades, including in connection with the Dealers' influence over OTCDerivNet (on whose board named representatives of various Dealers sat), LCH.Clearnet, and SwapClear, *id.* ¶¶ 309–334.

Under these circumstances, allowing the PTAC's claims as to 2008–2012 to be added would require that the time-consuming and laborious process of framing the document discovery to be produced for that period begin from something close to a standing start. For many reasons, the parties' agreements as to document production parameters in 2013–2016 would not, logically, control discovery relevant to the 2008–2012 claims.

As to document custodians, at particular Dealers, given natural turnover and promotions and reassignments, there were assuredly different personnel responsible for IRS-related matters during the two periods. Beyond that, the many issues and incidents novel to the earlier period (*e.g.*, interactions with and exercise of influence over Tradeweb and CME/Swapstream) likely involved substantially different personnel at particular Dealers from those as to whom discovery has been authorized as to 2013–2016.

As to the delineations of topics and search terms that would guide document collection and review, the many distinct events, issues, entities, and players at issue in 2008–2012 similarly would require a fresh assessment of these parameters. So would the fact that plaintiffs' claims involve a materially different (pre-Dodd-Frank) regulatory environment than during 2013–2016. It is likely, too, that there would be rounds of discovery disputes requiring judicial intervention, including as to the start date for document review (numerous allegations in the PTAC date to 2007 and years before) and as to the permissibility of discovery into particular topics.

There would also be an overarching question as to the proper scale of overall discovery, which the Court would likely be called upon to resolve. Adding five years of claims to the existing four years would not ineluctably entitle plaintiffs to the receipt of 125% more discovery. A nine-year conspiracy claim implicating numerous episodes, issues, and personnel would by its nature require thoughtful application of the proportionality command of Federal Rule of Civil Procedure 26(b)(1). To the extent that defense discovery for 2013–2016 had not already been produced to plaintiffs, a fair question would arise whether to revisit the agreed parameters of that discovery in the interests of keeping the overall discovery burden manageable.

The PTAC's expanded claims also implicate third parties. Those identified on the face of the PTAC include numerous clearinghouses, interdealer brokers, other service providers, and industry associations. Plaintiffs have pursued third-party discovery as to the 2013–2016 claims and could be expected to seek discovery from various entities named in the 2008–2012 claims. As to these third parties, the scope of discovery—potentially as sought by both sides—would be an issue. Extended negotiations (and/or discovery litigation) with these parties would be likely, possibly complicated by the greater age of the materials sought.

Finally, independent of electronic and hard-copy document discovery, the 2008–2012 claims would require—as have the 2013–2016 claims—the locating and harvesting of IRS trading data throughout the period. Such data is relevant, *inter alia*, to liability (including the existence of a pricing injury from the alleged conspiracy) and damages. Even assuming that such discovery demands did not give rise to disputes requiring extended negotiation and resolution, identifying and collecting this data, which before Dodd-Frank's SEF mandate took effect was likely held in decentralized locales, would likely take substantial time.

For these reasons, an amendment to add the industry-wide, complex, and half-decade-long claims proposed by the PTAC, if allowed to stand, would obliterate the May 21, 2018 deadline for substantial completion of document production.[13] In connection with the 2013–2016 period, it took counsel for the many parties (and third parties) seven months of focused work, beginning from the date of the ruling on the motion to dismiss, to formulate and narrow discovery demands, negotiate discovery parameters including as to custodians and search terms and strings, and to litigate to completion most discovery disputes as to matters pertinent to that period.[14] A similar exercise would now be necessitated as to plaintiffs' new claims.

---

[13] This would have been so even if, improbably, all defendants had immediately acceded to the entire PTAC, such that negotiations over the scope of document production could have begun shortly after the PTAC's filing on February 21, 2018. A more realistic assumption for the start date of any negotiations over post-PTAC document production parameters is the date on which the Court realistically could have resolved the parties' dispute as to the viability of the PTAC's 2008–2012 claims. It took the Court two months after argument to resolve the motions to dismiss the SAC. As to the PTAC, the Court, on May 10, 2018, issued a bottom-line order notifying counsel as to how it had determined to resolve the motion for leave to amend and that a decision (this) would follow. Dkt. 386.

[14] One discrete dispute—only recently briefed—remains in the process of resolution as to cellphone records of Dealer employees, sought by plaintiffs. *See* Dkt. 384. The Court has also recently received briefing on, and resolved at a hearing, a dispute as to discovery plaintiffs have propounded on an inter-dealer broker. *See* Dkt. 382.

All factors considered, the Court's judgment is that permitting the PTAC to be amended to add back five years of claims as to 2008–2012 would cause, at a bare minimum, a six-month delay of the substantial completion deadline for document production. A more realistic (yet still conservative) estimate is that, given the scale and splay of the added charges, reviving the 2008–2012 claims would require moving that deadline back by nine or more months.

Further, because plaintiffs' claims as to the two periods implicate common personnel and circumstances, in the event the PTAC were accepted, the deposition discovery scheduled to occur between May 21, 2018 and December 21, 2018, as a practical matter, would have to be shelved and put over, to enable expanded document discovery first to be completed. Otherwise, deponents relevant to both periods could face multiple depositions; and deposition preparation and questioning might be impeded by incomplete document discovery. The added five years of claims covering expanded topics, in the Court's assessment, would also likely require elongating the period for deposition discovery. While the Court would press to move expeditiously, a realistic estimate is that an additional three months for deposition discovery would be necessary.

All in, therefore, this Court's conservative estimate, informed by its experience managing this MDL and by its experience presiding over—and, earlier, litigating—other complex financial cases is that permitting the 2008–2012 claims to stand would cause a delay of—at the very least—12 months for the completion of fact discovery.

*Prejudice*: Apart from the inherent casualties of a long delay—which may compromise the truth-seeking process and parties' and witnesses' interest in closure—the amendment here, if granted, would palpably prejudice the defendants.

For seven months, defendants expended time, money, and energy in the discovery phase of this litigation on the only rational assumption as to this case's temporal scope: that plaintiffs' surviving claims were limited to 2013–2016.

On that premise, counsel exchanged several hundred discovery communications, held dozens of meet-and-confers addressing discovery, and "devoted enormous effort to reaching agreement on matters such as the scope of discovery, search terms, and custodians." D. Mem. at 6. Counsel also, after a series of meet-and-confers failed to yield resolution, litigated a series of disputes that turned on this temporal premise. One dispute involved the document-discovery start date; another involved whether pre-Dodd-Frank events and entities that had been implicated by the dismissed claims were fair game for discovery. The Court's resolution of these disputes in turn shaped the time-intensive discovery efforts that followed—including the identification of custodians, the formulation of search terms and search strings, the tabulation of "hit counts" aimed at measuring efficacy and burden and ensuing negotiations, and the collection of millions of documents. *Id.* It is safe to assume that, on these efforts, each of the 11 defendant groups devoted very substantial time and incurred very substantial legal fees.[15]

Reviving the 2008–2012 claims would negate this work, waste these efforts, and largely send the parties back to the discovery drawing board. It would effectively overrule the Court's rulings setting the document-discovery start date and excluding (in whole or large part) a host of pre-Dodd Frank topics from the scope of permitted discovery.[16] It would require counsel to start

---

[15] The time spent by the Court resolving the discovery disputes alone—which was substantial—gives the Court insight as to the formidable amount of time that counsel for each party expended on the range of discovery matters summarized above.

[16] The pre-Dodd-Frank topics as to which the Court substantially or wholly precluded discovery as irrelevant or marginally so included CME's Swapstream platform, *see* Dkt. 322, at 4, Project

negotiating anew the expanded universe of discovery issues.  It would require developing and

testing new potential search terms to gauge the utility and burden of each.  It would require

counsel to revisit prior compromises based on aggregate burdens for each defendant in light of

the added burdens presented by the amended allegations and extended time period.  It would

almost certainly open up new rounds of protracted litigation over discovery disputes.  It is safe to

assume that the duplicative fees (of counsel and litigation support) and costs wasted by the need

for this do-over, when measured across the 11 defense firms, would extend well into seven

figures, to say nothing of the wasted time of client personnel.

In these circumstances, plaintiffs' terse incantation of regret for "any inconvenience,"

Dkt. 345 at 22, 23, that may have been caused by the last-minute disclosure of this most

consequential proposed amendment is quite unequal to the moment.  It reflects a lack of

appreciation, or perhaps denial, of the scale of the work that the proposed amendment would

moot.  *Cf. BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, No. 09 CIV. 9783 RWS, 2013 WL

6484727, at *6 (S.D.N.Y. Dec. 9, 2013) (denying motion to amend, based on prejudice stemming

from length of case and because amendment would have "interfere[d] with ongoing expert

discovery and trial preparation"); *In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22, 26

(E.D.N.Y. 2004) ("Leave to amend must nonetheless be denied because of the large additional

expenditures of time and effort that would be required by the court and parties.").

Plaintiffs' arguments against finding prejudice miss the mark.  Plaintiffs note that that the

new claims "address subjects that were raised in previous complaints."  Pl. Mem. at 24.  But that

observation does not grapple with the sunk costs that would largely go to waste were discussions

---

Fusion, *id.* at 6, SwapClear's rulebook restrictions, *id.* at 8–9, and the Dealers' activities with
respect to OTCDerivNet, SwapClear, and LCH.Clearnet, *id.* at 12–13.

as to discovery parameters required to start anew. And the fact that plaintiffs have repeatedly attempted to refine their claims as to these subjects—the PTAC is plaintiffs' fourth complaint— *disfavors* granting leave to amend. The principal subjects of the amendment (Project Fusion and CME/Swapstream) were at the heart of the claims the Court dismissed. Plaintiffs then sought discovery on these subjects, which the Court denied. This is thus the third time that plaintiffs have litigated in an attempt to insert these subjects into this case. *See, e.g.*, *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) ("[A] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (internal quotation omitted).

Plaintiffs also note that as of when they moved to amend, no "substantive" documents had been produced or any depositions held. Pl. Mem. at 24. But that argument trivializes the intensive pre-production work by all counsel over the preceding seven months that the PTAC would supervene. In any event, defendants, executing on the negotiated discovery plan, have since made voluminous document productions, *see* Dkt. 388 at 1 (May 16, 2018 status letter), and, following a recent limited extension of the substantial completion deadline, are on track to achieve substantial completion of document production by late June.[17]

***Gamesmanship***: The Court, finally, addresses plaintiffs' counsels' conduct towards the Court and the defense in connection with the bid to restore the 2008–2012 claims.

Plaintiffs' counsel began to consider amending to restore these claims on July 28, 2017, *see* Dkt. 345 at 20, and thereafter investigated such an amendment, Dkt. 356 at ¶ 5. Many of the PTAC's new allegations as to 2008–2012 are sourced to publicly available materials, which

---

[17] In a status call with counsel held May 18, 2018, the Court, on consent, extended the substantial completion deadline until June 29, 2018.

plaintiffs' counsel appear to have accessed between July 28, 2017 and February 2018. *See, e.g.*, PTAC ¶¶ 100 & nn.17–18, 112 & n.20, 117 & n.21, 118 & n.22, 122 & nn.23–24, 124 & nn.25–26, 125 & nn.27–29, 131 & n.30, 133 & nn.31–32, 169 & nn.33–34, 172 & n.36, 213 & n.38, 214 & n.39, 215 & nn.40–41, 216 & nn.42–43, 217 & nn.44–45, 218 & nn.46–47, and 238 & n.62; *see also* Dkt. 356-1 ¶ 5 ("We had already pled all of the relevant facts of which we had knowledge in our prior pleading."). Counsel also conducted interviews or follow-up interviews regarding the 2008–2012 claims: three in September 2017, four in October 2017, two in December 2017, five in January 2017, and eight between February 1 and 21, 2018. Dkt. 343 at 3.

Plaintiffs' counsel first disclosed their intention to move for leave to restore the 2008–2012 claims to the defense on February 14, 2018 and to the Court on February 21, 2018—the latter being the deadline for so moving. Plaintiffs' counsel admit having made an affirmative decision not to disclose earlier the prospect of moving to so amend. Dkt. 345 at 21. Plaintiffs' counsel explain that they did not have a legal duty to disclose a possible amendment. And they represent that they did not make a "final decision" to file a proposed amended complaint along these lines until February 12, 2018. *See* Dkt. 345 at 24 (status call of February 23, 2018); Dkt. 343 (letter of February 23, 2018) ("[W]e did not make a final decision to proceed until we were satisfied, based on interviews and other research conducted in late January and February 2018, that our allegations were well-founded."); Dkt. 356-1 (declaration of April 2, 2018) ("On or around February 12, 2018, following these interviews, we believed we had learned enough key facts to support the proposed amendment.").

Plaintiffs' counsel are correct that there was no freestanding duty—under the law or the case management plan—to reveal in advance a forthcoming amendment, even a sweeping one.

Plaintiffs' silence on that point, however, did not occur in a vacuum. During the seven months while plaintiffs' counsel were actively working towards an amendment that would vastly expand the temporal and substantive contours of this litigation, a separate work-stream was underway. Specifically, counsel for all parties—drawing heavily at times on the resources of the Court—were intensively negotiating, litigating, and implementing, at great time and expense, an MDL discovery plan premised on the current contours of the case.

A question therefore is presented by plaintiffs' counsel's communications with the Court and defense during this process. Having reviewed those communications, the Court, regrettably, concludes this: In ways large and small, plaintiffs' counsel throughout these seven months fed the false impression that the temporal scope of plaintiffs' claims was fixed at 2013–2016. The result was to mislead the Court and the defense and to occasion extensive work and expense that—had the retooled 2008–2012 claims proven viable—would have largely gone wasted. And, even crediting as true the representation that the "final decision" to file a PTAC was made shortly before the filing deadline, counsel's choice not to reveal earlier the substantial prospect of such a game-changing amendment while counsel's conduct and statements suggested otherwise prevented the Court and experienced counsel for all parties from assessing the impact of—and adapting the case management plan to accommodate—the possibility of such a consequential event.

The following communications with the Court are illustrative:

- ***August 2017 case management plan***:  On August 18, 2017, the parties submitted a jointly proposed case management plan, Dkt. 245-1, which the Court approved, Dkts. 246, 250. At the Court's direction, the plan set prompt but achievable deadlines for fact discovery and for intermediate activities foundational to the fact-discovery process. In addition to those reviewed above

regarding substantial completion of document production and fact discovery, these included that the parties: (a) designate "outside counsel data representatives" "to begin a meet and confer process regarding the scope of data productions in this proceeding within twenty-one (21) days" of court approval of the plan; (b) provide "a preliminary document custodian list" within 21 days and "preliminary search terms" within 30 days; and (c) "determine whether they are in agreement or disagreement on document custodians" within 45 days. This agreed-upon schedule sits uneasily alongside counsel's contemporaneous pursuit of claims whose addition would inherently make it obsolete—and all the more obsolete were the motion for leave to amend to be filed on the last permissible date.

- *August 2017 motion for clarification*: On August 11, 2017, plaintiffs moved for clarification of "a narrow aspect" of the July 28 ruling, to wit, that the Court had not limited their 2013–2016 claims to "order book trading" alone but instead had preserved claims as to all anonymous request-for-quotes ("RFQ") trading on the three exchanges at issue (Javelin, Tera, and TrueEx). *See* Dkts. 241–242. The Court so clarified. Dkt. 251 at 1. Although not directed to the temporal scope of claims, a fair implication of this request, given plaintiffs' silence, was that plaintiffs did not intend to take issue with the other parameters of their claims as resolved by the July 28 ruling.

- *October 2017 dispute regarding defense discovery*: As noted, plaintiffs sought pre-2013 discovery as relevant to their 2013–2016 claims. They asked the Court to order the defense to produce documents from January 2009 forward,

Dkt. 254 at 3, while stating that—"to address any reasonable burden objections"—they were willing to receive documents from January 2010 forward if defendants agreed also to produce their regulatory production from a CFTC investigation and their document production from a separate MDL involving credit default swaps, *id.* A natural implication of plaintiffs' motion and negotiating position was that plaintiffs would not later ask for production of documents dating to January 2008 (or earlier), as the amendment that plaintiffs then had under consideration, to add claims dating to 2008, would necessarily contemplate.

- *October 2017 dispute regarding CPTF's standing*: On October 18, 2017, defendants sought formal discovery from CPTF, to substantiate that CPTF had participated in IRS trades within the case's scope as narrowed. Dkt. 270. In opposition, plaintiffs argued that expediting discovery would "disregard the schedule in the case, which the parties negotiated and the Court ordered," and "disrupt the orderly flow of discovery." Dkt. 295 at 1. In contrast, plaintiffs noted, CPTF "has been diligently meeting every deadline under this schedule." *Id.* The Court ruled for plaintiffs. Dkt. 296 at 1. A natural implication of these statements was that plaintiffs were committed to "the schedule in the case" and did not foresee events that might "disrupt the orderly flow of discovery."

- *November 15–17, 2017 status letter/call*: The parties' November 15, 2017 joint letter reported on discovery negotiations and an agreement to extend certain interim deadlines, and, referring to discovery disputes as to pre-2013 events, that "some disagreements relating to the scope of discovery may require

resolution by the Court." Dkt. 302 at 1–2. In the ensuing call, the Court asked whether there was "anything else that class plaintiffs have to report to me other than what's in the November 15 letter?" Plaintiffs' counsel said no, noting only that these discovery disputes were nearing an impasse. Dkt. 308 at 4, 9–10. The Court asked counsel, upon an impasse, promptly to brief "gating issues," to allow the Court to resolve "threshold issues that are holding us up"; counsel stated that they remained hopeful that the schedule in the case management plan was realistic. *Id.* at 8, 14–15. That schedule, of course, would be wholly *unrealistic* in the event that the motion plaintiffs were then considering to restore the 2008–2012 claims were made and granted. And the Court fairly read counsel's negative response to its question whether class plaintiffs had "anything else" to report to imply the absence of any unreported matters of consequence, which an amendment to more than double the case's scale surely would be.

- ***December 13–15, 2017 status letter/call***: The parties' December 13, 2017 joint letter reported an impasse on the pre-2013 discovery issues, but anticipated that the resolution of these issues would likely resolve disagreements over defendants' document custodians. Dkt. 315 at 1. In the ensuing call, plaintiffs' counsel expressed confidence that, after those rulings, "we hopefully can hit the ground running." Dkt. 320 at 7. The Court asked counsel: "Does any party anticipate any other issue being brought in reasonably short order to the Court's attention?" *Id.* at 10–11. Other than possible disputes regarding search terms after the Court's ruling, plaintiffs' counsel said no. *Id.* at 11. Counsel's

statements—and negative response to the Court's inquiry about whether other issues might arise in reasonably short order—again sit uncomfortably alongside their ongoing consideration of moving to restore the 2008–2012 claims, the deadline for which was two months away and as to which plaintiffs' counsel had by then conducted nine interviews. *See* Dkt. 343 at 3.

- *December 2017 omnibus discovery disputes*: On December 19, 2017, plaintiffs moved for discovery on numerous pre-Dodd Frank subjects, including Tradeweb/Project Fusion and CME/Swapstream. In a joint letter setting out each side's position, Dkt. 319, plaintiffs argued only that these subjects were germane to the existing 2013–2016 claims. Plaintiffs said nothing about potential restoration of the 2008–2012 claims (to which these subjects also related). As discussed earlier, the entire exercise of litigating and resolving these issues stood to be mooted by the amendment that plaintiffs then had under consideration to restore the 2008–2012 claims. On top of the time counsel spent negotiating and briefing these disputes, the Court, to keep the case on schedule, spent significant time in late December 2017 and early January 2018 resolving them. *See* Dkt. 322 (January 8, 2018 order resolving disputes).

- *January 24–26, 2018 status letter/call*: The parties' January 24, 2018 joint letter stated that, in light of the resolution of the omnibus discovery disputes, "it appears that any further disputes regarding the scope of document discovery will primarily involve party-specific issues, as opposed to gating issues." Dkt. 324 at 1. It added that plaintiffs had asked "each defendant" whether "it is on track to meet the substantial completion deadline" for document productions.

*Id.* The letter further reported that plaintiffs anticipated seeking leave to add LACERA, and, if defendants agreed, the parties would submit a proposed order to that effect. *Id.* at 2. In the ensuing call, the Court asked defense counsel if there was any prejudice to adding LACERA; the defense responded that, subject to reserving the right to challenge standing, it did not expect to object to this amendment. Dkt. 331 at 17–18. Various of plaintiffs' counsel's statements are problematic in light of the amendment then under consideration to revive the 2008–2012 claims, as to which counsel had by then conducted 14 interviews. The statement that future discovery issues were likely to be "party-specific" is coherent only upon the assumption that the claims at issue not expand beyond 2013–2016. The statement that plaintiffs' counsel had asked each defendant whether it was "on track to meet the substantial completion deadline" presupposes that *plaintiffs* did not have in mind a motion to be filed three weeks later that would vitiate that deadline. Plaintiffs' volunteering of their intention to seek to add LACERA by the February 21 deadline fairly implied the absence of other intended amendments. And the Court's inquiry whether that addition might cause any prejudice was a natural opportunity for responsible counsel to alert the Court to the far more consequential amendment that plaintiffs were pursuing.

The Court is constrained to express its disappointment at counsel's lack of candor. The assembled record reflects a series of points over a half-year period at which responsible counsel, to assure that the Court was not badly misled as to the direction that counsel anticipated for this complex and important multi-district litigation, would and should have disclosed the real and

presumably growing prospect of pursuing a game-changing amendment. At each juncture, however, plaintiffs' counsel—deliberately—chose not to do so. Plaintiffs' counsel instead repeatedly assured the Court that this litigation was on track to meet the deadlines in the case management plan and that counsel were dedicated to meeting those deadlines. Audaciously, in correspondence with the Court, plaintiffs' counsel even chided the defense for filing a discovery motion that could disrupt the orderly case schedule to which plaintiffs professed to be "diligently" committed, *see* Dkt. 295, and touted that they had inquired of each defendant whether it was on track to meet the deadline for substantial completion of document production, *see* Dkt. 324. Plaintiffs' counsel also foisted on the Court and the defense costly and time-consuming discovery motions that the expanded claims, which counsel were actively exploring, would have rendered obsolete. The Court expected better of the estimable and experienced counsel whose applications to lead the putative class the Court was pleased to grant.

Plaintiffs' counsel were also unacceptably coy in their dealings with the defense. The discovery negotiations and litigation here centrally turned on the aggregate burden presented by plaintiffs' discovery requests. Plaintiffs' counsel's decision to keep under wraps the possibility of a momentous amendment, and to feign that the claims to be litigated were fixed at 2013–2016, enabled plaintiffs to lock in commitments as to aggregate discovery pertinent to the 2013–2016 claims. Only when those negotiations had essentially reached fruition did plaintiffs disclose their bid to expand their claims by five years.

The Court therefore concludes, reluctantly but firmly and after considered attention to the question, that plaintiffs' counsel engaged in unacceptable gamesmanship. Presumably concerned that earlier disclosure of their intention to move to revive the dismissed claims might lead the defense to object or the Court to pretermit such a bid, plaintiffs kept mum until virtually the last

possible minute. The result of this tactical conduct was to mislead both the Court and opposing counsel as to a highly material dimension of this litigation and to cause both to expend significant time, and counsel to incur substantial costs and expenses, on work that the amended complaint stood to overtake. This conduct independently warrants denial of the motion for leave to restore the 2008–2012 claims. *Cf. State Trading Corp.*, 921 F.2d at 418 (denying leave to amend based on tactical decision not to earlier plead new allegations; "not unreasonable to impute lack of good faith" to plaintiff where tactical delay appeared undertaken to reduce chance of *forum non conveniens* dismissal).[18]

The Court finally addresses two justifications plaintiffs' counsel give for not alerting the Court earlier to the prospect of the amendment.

First, counsel assert that their silence was necessitated "by the work-product doctrine." Dkt. 356-1 ¶ 7. That is wrong. While that doctrine might shield from discovery the substance of counsel's legal work, that doctrine would not be implicated by providing earlier notice of a potential tectonic amendment, any more than it was implicated by plaintiffs' courtesy of giving the Court and defense advance notice of their intention to add LACERA as a class plaintiff.

Second, counsel claim to have feared witness tampering, based on an incident in which an in-house lawyer for defendant Bank of America attempted to contact Richard Cohen, a former executive whom plaintiffs' filings had identified as a consultant. *Id.* ¶ 8. Plaintiffs extrapolate

---

[18] For avoidance of doubt, although the case law identifies counsel's bad faith as a basis to deny a motion for leave to amend, the Court has chosen not to reach the issue of whether the conduct in question is properly termed such. The Court's judgment is that the finding of gamesmanship, on the facts here, is sufficient to support denial of leave to amend and that no productive purpose would be served by inquiring further into bad faith. The Court's discussion of gamesmanship above, therefore, should not be taken as reflecting a finding of bad faith with respect to any firm or individual, as the Court has not so found. The Court is further deeply respectful of the vigor and top quality of plaintiffs' counsel's overall representation of the putative class in this case, and is confident that this episode will prove aberrational.

that the defense groups would have responded to notice of a potential PTAC by "persuading or coercing former employees not to cooperate with us." *Id.* ¶ 7. There is, however, a world of difference between disclosing an intention to move for leave to amend and disclosing witness identities. And had this concern been raised, the Court, upon a proper showing, stood ready to use its supervisory powers to enjoin or otherwise guard against witness tampering. Further, had the need arisen for the Court to test plaintiffs' *bona fides* in pursuing an amendment, the obvious solution was for plaintiffs to make an *in camera* submission to the extent that witness names or other confidential material were implicated. *See, e.g.*, Dkt. 343 at 3 (listing—in redacted form, with the Court's authorization—witnesses interviewed in connection with the PTAC).

Accordingly, the Court holds that, independent of the proposed amendment's futility, the factors of delay, undue prejudice, and plaintiffs' counsel's gamesmanship support denial of the motion to amend to restore the 2008–2012 claims.[19]

---

[19] In light of these findings, and the distinct procedural posture of this case, the cases on which plaintiffs rely are far afield. *Pasternack v. Shrader*, 863 F.3d 162 (2d Cir. 2017), held that "the denial of leave to amend, based solely on delay and litigation expense, was an abuse of discretion." *Id.* at 174. Unlike in *Pasternack*, the Court's findings here of delay and prejudicial incurring of expenses are not generalized but are solidly anchored in a detailed record and the Court has also found gamesmanship. Further, although in *Pasternack* "essentially no discovery had been undertaken," here, counsel had engaged in more than six months of intensive and expensive negotiations and litigation over discovery (as well as initial rounds of document production) which, along with the scheduling order, the amendment would subvert. Also inapposite is *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015). The Second Circuit there reversed a denial of leave to amend because the district court had put plaintiffs to "a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." *Id.* at 190. The Circuit held that the district court had abused its discretion under Rule 15 to deny leave to amend in finding that a plaintiff had forfeited its right to amend by standing by its allegations after defendant's objections were previewed at an informal pre-motion conference. Nothing of the sort happened here: Prior to the PTAC, plaintiffs filed three successive complaints, including an SAC filed after defendants filed a proper motion to dismiss an initial amended complaint. Although the case management

## CONCLUSION

For the reasons reviewed above, the Court grants in part and denies in part plaintiffs' motion to file the Proposed Third Amended Complaint. The Court directs plaintiffs, within one week of this order, to file a Third Amended Complaint consistent with the rulings herein.[20]

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: May 23, 2018
New York, New York

---

plan set a deadline for motions for leave to amend, Rule 15 did not afford plaintiffs an entitlement to file a *fourth* complaint, let alone one that proposed to more than double the temporal reach of plaintiffs' claims. *See, e.g.*, *F5 Capital v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 42–44 (S.D.N.Y. 2016). In any event, the findings here of long delay, undue prejudice, and gamesmanship distinguish *Loreley.* For the same reasons—and also because the amendment here was not based on discovery that yielded new evidence—*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011) is of no help to plaintiffs here. Finally, the district court decisions on which plaintiffs rely are inapposite. *See, e.g.*, *Bolling v. Gold*, No. C13-0872JLR, 2015 WL 2406487, at \*4–6 (W.D. Wash. May 19, 2015) (addressing only futility of proposed third amended complaint, not other considerations); *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 223, 227 (S.D.N.Y. 1975) (allowing amendment which court found unnecessary given its conclusion that the allegations therein were already embraced by the existing complaint); *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-3012-WJM-BNB, 2014 WL 5599127, at \*3 (D. Colo. Nov. 4, 2014) (allowing amendment where plaintiffs promptly sought leave to amend after dismissal order, amendments were based on information learned in discovery, and no showing of delay, undue prejudice, or gamesmanship had been made).

[20] In light of this ruling, there is no factual basis for plaintiffs' proposed restoration of claims against Tradeweb. The Third Amended Complaint, as filed, is not to include such claims.